**EXECUTION COPY**

**DIP LOAN AGREEMENT**

**dated as of May 8, 2013**

**among**

**CODA HOLDINGS, INC.,**
**as Borrower**

**THE GUARANTORS PARTY HERETO**

**THE LENDERS PARTY HERETO FROM TIME TO TIME**

**and**

**FCO MA CODA HOLDINGS LLC,**
**as Agent**

## TABLE OF CONTENTS

Page

SECTION 1.     DEFINITIONS AND RULES OF CONSTRUCTION ......................................2

SECTION 2.     THE LOANS .........................................................................................17

2.1   DIP Loans .......................................................................... 17
2.2   Roll-Up Loans..................................................................... 18
2.3   Interest................................................................................ 18
2.4   Fees. .................................................................................... 19
2.5   Maturity Date ..................................................................... 19
2.6   Payment Requirements ....................................................... 19
2.7   Prepayments ....................................................................... 20
2.8   Pro Rata Treatment ............................................................ 20
2.9   Maximum Interest............................................................... 20
2.10  Withholdings and Increased Costs..................................... 21
2.11  Loan Account...................................................................... 24
2.12  Registered Notes; Transfer and Replacement of Notes ..... 24
2.13  Super Priority Nature of Obligations and Lenders' Liens ......................................... 25
2.14  Payment of Obligations. Liens............................................ 25
2.15  No Discharge; Survival of Claims Liens ............................ 25
2.16  Waiver of any Primary Rights Liens .................................. 26

SECTION 3.     SECURITY INTEREST OF NON-DEBTOR SUBSIDIARIES.....................26

3.1   Grant .................................................................................. 26
3.2   Perfected Security Interest ................................................. 27
3.3   Financing Statements ......................................................... 27

SECTION 4.     CONDITIONS PRECEDENT TO LOAN..................................................27

4.1   Initial Advance.................................................................... 27
4.2   Other Advances................................................................... 29
4.3   Final Advance ..................................................................... 29

SECTION 5.     REPRESENTATIONS AND WARRANTIES OF BORROWER.................30

5.1   Corporate Status; Authorization and Authority ................ 30
5.2   Governmental Authorization .............................................. 30
5.3   Consents.............................................................................. 30
5.4   Actions Before Governmental Authorities ......................... 31
5.5   Laws .................................................................................... 31
5.6   Information Correct and Current ....................................... 32
5.7   Tax and Benefit Plan Matters ............................................ 32
5.8   Intellectual Property Claims .............................................. 32
5.9   Sufficiency of Assets .......................................................... 33
5.10  Litigation............................................................................ 33

-i-

CODA: DIP LOAN AGREEMENT

**TABLE OF CONTENTS**
(Continued)

Page

5.11    Financial Statements .................................................................................... 33
5.12    Use of Proceeds; Margin Stock.................................................................... 33
5.13    Financial Accounts....................................................................................... 34
5.14    Employee Loans........................................................................................... 34
5.15    Capitalization and Subsidiaries ................................................................... 34
5.16    The Budget.................................................................................................... 34
5.17    Prepetition Obligations; Defenses............................................................... 34
5.18    Prepetition Documents................................................................................. 34
5.19    Chapter 11 Case Matters.............................................................................. 35
5.20    Collateral ...................................................................................................... 35

SECTION 6.       INSURANCE; INDEMNIFICATION............................................................36

6.1    Coverage ....................................................................................................... 36
6.2    Certificates .................................................................................................... 36
6.3    Attorney-in-Fact............................................................................................ 36
6.4    Indemnity ...................................................................................................... 36

SECTION 7.       OTHER COVENANTS ..................................................................................37

7.1    Financial Reports; Notices............................................................................ 37
7.2    Affirmative Covenants................................................................................... 38
7.3    Further Assurances......................................................................................... 39
7.4    Indebtedness.................................................................................................. 39
7.5    Collateral........................................................................................................ 39
7.6    Investments .................................................................................................... 40
7.7    Distributions.................................................................................................. 40
7.8    Transfers ........................................................................................................ 40
7.9    Mergers or Acquisitions; Preservation of Existence.................................... 40
7.10    Taxes............................................................................................................ 40
7.11    Corporate Changes....................................................................................... 40
7.12    Deposit Accounts;........................................................................................ 41
7.13    Subsidiaries ................................................................................................. 41
7.14    Transactions with Affiliates......................................................................... 41
7.15    Amendments to Other Agreements.............................................................. 41
7.16    Repayment of Indebtedness ......................................................................... 41
7.17    Reclamation Claims ..................................................................................... 41
7.18    Chapter 11 Claims........................................................................................ 42
7.19    Variance Covenant........................................................................................ 42
7.20    Sale Milestones............................................................................................ 42

SECTION 8.       AGENT ..........................................................................................................43

8.1    Appointment of Agent .................................................................................. 43

CODA: DIP LOAN AGREEMENT

## TABLE OF CONTENTS
### (Continued)

Page

| | | |
|---|---|---|
| 8.2 | Binding Effect; Use of Discretion | 45 |
| 8.3 | Agent's Reliance, Etc. | 45 |
| 8.4 | Agent Individually | 46 |
| 8.5 | Lender Credit Decision | 46 |
| 8.6 | Indemnification | 47 |
| 8.7 | Successor Agent | 47 |
| 8.8 | Release of Collateral | 48 |

SECTION 9.    EVENTS OF DEFAULT ... 48

| | | |
|---|---|---|
| 9.1 | Payments | 48 |
| 9.2 | Covenants | 48 |
| 9.3 | Other Loan Documents | 48 |
| 9.4 | Enforceability | 49 |
| 9.5 | Representations | 49 |
| 9.6 | Bankruptcy Matters | 49 |
| 9.7 | Judgments | 51 |
| 9.8 | Attachments | 51 |
| 9.9 | Other Obligations | 51 |
| 9.10 | Material Adverse Effect | 51 |

SECTION 10.    REMEDIES ... 51

| | | |
|---|---|---|
| 10.1 | General | 51 |
| 10.2 | Application of Proceeds | 52 |
| 10.3 | Marshaling; Deductions | 53 |
| 10.4 | Indemnification by the Lenders | 53 |
| 10.5 | Cumulative Remedies | 53 |

SECTION 11.    MISCELLANEOUS ... 53

| | | |
|---|---|---|
| 11.1 | Severability | 53 |
| 11.2 | Notice | 54 |
| 11.3 | Entire Agreement | 55 |
| 11.4 | No Strict Construction | 55 |
| 11.5 | No Waiver | 55 |
| 11.6 | Survival | 55 |
| 11.7 | Successors and Assigns | 55 |
| 11.8 | Amendments, Waivers | 55 |
| 11.9 | Performance | 57 |
| 11.10 | Waiver of Jury Trial | 57 |
| 11.11 | Governing Law and Jurisdiction | 57 |
| 11.12 | Professional Fees | 58 |
| 11.13 | Confidentiality | 58 |

CODA: DIP LOAN AGREEMENT

## TABLE OF CONTENTS
(Continued)

Page

| | | |
|---|---|---|
| 11.14 | Assignment | 59 |
| 11.15 | Revival of Secured Obligations | 60 |
| 11.16 | Adjustments | 60 |
| 11.17 | No Third Party Beneficiaries | 61 |
| 11.18 | Counterparts | 61 |
| SECTION 12. | GUARANTY. | 61 |
| 12.1 | Guaranty | 61 |
| 12.2 | Guaranty of Payment | 61 |
| 12.3 | No Discharge or Diminishment of Guaranty | 61 |
| 12.4 | Defenses Waived | 62 |
| 12.5 | Rights of Subrogation | 62 |
| 12.6 | Reinstatement; Stay of Acceleration | 63 |
| 12.7 | Information | 63 |
| 12.8 | Liability Cumulative | 63 |

## TABLE OF CONTENTS
(Continued)

Exhibits and Schedules

| | |
|---|---|
| Exhibit A: | Advance Request |
| Exhibit B-1: | Form of DIP Note |
| Exhibit B-2: | Form of Roll-Up Note |
| Exhibit C: | Name, Locations, and Other Information for Borrower & Guarantors |
| Exhibit D: | Patents, Trademarks, Copyrights and Licenses |
| Exhibit E: | Deposit Accounts and Investment Accounts |
| Exhibit F: | Reserved |
| Exhibit G: | Reserved |
| Exhibit H: | Reserved |
| Exhibit I: | Initial Approved Budget |
| | |
| Schedule A | Commitments |
| Schedule B | Exit Facility Commitments |
| Schedule 1 | Subsidiaries |
| Schedule 1A | Existing Permitted Indebtedness |
| Schedule 1B | Existing Permitted Investments |
| Schedule 1C | Existing Permitted Liens |
| Schedule 5.4 | Actions Before Governmental Authorities |
| Schedule 5.7 | Tax Matters |
| Schedule 5.9 | Sufficiency of Assets |
| Schedule 5.10 | Litigation |
| Schedule 5.14 | Employee Loans |
| Schedule 5.15 | Capitalization |

CODA: DIP LOAN AGREEMENT

## DIP LOAN AGREEMENT

THIS DIP LOAN AGREEMENT is made and dated as of May 8, 2013 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") and is entered into by and among FCO MA CODA HOLDINGS LLC, in its capacity as administrative and collateral agent for Lenders (together with its successors and assigns in such capacity, "Agent"), the Persons who are or hereafter become party to this Agreement as lenders (collectively the "Lenders", and each individually, a "Lender"), CODA HOLDINGS, INC., a Delaware corporation and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Borrower"), and the Subsidiaries of Borrower listed on the signature pages hereto (the "Guarantors" and, collectively with the Borrower, the "Loan Parties").

### RECITALS

A.    On May 1, 2013 (the "Petition Date"), Borrower and certain Guarantors (such Guarantors, the "Debtor Subsidiaries") commenced Chapter 11 Cases No. 13-11153CSS through 13-11157CSS (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. 101 et. seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Borrower and the Debtor Subsidiaries continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

B.    Lio Energy Systems Holdings LLC and Miles Electric Vehicles Limited (collectively, the "Non-Debtor Subsidiaries"), each a Guarantor hereunder, are not subject to the Chapter 11 Cases as of the date hereof;

C.    Borrower has requested that the Lenders provide senior secured superpriority delayed-draw term loans to Borrower of up to Five Million Dollars ($5,000,000) in the aggregate;

D.    The Lenders are willing to make Postpetition delayed-draw term loans of up to such amount on the terms and conditions set forth in this Agreement;

E.    The Guarantors have agreed to provide an unconditional guaranty of the obligations of Borrower under this Agreement; and

F.    Borrower and the Guarantors have agreed to secure all of their obligations under this Agreement and the other Loan Documents by granting to Agent, for the benefit of Agent and the Lenders, under and pursuant to the Loan Documents and the Financing Orders, a security interest in and lien upon the Collateral having the priority specified in the Financing Orders.

AGREEMENT

NOW, THEREFORE, Agent, Borrower, Guarantors and each Lender agree as follows:

**Section 1.    Definitions and Rules of Construction.**

1.1    Unless otherwise defined herein, the following capitalized terms have the following meanings:

"Account Control Agreement(s)" means any agreement entered into by and among Agent or Notes Agent, the applicable Loan Party and a third party Bank or other institution (including a securities intermediary) at which a Loan Party maintains a Deposit Account or an account holding Investment Property and which agreement grants Agent or Notes Agent, as applicable, control of the subject account or accounts.

"Advance" means any DIP Loan funds advanced under this Agreement.

"Advance Date" means the funding date of any Advance.

"Advance Request" means a request for an Advance submitted by Borrower to Agent in substantially the form of Exhibit A.

"Aeris" means aeris CAPITAL Archer, L.P., a Cayman Islands exempted limited partnership.

"Affiliate" means, with respect to any Person, (a) each officer, director, partner or joint-venturer of such Person (and in the case of any Person that is a limited liability company, each manager and member of such Person), and (b) any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person.

"Agent" has the meaning given to it in the preamble hereto.

"Agreement" has the meaning given to it in the preamble hereto.

"Approved Bidding Procedures" has the meaning assigned to it in the Bidding Term Sheet (as such term is defined in the Restructuring Support Agreement).

"Approved Budget" means the Initial Approved Budget; provided, that upon approval of any updated 13-week cash flow budget delivered pursuant to Section 7.1(b)(iii), such updated forecast shall thereafter constitute the "Approved Budget".

"Approved Sale" has the meaning given to it in Section 7.20(f).

"Asset Sale" means any Disposition of property of Borrower or any Guarantor, other than Permitted Transfers.

"Assignment Agreement" has the meaning given to it in Section 11.14(b).

"Auction" has the meaning given to it in the Approved Bidding Procedures.

2

"Bankruptcy Code" has the meaning specified in the Recitals hereto.

"Bankruptcy Court" has the meaning specified in the Recitals hereto.

"Benefitted Lender" has the meaning given to it in Section 11.16.

"Bid Deadline" has the meaning given to it in Section 7.20(d).

"Bidding Procedures Motion" has the meaning given to it in Section 4.1(e).

"Bidding Procedures Order" has the meaning given to it in Section 7.20(c).

"Borrower" has the meaning given to it in the preamble hereto.

"Bridge Agent" means FCO, in its capacity as administrative and collateral agent for the Bridge Lenders.

"Bridge Agreement" means that certain Loan and Security Agreement, dated as of December 7, 2012, among Borrower, the Bridge Lenders and Bridge Agent.

"Bridge Collateral" means all Collateral and Secured Assets (as such terms are defined in the Bridge Agreement).

"Bridge Documents" means the Bridge Agreement and the other Loan Documents (as defined in the Bridge Agreement).

"Bridge Lender" means a Person party to the Bridge Agreement as a lender from time to time.

"Bridge Obligations" means all amounts owing by the Loan Parties to Bridge Agent and the Bridge Lenders pursuant to the Bridge Documents.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person other than a corporation, and any and all warrants, rights or options to purchase any of the foregoing.

"Carve-Out" has the meaning given to it in the Financing Order.

"Carve-Out Date" has the meaning given to it in the Financing Order.

"Cash Collateral" means, all "Cash Collateral" as defined by Section 363 of the Bankruptcy Code, all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Debtors in which the Prepetition Secured Parties or Agent has a security interest, Lien or mortgage, whether such security interests, liens or mortgages existed as of the commencement of the Chapter 11 Cases or arise thereafter pursuant to a Financing Order, and whether the property converted to cash existed as of the commencement of the Chapter 11 Cases or arose or was generated thereafter, including, without limitation, all proceeds from the sale or other disposition of the Prepetition Collateral or Collateral.

3

"Cash Equivalents" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the U.S. federal government or (ii) issued by any agency of the U.S. federal government the obligations of which are fully backed by the full faith and credit of the U.S. federal government, (b) any readily-marketable direct obligations issued by any other agency of the U.S. federal government, any state of the U.S. or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the U.S., (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) Agent or (ii) any commercial bank that is (A) organized under the laws of the U.S., any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 or (e) shares of any U.S. money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the U.S.; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) and (d) above shall not exceed 365 days. For the avoidance of doubt, "Cash Equivalents" does not include (and the Loan Parties are prohibited from purchasing or purchasing participations in) any auction rate securities or other corporate or municipal bonds with a long-term nominal maturity for which the interest rate is reset through a Dutch auction.

"Change in Control" means any reorganization, recapitalization, consolidation or merger, or other transaction or series of related transactions of Borrower, any Guarantor or any Subsidiary of any of the foregoing or any sale or exchange of outstanding Capital Stock (or similar transaction or series of related transactions) of Borrower, any Guarantor or any Subsidiary of any of the foregoing in which the holders of such Person's outstanding Capital Stock immediately before consummation of such transaction or series of related transactions do not, immediately after consummation of such transaction or series of related transactions, retain Capital Stock representing more than fifty percent (50%) of the voting power of the surviving entity of such transaction or series of related transactions (or the parent of such surviving entity if such surviving entity is wholly owned by such parent), in each case without regard to whether Borrower, such Guarantor or such Subsidiary, as applicable, is the surviving entity.

"Chapter 11 Cases" has the meaning given to it in the Recitals hereto.

"Closing Date" means the date of this Agreement.

"Coda JV Holdings" means Coda JV Holdings LLC, a Delaware limited liability company.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all property and interests in property and proceeds thereof now owned or hereafter acquired by any Loan Party, in or upon which a Lien is granted or purported to be

4

granted or now or hereafter exists in favor of any Lender or Agent, whether under the Financing Order, this Agreement or under any other Loan Document.

"Collection Account" means the following account of Agent (or such other account as Agent shall identify in writing to Borrower or Lenders, as applicable):

> Bank Name: Bank of America
> ABA: 026 009 593
> Account Name: Trust Wires
> Account #: 2047628893919
> FFCT Name: FCO MA Coda Holdings LLC
> FFCT Acct #: 726455.2
> Ref: Coda Holdings, Inc. / FCO MA Coda Holdings LLC
> Attn: Global Custody and Agency Services

"Commitment" means, as to any Lender, the obligation of such Lender to make DIP Loans to Borrower in a principal amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule A. The aggregate amount of the Commitments equals the Maximum DIP Loan Amount.

"Commitment Fee" means a fee equal to three percent (3.0%) of the Maximum DIP Loan Amount as of the Closing Date.

"Commitment Percentage" means, for any Lender, the percentage equivalent of a fraction, the numerator of which is the Commitment of such Lender and the denominator of which is the Maximum DIP Loan Amount.

"Committee" shall mean the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Confidential Information" has the meaning given to it in Section 11.13.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another, including any such obligation directly or indirectly guaranteed, endorsed, co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards or merchant services issued for the account of that Person; and (iii) all obligations arising under any interest rate, currency or commodity swap agreement, interest rate cap agreement, interest rate collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The

5

amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Copyright License" means any agreement, whether in written or electronic form, in which Borrower now holds or hereafter acquires any interest, granting any right in or to any Copyright or Copyright registration (whether a Loan Party is the licensee or the licensor thereunder) including licenses pursuant to which a Loan Party has obtained the exclusive right to use a copyright owned by a third party.

"Copyrights" means all of the following now owned or hereafter acquired or created (as a work for hire for the benefit of a Loan Party) by a Loan Party or in which a Loan Party now holds or hereafter acquires or receives any right or interest, in whole or in part: (a) all copyrights, whether registered or unregistered, held pursuant to the Requirements of Law of the U.S., any state thereof or any other country; (b) registrations, applications, recordings and proceedings in the U.S. Copyright Office or in any similar office or agency of the U.S., any state or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of a Loan Party) or acquired by a Loan Party, in whole or in part; (e) prior versions of works covered by copyright and all works based upon, derived from or incorporating such works; (f) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to copyrights, including damages, claims and recoveries for past, present or future infringement; (g) rights to sue for past, present and future infringements of any copyright; and (h) any other rights corresponding to any of the foregoing rights throughout the world.

"Debtors" means, collectively, Borrower and the Debtor Subsidiaries.

"Debtor Subsidiaries" has the meaning given to it in the Recitals hereto.

"Default Rate" means a rate per annum equal to two percent (2.0%) above the Interest Rate.

"Deposit Account" has the meaning given to it in the UCC.

"DIP Loan" has the meaning given to it in Section 2.1(a).

"DIP Note" means a Promissory Note substantially in the form of Exhibit B-1.

"DIP/Roll-Up Note" means a DIP Note or a Roll-Up Note.

"Disposition" means with respect to any property, any sale, lease, sale-leaseback, assignment, conveyance, transfer or other disposition thereof and any issuance of Capital Stock

6

of Borrower or any Guarantor. The terms "Dispose" and "Disposed of" have correlative meanings.

"ERISA" is the U.S. Employee Retirement Income Security Act of 1974, and its regulations, as amended.

"Event of Default" has the meaning given to it in Section 9.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Lender or required to be withheld or deducted from a payment to a Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loans or Commitments or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.10, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Lender's failure to comply with Section 2.10(d), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Facility" has the meaning assigned to it in the Restructuring Support Agreement.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) any current or future regulations or official interpretations thereof, and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"FCO" means FCO MA Coda Holdings LLC.

"Final Advance" means an Advance to be provided to Borrower after the occurrence of the Carve-Out Date in an amount equal to all (a)(i) unpaid professional fees and disbursements of Debtors' counsel and any Committee's counsel incurred by the Debtors' estates following the Carve-Out Date, payable under sections 330 and 331 of the Bankruptcy Code (and subject to final allowance by the Bankruptcy Court), in an aggregate amount not to exceed $150,000.00, plus (ii) with respect to the Debtors' counsel and local counsel, the aggregate amount of any accrued and unpaid professional fees and disbursements incurred by the Debtors prior to the occurrence of the Carve-Out Date (subject to final allowance by the Bankruptcy Court), plus (iii) with respect to any Committee's primary counsel, the aggregate amount of any budgeted, accrued and unpaid professional fees and disbursements incurred by the Debtors prior to the occurrence of the Carve-Out Date (subject to final allowance by the Bankruptcy Court) plus (b) fees pursuant to 28 U.S.C. § 1930 minus (c) the amount of cash available to the Debtors on the date of the Final Advance to pay the obligations described clauses (a) and (b) of this definition.

7

"Final Certification" means a certification of Borrower to be provided to Agent setting forth in detail the proper amount of the Final Advance.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the Required Parties, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Agent and Notes Agent waive such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes the Debtors to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, provides for the super priority of Agent's and the Lenders' claim and authorizes the use by the Debtors of their Cash Collateral in accordance with the terms of this Agreement.

"Final Roll-Up Amount" means, with respect to any Lender as of entry of the Final Order, an amount equal to the sum of (a) the Commitment of such Lender and (b) the commitment of such Lender and its affiliated entities set forth on Schedule B hereto in respect of the Exit Facility pursuant to the Restructuring Support Agreement.

"Financing Order" means, the Interim Order or the Final Order, whichever is in effect at the time of any determination made hereunder, and "Financing Orders" means the Interim Order and the Final Order, collectively.

"Financial Statements" has the meaning given to it in Section 7.1.

"Foreign Lender" means a Lender that is not a U.S. Person.

"GAAP" means generally accepted accounting principles in the U.S., as in effect from time to time.

"Governmental Authority" means any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity and any self-regulatory organization.

"Guaranteed Obligations" has the meaning given to it in Section 12.1.

"Guarantors" has the meaning given to it in the preamble hereto.

"Guaranty" has the meaning given to it in Section 12.2.

"Indebtedness" means indebtedness of any kind, including (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations, and (d) all Contingent Obligations.

8

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial Approved Budget" has the meaning given to it in Section 4.1(a)(vii).

"Intellectual Property" means any intellectual property, in any medium, of any kind or nature whatsoever, now or hereafter owned or acquired or received by a Loan Party or in which a Loan Party now holds or hereafter acquires or receives any right or interest, and shall include, in any event, any Copyright, Trademark, Patent, trade secret, customer list, internet domain name (including any right related to the registration thereof), proprietary or confidential information, mask work, source, object or other programming code, invention (whether or not patented or patentable), technical information, procedure, design, knowledge, know-how, software, data base, data, skill, expertise, recipe, experience, process, model, drawing, material or record.

"Intercreditor Agreement" means that certain Amended and Restated Intercreditor Agreement, dated as of December 7, 2012, among Bridge Agent, Notes Agent and Term Loan Agent, as agreed as to certain terms and acknowledged by Borrower and each Guarantor.

"Interest Payment Date" means the first business day of each calendar month.

"Interest Rate" means for any day a per annum rate of interest equal to six percent (6.0%).

"Interim Advance" means $1,900,000.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), in form and substance satisfactory to the Required Parties, together with all extension, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Debtors to execute and perform under the terms of this Agreement, incur DIP Loans in an aggregate principal amount not to exceed the Interim Advance (and related Roll-Up Loans) prior to the date of entry of the Final Order and use their Cash Collateral in accordance with the terms of this Agreement.

"Investment" means any beneficial ownership (including ownership of any Capital Stock) of or in any Person, or any loan, advance or capital contribution to any Person or the acquisition of all, or substantially all, of the assets of another Person.

"Investment Bank" has the meaning given to it in Section 7.19(a).

"Investment Property" has the meaning given to it in the UCC.

"Lender" has the meaning given to it in the preamble hereto.

"License" means any Copyright License, Patent License, Trademark License or other license of rights or interests, whether in-bound or out-bound, whether in written or electronic

9

form, now or hereafter owned or acquired or received by a Loan Party or in which a Loan Party now holds or hereafter acquires or receives any right or interest, and shall include any renewals or extensions of any of the foregoing thereof.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any capital lease or other lease in the nature of a security interest.

"Loans" means the DIP Loans and the Roll-Up Loans.

"Loan Parties" has the meaning given to it in the Recitals hereto.

"Loan Documents" means this Agreement, the DIP/Roll-Up Notes, the Account Control Agreements, the Financing Orders, and any other documents executed in connection with the Secured Obligations or the transactions contemplated hereby, as the same may from time to time be amended, modified, supplemented or restated.

"Margin Stock" means "margin stock" within the meaning of Regulations T, U and X of the Board of Governors of the Federal Reserve System.

"Material Adverse Effect" means a material adverse effect, as measured from and after the Closing Date, upon: (i) the business, operations, properties, assets, prospects or condition (financial or otherwise) of Borrower or any Guarantor; or (ii) the ability of Borrower or any Guarantor to perform the Secured Obligations in accordance with the terms of the Loan Documents, or the ability of Agent or any Lender to enforce any of its rights or remedies with respect to the Secured Obligations; or (iii) the Collateral or Agent's Liens on the Collateral or the priority of such Liens.

"Maturity Date" means the earlier to occur of: (a) June 30, 2013; (b) the date of acceleration of the Loans pursuant to an Event of Default; (c) the date of termination of the Commitments; (d) the date that is twenty-one (21) calendar days after the Petition Date, unless the Final Order has been entered and become effective prior thereto; (e) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Required Parties; (f) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Required Parties; and (g) the effective date of any Debtor's plan of reorganization confirmed in the Chapter 11 Cases, unless extended with the prior written consent of Agent and Required Lenders.

"Maximum DIP Loan Amount" means Five Million and No/100 Dollars ($5,000,000).

"Maximum Rate" has the meaning given to it in Section 2.9.

"Net Proceeds" means (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof, net of reasonable fees, costs and expenses, including attorneys' and other reasonable professional fees (including any fees of the Investment Bank) and any amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted

10

hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Loan Document) and net of taxes required to be paid by Borrower or any Guarantor in connection with such Asset Sale or Recovery Event in the taxable year that such Asset Sale or Recovery Event is consummated, and (b) in connection with any issuance or sale of Capital Stock, the cash proceeds received from such issuance or incurrence, net of reasonable attorneys' fees.

"Non-Debtor Subsidiaries" has the meaning given to it in the Recitals hereto.

"Noteholders" a Person that is a holder of a Note from time to time.

"Note Purchase Agreement" means that certain Amended and Restated Secured Note Purchase Agreement, dated as of October 18, 2010, among Borrower and the Noteholders and the letter dated as of January 31, 2012 among Borrower, Miles Rubin, Miles EV Holdings Ltd., Aeris and FCO.

"Notes" means those certain Amended and Restated Secured Convertible Promissory Notes, dated as of January 31, 2012 issued by Borrower in favor of the Noteholders.

"Notes Agent" means FCO, in its capacity as collateral agent for the Noteholders.

"Notes Collateral" means the Collateral (as defined in each of the Security Agreements (as such term is defined in the Note Purchase Agreement)), together with any assets of the Loan Parties upon which Notes Agent shall be granted a lien as "adequate protection".

"Notes Documents" means the Notes, the Note Purchase Agreement, the Security Agreements (as defined in the Note Purchase Agreement), each guaranty executed in connection therewith and all other documents executed connection therewith.

"Notes Obligations" means all amounts owing by the Loan Parties to Notes Agent and the Noteholders pursuant to the Notes Documents.

"Obligated Party" has the meaning given to it in Section 12.2.

"Other Connection Taxes" means, with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Participant Register" has the meaning given to it in Section 2.12(c).

"Patent License" means any agreement, whether in written or electronic form, in which a Loan Party now holds or hereafter acquires any interest, granting any right with respect to any invention on which a Patent is in existence (whether a Loan Party is the licensee or the licensor thereunder).

"Patents" means all of the following in which a Loan Party now holds or hereafter acquires any interest: (a) all letters patent of the U.S. or any other country, all registrations and recordings thereof, and all applications for letters patent of the U.S. or any other country and all provisional patent applications of the U.S. or any other country, including registrations, recordings and applications in the U.S. Patent and Trademark Office or in any similar office or agency of the U.S., any state or any other country; (b) all reissues, divisions, continuations, renewals, continuations-in-part or extensions thereof; (c) all petty patents, divisionals and patents of addition; (d) all patents to issue in any such applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to patents, including damages, claims and recoveries for past, present or future infringement; and (f) rights to sue for past, present and future infringements of any patent.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56), as amended.

"Permitted Indebtedness" means: (i) Indebtedness of the Loan Parties in favor of Agent and Lenders arising under this Agreement or any other Loan Document; (ii) Indebtedness for borrowed money existing on the Petition Date that is disclosed in Schedule 1A, including any interest or fees with respect to such Indebtedness accruing after the Petition Date, (iii) all Indebtedness (other than Indebtedness for borrowed money) existing on the Petition Date, including any interest or fees with respect to such Indebtedness accruing after the Petition Date; (iv) Indebtedness incurred after the Petition Date in the ordinary course of business consistent with the Approved Budget and (v) Indebtedness that also constitutes a Permitted Investment.

"Permitted Investment" means: (i) Investments existing on the Closing Date which are disclosed in Schedule 1B; (ii) Investments in Cash Equivalents; and (iii) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of the Loan Parties' business.

"Permitted Liens" means any and all of the following: (i) Liens in favor of Agent on behalf of the Secured Parties; (ii) Liens existing on the Closing Date which are disclosed in Schedule 1C; (iii) Liens for Taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings; provided, that Borrower maintains adequate reserves therefor in accordance with GAAP; (iv) Liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of the Loan Parties' business and imposed without action of such parties; provided, that the payment thereof is not yet required; (v) deposits, to the extent made in the ordinary course of business, under worker's compensation, unemployment insurance, social security and other similar Requirements of Law; (vi) statutory and common law rights of set-off and other similar rights, including as to deposits of cash and

12

securities in favor of banks, other depository institutions and brokerage firms; and (vii) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by any Requirement of Law or arising in the ordinary course of business so long as they do not materially impair the value or marketability of the related property.

"Permitted Transfers" means (i) any sales of Inventory constituting completed automobiles manufactured by Borrower and its Subsidiaries, (ii) sales of other Inventory in the ordinary course of business, (iii) Dispositions of worn-out, obsolete or surplus equipment at fair market value in the ordinary course of business and (iv) the Approved Sale.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, other entity or Governmental Authority.

"Petition Date" has the meaning given to it in the Recitals hereto.

"Postpetition" means the time period beginning immediately after the filing of the Chapter 11 Cases.

"Prepayment Date" has the meaning given to it in Section 2.7(c).

"Prepetition" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Prepetition Collateral" means (a) the Bridge Collateral, (b) the Notes Collateral and (c) the Term Loan Collateral.

"Prepetition Documents" means (a) the Bridge Documents, (b) the Notes Documents and (c) the Term Loan Documents.

"Prepetition Obligations" means (a) the Bridge Obligations, (b) the Notes Obligations and (c) the Term Loan Obligations.

"Prepetition Secured Parties" means (a) Bridge Agent and the Bridge Lenders, (b) Notes Agent and the Noteholders and (c) Term Loan Agent and the Term Lenders.

"Priority Enhanced Notes" has the meaning assigned to it in the Intercreditor Agreement.

"Qualified Assignee" means (a) any Lender, (b) any Affiliate of any Lender (c) any commercial bank, savings and loan association or savings bank or any other entity which is an "accredited investor" (as defined in Regulation D under the Securities Act of 1933, as amended) which extends credit or buys loans as one of its businesses, including insurance companies, mutual funds, lease financing companies and commercial finance companies, in each case of this clause (c), which either (i) has a rating of BBB or higher from Standard & Poor's Rating Group and a rating of Baa2 or higher from Moody's Investor Service, Inc. at the date that it becomes a Lender, or (ii) together with its Affiliated entities, holds loan assets in excess of $250,000,000 or (d) any other Person (other than a natural person) approved by Agent, provided however, that notwithstanding the foregoing, unless approved by Agent, a "Qualified Assignee" shall not

13

include Borrower, any Guarantor, any of its or their respective Subsidiaries or any Affiliate of any of the foregoing.

"Recovery Event" means any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any Collateral.

"Register" has the meaning given to it in Section 2.12(a).

"Related Persons" has the meaning given to it in Section 8.3.

"Required Lenders" means at any time, (a) if only one Lender holds the outstanding Loans and the Commitments, such Lender; or (b) if more than one Lender that holds the outstanding Loans and Commitments, then one or more Lenders that hold in the aggregate more than 50% of the sum of the aggregate unpaid principal amount of the Loans then outstanding and the Commitments then in effect.

"Required DIP Lenders" means the Required DIP Lenders (as such term is defined in the Restructuring Support Agreement), subject to the requirements of Section 11.8(c) of this Agreement.

"Required Noteholders" means the Required Noteholders (as such term is defined in the Restructuring Support Agreement), subject to the requirements of Section 11.8(c) of this Agreement.

"Required Parties" means the Required Parties (as such term is defined in the Restructuring Support Agreement).

"Requirement of Law" means, with respect to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, policy, order, injunction, judgment, writ, injunction, decree, or other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of April 30, 2013, among the Loan Parties, Bridge Agent, Notes Agent, Term Loan Agent and certain other Prepetition Secured Parties.

"Roll-Up Loan" has the meaning given to it in Section 2.2(a).

"Roll-Up Note" means a Promissory Note substantially in the form of Exhibit B-2.

"Sale" has the meaning given to it in Section 4.1(e).

"Sale Motion" has the meaning given to it in Section 4.1(e).

"Sale Order" has the meaning given to it in Section 7.20(f).

"Sale Process" has the meaning given to it in Section 7.20.

14

"Secured Obligations" means the obligations of Borrower and the Guarantors arising under this Agreement and any Loan Document, including any obligation to pay any amount now owing or later arising.

"Secured Parties" means Agent and Lenders.

"Subsidiary" means an entity, whether a corporation, partnership, limited liability company, joint venture or otherwise, in which Borrower owns or controls 10% or more of the outstanding voting securities, including each entity listed on Schedule 1 hereto.

"Successful Bid" has the meaning given to it in the Restructuring Support Agreement.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Lender" means a Person party to the Term Loan Agreement as a lender from time to time.

"Term Loan Agent" means Aeris, in its capacity as collateral agent for the Term Lenders.

"Term Loan Agreement" means that certain Term Loan Facility letter dated February 10, 2012, between Borrower and the Term Lenders.

"Term Loan Collateral" means the Collateral (as defined in the Term Loan Agreement), together with any assets of the Loan Parties upon which Term Loan Agent shall be granted a lien as "adequate protection".

"Term Loan Documents" means the Term Loan Agreement and the other Loan Documents (as defined in the Term Loan Agreement).

"Term Loan Obligations" means all amounts owing by the Loan Parties to Term Loan Agent and the Term Lenders pursuant to the Term Loan Documents.

"Trademark License" means any agreement, whether in written or electronic form, in which Borrower now holds or hereafter acquires any interest, granting any right in and to any Trademark or Trademark registration (whether a Loan Party is the licensee or the licensor thereunder).

"Trademarks" means any of the following in which a Loan Party now holds or hereafter acquires any interest: (a) any trademarks, tradenames, corporate names, company names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof and any applications in connection therewith, including registrations, recordings and applications in the U.S. Patent and Trademark Office or in any similar office or agency of the U.S., any state or any other country (collectively, the "Marks"); (b) any reissues, extensions or renewals thereof; (c) the goodwill of the business symbolized by or associated with the Marks; (d) income,

15

royalties, damages, claims and payments now and hereafter due and/or payable with respect to the Marks, including damages, claims and recoveries for past, present or future infringement; and (e) rights to sue for past, present and future infringements of the Marks.

"UCC" means the Uniform Commercial Code as the same is, from time to time, in effect in the State of New York; provided, that in the event that, by reason of mandatory provisions of any Requirement of Law, any or all of the attachment, perfection or priority of, or remedies with respect to, Agent's Lien on any Collateral is governed by the Uniform Commercial Code as the same is, from time to time, in effect in a jurisdiction other than the State of New York, then the term "UCC" shall mean the Uniform Commercial Code as in effect, from time to time, in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"U.S." means the United States of America.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.10(d).

Meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. Unless otherwise specified, all references in this Agreement or any Annex or Schedule hereto to a "Section," "subsection," "Exhibit," "Annex," or "Schedule" shall refer to the corresponding Section, subsection, Exhibit, Annex, or Schedule in or to this Agreement. Unless otherwise specifically provided herein, any accounting term used in this Agreement or the other Loan Documents has the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP, consistently applied.

Unless otherwise defined herein or in the other Loan Documents, terms that are used herein or in the other Loan Documents and defined in the UCC have the meanings given to them in the UCC. Without limiting the generality of the foregoing sentence, the following specified terms have the meaning set forth for such terms in the UCC: "Account" (including health-care-insurance receivables), "Account Debtor", "Chattel Paper" (including tangible and electronic chattel paper), "Commercial Tort Claims", "Commodity Account", "Deposit Account", "Documents", "Equipment" (including all accessions and additions thereto), "Fixtures", "General Intangibles" (including payment intangibles and software), "Goods", "Instrument", "Inventory" (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), "Investment Property" (including securities and securities entitlements), "Letter-of-Credit Right" (whether or not the letter of credit is evidenced by a writing), "Payment Intangibles", "Proceeds", "Promissory Notes", "Securities Account", and "Supporting Obligations". Each of the foregoing terms shall include all of such items now owned, or hereafter acquired, by any Non-Debtor Subsidiary or other Loan Party.

As used herein, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by

16

the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" have correlative meanings), (iii) words "hereof", "herein" and "hereunder" and words of similar import, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and (iv) references to agreements (including this Agreement) shall, unless otherwise specified, be deemed to refer to such agreements or as amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time.

**Section 2.    The Loans.**

2.1    <u>DIP Loans</u>.

(a)    <u>DIP Loans</u>. Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of Borrower contained herein, each Lender severally and not jointly agrees (i) to make, from time to time, term loans (each, a "<u>DIP Loan</u>") to Borrower in an aggregate maximum amount equal to such Lender's Commitment and (ii) to fund into the Collection Account of Agent on the Closing Date, the maximum amount of such Lender's Commitment. The DIP Loans made by each Lender are evidenced by this Agreement and, solely if requested by any such Lender, a DIP Note payable to such Lender. No interest will be payable to any Lender by Borrower, any Guarantor or Agent with respect to amounts held by Agent in the Collection Account prior to such amounts being advanced to Borrower pursuant to the terms and conditions set forth herein. If, as of the time the Commitments are terminated, there are any funds in the Collection Account, Agent shall, promptly following such termination (or, if the Carve-Out Date has then occurred, promptly following the making of the Final Advance), return to each Lender such Lender's share of such funds by wire transfer of immediate funds to such account as such Lender shall advise Agent in writing.

(b)    <u>Advances</u>. Subject to the terms and conditions of this Agreement, the Lenders will make, and Borrower agrees to draw, an Advance of $1,900,000 on the Closing Date. All Advances made by Lenders on the Closing Date are deemed to be in compliance with the terms of this Agreement. No more frequently than weekly (commencing with the week of May 12, 2013), Borrower may request additional Advances in an aggregate amount up to $3,100,000 in minimum increments of $50,000 (so long as such minimum increment is not greater than contemplated by the Approved Budget), each of which requested Advances shall be in an amount (together with all previous Advances) no greater than the amount of total cash disbursements (including repayment of the Bridge Obligations) set forth in the Approved Budget through the end of the following calendar week. Further, after the Carve-Out Date, the Lenders will make, and Borrower agrees to draw, the Final Advance. The aggregate outstanding Advances may be up to the Maximum DIP Loan Amount.

(c)    <u>Advance Request</u>. To obtain an Advance, Borrower shall complete, sign and deliver an Advance Request (at least two (2) business days before the applicable Advance Date, other than the Closing Date) to Agent; <u>provided</u>, that Borrower shall be required to submit a Final Certification (and not an Advance Request) with respect to the Final Advance. For each Advance, Agent shall fund the Advance Request from amounts held in the Collection Account in accordance with clause (d) below as requested by the applicable Advance Request or Final

17

Certification, provided that each of the applicable conditions precedent to such Advance is satisfied as of the requested Advance Date.

(d) <u>Funding</u>. Upon the terms and subject to the conditions set forth herein, Agent shall make available to Borrower an amount equal to the requested Advance (net of any amounts due and payable to Agent or any Lender), in U.S. dollars in immediately available funds prior to 11:00 a.m. (Los Angeles time) on the Closing Date and on each Advance Date thereafter. Such Advances shall be sent by wire transfer to the following deposit account of Borrower:

> Bank Name: Wells Fargo Bank
> Bank Address: 453 Market Street, 17th Floor, San Francisco, CA 94111
> ABA: 121-000-248
> Account #: 59179-81952
> Account Name: Coda Holdings, Inc
> Ref: DIP Loan Proceeds

(e) <u>No Reborrowing</u>. Once amounts of the DIP Loans are repaid or prepaid, such amounts cannot be reborrowed.

2.2 <u>Roll-Up Loans.</u>

(a) <u>Roll-Up</u>. Upon entry of the Final Order, an amount of each Lender's Priority Enhanced Notes equal to such Lender's Final Roll-Up Amount will be converted into a roll-up loan (each, a "<u>Roll-Up Loan</u>"). Repayment of a DIP Loan will not reduce the amount of the outstanding Roll-Up Loans. The Roll-Up Loans made by each Lender are evidenced by this Agreement and, solely if requested by any such Lender, a Roll-Up Note payable to such Lender.

(b) <u>Reduction of Priority Enhanced Notes</u>. Each party hereto acknowledges that the outstanding principal balance of the Priority Enhanced Notes held by each Roll-Up Lender (or Affiliate of such Roll-Up Lender) shall be reduced by an amount equal to the amount of Roll-Up Loans made by such Roll-Up Lender.

(c) <u>Section 364(e)</u>. All Roll-Up Loans shall have the benefit of Section 364(e) of the Bankruptcy Code.

(d) <u>No Reborrowing</u>. Once amounts of the Roll-Up Loans are repaid or prepaid, such amounts cannot be reborrowed.

2.3 <u>Interest</u>.

(a) <u>Interest Rate</u>. The principal balance of each Loan shall bear interest thereon at the Interest Rate based on a year consisting of 360 days, with interest computed daily based on the actual number of days elapsed; provided that following the occurrence and during the continuation of an Event of Default, the aggregate outstanding principal of all Loans and all other Secured Obligations outstanding hereunder shall bear interest at the Default Rate.

18

(b)    Payment.    Interest accrued on the Loans shall be payable, without duplication:

(i)    on each Interest Payment Date;

(ii)    on the Maturity Date; and

(iii)    as set forth in Section 2.7(c), on any date when the Loans are prepaid hereunder.

All interest shall be payable in cash; provided, that interest accrued on the Loans due and payable on each Interest Payment Date shall be payable in kind. All interest on any Loan payable in kind on any Interest Payment Date shall be capitalized and added to the outstanding principal amount of such Loan as of such date (inclusive of any amount theretofore so added pursuant to this sentence). For purposes of this Agreement, the amounts so capitalized pursuant to the foregoing sentence shall bear interest in accordance with this Section 2.3 as such amounts shall constitute a portion of the Loans. Notwithstanding the foregoing or anything otherwise provided in this Agreement to the contrary, solely for purposes of determining the amount of available Commitments pursuant to Section 2.1(a), no portion of any interest capitalized pursuant to this Section 2.3(b) shall be deemed to constitute a portion of the outstanding principal balance of the DIP Loans.

2.4    Fees.

(a)    Commitment Fee.    Borrower unconditionally and irrevocably promises to pay in kind on the Closing Date, for the ratable account of each Lender, the Commitment Fee in accordance with the terms hereof. Such fee shall be capitalized and added to the outstanding principal amount of the Roll-Up Loans as of such date. For purposes of this Agreement, the amounts so capitalized pursuant to the foregoing sentence shall bear interest in accordance with Section 2.3 as such amounts shall constitute a portion of the Roll-Up Loans.

(b)    Administration Fee.    Borrower unconditionally and irrevocably promises to pay on the Closing Date in full to Agent, for its own account, an administration fee equal to $50,000 in accordance with the terms hereof.

2.5    Maturity Date.    Borrower unconditionally and irrevocably promises to pay on the Maturity Date in full to Agent, for the ratable account of each Lender, the aggregate outstanding principal amount of the Loans in accordance with the terms hereof. Subject to the Lenders' obligations to make the Final Advance, the then-outstanding Commitments shall terminate on the Maturity Date.

2.6    Payment Requirements.    All payments (including prepayments) to be made by Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 11:00 A.M., Los Angeles time, on the due date thereof to Agent, for the account of the Lenders, to the Collection Account in U.S. dollars and in immediately available funds and Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received; provided, however, Agent shall not be required to distribute such payments to a Lender until Agent has received properly completed

19

and executed documentation as required under Section 2.10(d). If Agent, in its reasonable determination, has not received properly completed and executed documentation as provided by Section 2.10(d) or if Agent has determined, or has reason to believe, that any such previously provided documentation is incorrect or obsolete, Agent, in its reasonable discretion, may deduct or withhold from such payments at the highest statutory applicable rate and distribute the remaining amounts of such payments (after such deduction or withholding) to such Lender. If any payment hereunder becomes due and payable on a day other than a business day, such payment shall be extended to the next succeeding business day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable interest rate during such extension.

2.7     Prepayments.

(a)     Voluntary Prepayments. The Loans may be voluntarily prepaid at any time, subject to the conditions set forth in Section 2.7(c).

(b)     Mandatory Prepayments. Except as otherwise required by the Financing Order, if on any date Borrower or any Guarantor shall receive Net Proceeds from any Asset Sale or Recovery Event, an amount equal to 100% of the Net Proceeds thereof shall be applied on the date of such receipt toward the prepayment of the Loans and the other amounts set forth in Section 2.7(c). Such prepayment shall be payable within ten (10) days of the receipt of such Net Proceeds.

(c)     Amounts prepaid pursuant to Section 2.7 shall be applied to the prepayment of the Loans in accordance with Section 2.8(b). Each prepayment of the Loans under Section 2.7 shall be accompanied by accrued interest owing on the amount prepaid through and including the date of such prepayment. Borrower shall deliver to Agent and each Lender notice of each prepayment of Loans in whole or in part pursuant to Section 2.7 not less than five (5) business days prior to the date such prepayment shall be made (each, a "Prepayment Date"). Such notice shall (i) set forth (x) the Prepayment Date, (y) the aggregate amount of such prepayment and (z) the amount of each Lender's share of such prepayment and (ii) be accompanied by a certificate signed by an officer of Borrower setting forth in reasonable detail the calculation of the amount of such prepayment.

2.8     Pro Rata Treatment.

(a)     Each Advance, each payment by Borrower on account of the Commitment Fee and any reduction of the Commitments shall be made *pro rata* according to the respective Commitment Percentages of the Lenders.

(b)     Except as otherwise may be agreed by Borrower, Agent and the Required Lenders, each payment (including each prepayment) by Borrower on account of principal of and interest on the Loans shall be made *pro rata* according to the respective outstanding principal amounts of the Loans then held by the Lenders.

2.9     Maximum Interest. Notwithstanding any provision in this Agreement, the DIP/Roll-Up Notes, or any other Loan Document, it is the parties' intent not to contract for, charge or receive interest at a rate that is greater than the maximum rate permissible by

20

Requirements of Law that a court of competent jurisdiction shall deem applicable hereto (the "Maximum Rate"). If a court of competent jurisdiction shall finally determine that Borrower has actually paid to any Lender an amount of interest in excess of the amount that would have been payable if all of the Secured Obligations had at all times borne interest at the Maximum Rate, then such excess interest actually paid by Borrower shall be applied as follows: first, to the payment of outstanding principal of the Loans ratably among the Lenders; second, after all principal is repaid, to the payment of Agent's accrued interest, costs, expenses, professional fees and any other Secured Obligations; third, to the payment of each Lender's accrued interest, costs, expenses, professional fees and any other Secured Obligations, ratably among them; and last, after all Secured Obligations are repaid, the excess (if any) shall be refunded to Borrower.

## 2.10    Withholdings and Increased Costs.

(a)    All payments by Borrower or any Guarantor under any Loan Document shall be made free and clear of all Taxes, except as required by applicable Requirements of Law. If any Requirement of Law (as determined in the good faith discretion of Borrower, any Guarantor or Agent) requires the deduction or withholding of any Tax from any such payment from or in respect of any sum payable under any Loan Document by Borrower, any Guarantor or Agent (i) then Borrower, such Guarantor or Agent, as applicable, shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with the Requirement of Law and (ii) if such Tax is an Indemnified Tax, then the sum payable by Borrower or any Guarantor shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section), Agent or the applicable Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Borrower and each Guarantor shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Agent timely reimburse it for the payment of, any Other Taxes.

(c)    As soon as practicable after any payment of Taxes by Borrower or any Guarantor to a Governmental Authority pursuant to this Section 2.10, such Person shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(d)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower and Agent, at the time or times reasonably requested by Borrower or Agent, such properly completed and executed documentation reasonably requested by Borrower or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrower or Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower or Agent as will enable Borrower or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Without limiting the generality of the foregoing,

21

(i) any Lender that is a U.S. Person shall deliver to Borrower and Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(ii) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed originals of IRS Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN; or

(4) to the extent a Foreign Lender is not the beneficial owner or if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner or each such direct and indirect partners, as applicable;

(iii) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of

Borrower or Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrower or Agent to determine the withholding or deduction required to be made; and

(iv)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and Agent at the time or times prescribed by Requirement of Law and at such time or times reasonably requested by Borrower or Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or Agent as may be necessary for Borrower and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (iv), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and Agent in writing of its legal inability to do so.

(e)    Each party's obligations under this Section 2.10 shall survive the resignation or replacement of Agent or any assignment of rights by a Lender and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(f)    The Loan Parties shall indemnify Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by Agent or such Lender or required to be withheld or deducted from a payment to Agent or such Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(g)    If the introduction of or any change in, after the Closing Date, any Requirement of Law increases any Agent's or Lender's costs or reduces its income for the Loans, then Borrower shall upon demand by such Agent or Lender (with a copy of such demand

23

to Agent) promptly pay to Agent for its own account or for the account of such Lender, as the case may be, the increase in cost or reduction in income or additional expense; provided that all requests, rules, guidelines or directives issued or promulgated under, in connection with or pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act or Basel III shall be deemed to be a change in a Requirement of Law, regardless of the date enacted, adopted or issued; provided, further, however, that Agent and Lender shall not be entitled pursuant to this Section 2.10(g) to any (i) Indemnified Taxes, (ii) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (iii) Connection Income Taxes, except in the case of any such introduction of or change in Requirement of Law that results in a Tax on Agent's or such Lender's loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, which Tax increases the cost to such Lender of maintaining its Loans or its Commitment. Agent and each Lender agrees that it shall allocate any such increased costs among its customers similarly affected in good faith and in a manner consistent with Agent's or such Lender's customary practice.

2.11    Loan Account. Agent, on behalf of Lenders, shall record on its books and records the amount of the Loans made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding. Such record shall, absent manifest error, be conclusive evidence of the amount of the Loans made by the Lenders to Borrower and the interest and payments thereon; provided, however, that in the event of any inconsistency between such record and the Register, the Register shall control. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrower hereunder (and under any DIP/Roll-Up Note) to pay any amount owing with respect to the Loan or provide the basis for any claim against Agent.

2.12    Registered Notes; Transfer and Replacement of Notes.

(a)    Agent, acting solely for this purpose as a non-fiduciary agent of Borrower, shall maintain at one of its offices a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and Borrower, Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. The provisions of this Agreement are intended to be construed so that any DIP/Roll-Up Notes issued hereunder and obligations thereon are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(b)    Upon receipt by Borrower of evidence reasonably satisfactory to it of the ownership of and the loss, theft destruction or mutilation of any DIP/Roll-Up Note issued hereunder and (i) in the case of loss, theft or destruction, of an indemnity reasonably satisfactory to it; or (ii) in the case of mutilation, upon surrender thereof, Borrower, at its expense, will execute and deliver in lieu thereof a new DIP/Roll-Up Note executed in the same manner as the DIP/Roll-Up Note being replaced, in the same principal amount as the unpaid principal amount

24

of the DIP/Roll-Up Note being replaced and dated the date to which interest shall have been paid thereon or, if no interest shall have yet been so paid, dated the Closing Date.

(c) Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans or other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, neither Agent (in its capacity as Agent) nor Borrower shall have any responsibility for maintaining a Participant Register.

2.13    Super Priority Nature of Obligations and Lenders' Liens.

(a) The liens and security interests granted to Agent and the Lenders on the Collateral owned by the Debtors shall have the super priority administrative expense and senior secured status afforded by Sections 364(c) and 364(d) of the Bankruptcy Code to the extent provided and as more fully set forth in the Financing Orders.

(b) Agent's and the Lenders' Liens on the Collateral owned by the Debtors and their administrative claims under Sections 364(c) and 364(d) of the Bankruptcy Code shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to the extent provided and as more fully set forth in the Financing Orders. Except as set forth herein or in the Financing Orders, no other claim having a priority superior or pari passu to that granted to Agent and the Lenders by the Financing Orders shall be granted or approved while any Secured Obligations remain outstanding.

2.14    Payment of Obligations. Liens.    Upon the maturity (whether by acceleration or otherwise) of any of the Secured Obligations, Agent and Lenders shall be entitled to immediate payment of such Secured Obligations without further application to or order of the Bankruptcy Court.

2.15    No Discharge; Survival of Claims Liens.    The Debtors agree that, unless the Lenders shall otherwise consent, (a) the Secured Obligations shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and each Debtor hereby waives pursuant to Section 1141(d)(4) of the Bankruptcy Code any such discharge) and (ii) the super priority administrative claim granted to Agent and Lenders pursuant to the Financing Orders and described in Section 2.13 and the Liens granted to Agent pursuant to the Financing Orders and described in Section 2.13 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Case.

25

2.16    Waiver of any Primary Rights Liens.  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Secured Obligation shall be outstanding, each Debtor hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Secured Obligations, or to approve a claim of equal or greater priority than the Secured Obligations.

**Section 3.    Security Interest of Non-Debtor Subsidiaries.**

3.1    Grant.  As security for the prompt, complete and indefeasible payment when due (whether on the payment dates or otherwise) of all the Secured Obligations, each Non-Debtor Subsidiary grants to Agent, for the benefit of the Secured Parties, a security interest in all of such Non-Debtor Subsidiary's right, title, and interest in and to the following personal property whether now owned and existing or hereafter acquired or arising and wheresoever located:

    (a)    All Accounts;

    (b)    All Chattel Paper ;

    (c)    All Commercial Tort Claims;

    (d)    All Contract ;

    (e)    All Money and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts;

    (f)    All Documents;

    (g)    All Equipment;

    (h)    All Fixtures;

    (i)    All General Intangibles, including Payment Intangibles, all Intellectual Property, Copyrights, Patents, Trademarks, Licenses, designs, drawings, technical information, marketing plans, customer lists, trade secrets, proprietary or confidential information, inventions (whether or not patentable), procedures, know-how, models and data;

    (j)    All Instruments, including Promissory Notes;

    (k)    All Inventory and other Goods;

    (l)    All Investment Property;

    (m)    All Letter-of Credit Rights;

    (n)    All Supporting Obligations;

    (o)    All of such Non-Debtor Subsidiary's books and records including ledgers, federal and state tax returns, records regarding such Non-Debtor Subsidiary's assets or liabilities,

the Collateral, business operations or financial condition, and all computer programs or storage or any equipment containing such information relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, Proceeds and insurance Proceeds of any or all of the foregoing; and

    (p)  To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for and rents, profits and products of each of the foregoing.

   3.2  <u>Perfected Security Interest</u>. Each Non-Debtor Subsidiary hereby represents and covenants that the security interest granted herein constitutes a valid, perfected security interest in the Collateral in existence on the Closing Date, and will constitute a valid, perfected security interest in Collateral acquired after the Closing Date. Each Non-Debtor Subsidiary hereby covenants that it shall give written notice to Agent promptly upon the acquisition by it or creation in favor of it of any Commercial Tort Claim or the establishment by it of any Deposit Account.

   3.3  <u>Financing Statements</u>. Each Non-Debtor Subsidiary hereby authorizes Agent to file UCC financing statements in all appropriate jurisdictions and amendments thereto that indicate the Collateral (i) as all assets of such Non-Debtor Subsidiary or words of similar effect or (ii) as being of an equal or lesser scope or with greater detail, and containing any other information required by the applicable UCC to perfect Agent's security interest (for the benefit of the Secured Parties) granted herein.

## Section 4.  <u>Conditions Precedent to Loan</u>.

   The obligations of the Lenders to make the Loans hereunder are subject to the satisfaction by Borrower of the following conditions:

   4.1  <u>Initial Advance</u>. On or prior to the Closing Date:

    (a)  Borrower shall have delivered to Agent the following:

      (i)  executed originals of this Agreement and each DIP/Roll-Up Note;

      (ii)  the certificate of incorporation or other similar organizational document of Borrower and each Guarantor certified as of a recent date by the secretary of state (or equivalent Governmental Authority) of the state of such Person's incorporation or formation;

      (iii)  certificates duly executed by the Secretary or Assistant Secretary of Borrower and each Guarantor certifying (i) the bylaws or other similar organizational document, as amended through the Closing Date, of Borrower or such Guarantor, as applicable; and (ii) the resolutions of the boards of directors (or equivalent governing body) of Borrower and each Guarantor evidencing (x) approval of the Loans, the grant of a security interest to Agent, on behalf of the Secured Parties, in and to the Collateral, and the other transactions evidenced

27

by the Loan Documents and (y) authorization to execute and deliver all Loan Documents to which such Person, as applicable, is party;

(iv)    certificates of good standing for each of Borrower and each Guarantor from such Person's state of incorporation or formation and from all other jurisdictions in which it does business and where the failure to be qualified would have a Material Adverse Effect;

(v)    all documentation and other information required by Governmental Authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the Patriot Act;

(vi)    a 13-week cash flow budget setting forth all projected cash receipts and disbursements (by line item) of Borrower and the Guarantors on a weekly basis, in form, scope and substance acceptable to Agent and Notes Agent (the "Initial Approved Budget"); and

(vii)    such other documents as Agent may reasonably request;

(b)    Fees and Expenses. There shall have been paid to Agent, for the account of Agent or the Lenders, as the case may be, all fees and all reimbursements of costs or expenses due and payable under this Agreement. There shall have been paid to Notes Agent, for its own account, all reimbursements of costs or expenses due and payable to Notes Agent under the Notes Documents;

(c)    Interim Order. The Interim Order, in form and substance satisfactory to Agent and Notes Agent, shall have been entered and shall be in full force and effect no later than three (3) business days after the Chapter 11 Cases are commenced;

(d)    Repayment of Bridge Facility. All Bridge Obligations shall have been, or shall be substantially concurrently with the funding of the initial DIP Loans, paid in full;

(e)    Sale Motion; Bidding Procedures Motion. On the Petition Date, (i) Borrower shall have filed a motion (the "Sale Motion") pursuant to Section 363 of the Bankruptcy Code, in form and substance satisfactory to Agent and Notes Agent, to sell all or substantially all of the Debtors' assets in one or more lots consented to by Agent and Notes Agent (the "Sale") though an auction to the bidder(s) with the highest and/or best bids(s) as determined in accordance with the Approved Bidding Procedures and (ii) Borrower shall have filed a motion (the "Bidding Procedures Motion"), in form and substance satisfactory to Agent and Notes Agent, seeking approval of the Approved Bidding Procedures and identifying a designee of the Consenting Senior Secured Lenders (as defined in the Restructuring Support Agreement) as the stalking horse bidder with respect thereto;

(f)    First Day Orders. All "first day orders," including, without limitation, all employee related orders and critical vendor orders entered at or about the time of the commencement of the Chapter 11 Cases, shall be in form and substance satisfactory to Agent;

28

(g) <u>Restructuring Support Agreement</u>. Agent shall have received a duly executed copy of the Restructuring Support Agreement, in form and substance satisfactory to Agent; and

(h) <u>Amendment to Intercreditor Agreement</u>. Agent shall have received a duly executed copy of an amendment to the Intercreditor Agreement, in form and substance satisfactory to Agent.

4.2 <u>Other Advances</u>. Except with respect to the Final Advance, on each Advance Date with respect to the Advance to be made on such date:

(a) Agent shall have received (i) an Advance Request as required by Section 2.1(c), duly executed by Borrower's Chief Executive Officer or Chief Financial Officer, (ii) a certificate executed by Borrower's Chief Executive Officer or Chief Financial Officer certifying that the amount of such Advance and the intended use of the funds to be so advanced are consistent with the Approved Budget and such funds shall be so used within the following 14 day period, and (iii) any other documents Agent may reasonably request;

(b) the representations and warranties set forth in this Agreement, including Section 5, and the other Loan Documents shall be true and correct in all material respects on and as of the Advance Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date;

(c) no Event of Default shall have occurred and be continuing; and

(d) (i) if (A) such Advance is to be made on or after the date twenty-one (21) days after the Petition Date or (B) the amount of such Advance, together with the outstanding principal amount of the DIP Loans, shall exceed the Interim Advance, the Bankruptcy Court shall have entered the Final Order on or prior to such date, (ii) the Interim Order or the Final Order, as the case may be, shall not have been vacated, reversed, modified or amended without the consent of the Required Parties, (iii) no motion for reconsideration of any such order shall have been timely filed and (iv) no appeal of any such order shall have been timely filed or, if such order is the subject of a pending appeal in any respect, none of the making of any Loans, the use of Cash Collateral in accordance with this Agreement, the granting of super priority claim status with respect to the Secured Obligations, the granting of the Liens described herein and the performance by any Debtor of its obligations under this Agreement shall be the subject of a presently effective stay pending appeal.

Each Advance Request shall be deemed to constitute a representation and warranty by Borrower on the relevant Advance Date as to the matters specified in clauses (b), (c) and (d) of this Section 4.2 and as to the matters set forth in such Advance Request.

4.3 <u>Final Advance</u>. In the case of the Final Advance, as of the date of the Final Advance:

(a) the Carve-Out Date shall have occurred;

(b) Borrower shall have provided the Final Certification to Agent; and

29

(c)    the Interim Order or the Final Order, as the case may be, shall be in full force and effect.

**Section 5.    Representations and Warranties of Borrower.**

Each Loan Party represents and warrants that:

5.1    Corporate Status; Authorization and Authority.

(a)    Each Loan Party is duly organized, legally existing and in good standing under the Requirements of Law of its jurisdiction of organization, and is duly qualified as a foreign corporation in all jurisdictions in which the nature of its business or location of its properties require such qualifications and where the failure to be qualified could reasonably be expected to have a Material Adverse Effect. The present names, former names (if any, including tradenames, fictitious names, assumed names and "doing business as" names), locations, places of formation, tax identification numbers, organizational identification numbers and other information as to each of Borrower and each Guarantor are correctly set forth in Exhibit C, as may be updated by Borrower in a written notice provided to Agent after the Closing Date. Except as otherwise disclosed to Agent in writing, none of Borrower nor any Guarantor has not changed its name since its respective formation.

(b)    Subject to the entry of the Interim Order (or the Final Order, when applicable), this Agreement and the other Loan Documents have been duly authorized, executed and delivered by Borrower and each Guarantor, in each case to the extent such Person is a party thereto, and constitute the legal, valid and binding obligations of Borrower and each Guarantor, to the extent such Person is a party thereto, enforceable against such Person in accordance with the respective terms of such documents, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar Requirements of Law affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability. Subject to the entry of the Interim Order (or the Final Order, when applicable), each of Borrower and each Guarantor has all requisite power and authority to own its assets, carry on its business and execute, deliver and perform its obligations under the Loan Documents to which it is a party.

5.2    Governmental Authorization. Other than the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document.

5.3    Consents. Borrower's execution, delivery and performance of this Agreement, any DIP/Roll-Up Note and all other Loan Documents to which it is a party, and each Guarantor's execution, delivery and performance of this Agreement and any other Loan Document to which it is a party: (i) will not result in the creation or imposition of any Lien upon the Collateral, other than Permitted Liens, (ii) do not violate any provisions of the Certificate or Articles of Incorporation or Formation or other similar organizational document (as applicable) of Borrower or any Guarantor or any of their respective bylaws or other similar organizational document, or any Requirement of Law to which Borrower or any Guarantor is subject and (iii)  do not violate

30

any contract or agreement of Borrower or any Guarantor or require the consent or approval of any other Person the effect of which has not been stayed by the automatic stay or the Bankruptcy Court.

5.4     Actions Before Governmental Authorities. Except as described on Schedule 5.4, there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of Borrower, threatened against or affecting Borrower, any Guarantor or their respective businesses or property that, if determined in a manner adverse to Borrower or any Guarantor, could result in a Material Adverse Effect.

5.5     Laws.

(a)     Neither Borrower nor any Guarantor is in violation of any Requirement of Law, or in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default could result in a Material Adverse Effect.

(b)     Without limiting the generality of the immediately preceding clause (a), each of Borrower, each Guarantor and the Subsidiaries of all of the foregoing is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control, and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it. None of Borrower, any Guarantor or any of its or their respective Subsidiaries and Affiliates:   (i) is a Person designated by the U.S. Government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person, or (iii) is controlled by (including by virtue of such Person being a director or owning voting Capital Stock), or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, any Loan Document would be prohibited under U.S. Requirements of Law.

(c)     Without limiting the generality of the immediately preceding clause (a), each of Borrower, each Guarantor and its and their respective Subsidiaries and Affiliates is in compliance with (i) the Trading with the Enemy Act of 1917, Ch. 106, 40 Stat. 411, as amended, and each of the foreign assets control regulations of the U.S. Treasury Department (31 CFR, Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the Patriot Act, and (iii) other federal or state Requirements of Law relating to "know your customer" and anti-money laundering rules and regulations. No part of the proceeds of the Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the U.S. Foreign Corrupt Practices Act of 1977.

31

(d)    None of Borrower or any Guarantor is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940.

(e)    No property of Borrower or any Guarantor has been used by any Loan Party or, to any Loan Party's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than in material compliance with applicable Requirements of Law.

5.6    <u>Information Correct and Current</u>.  No information (financial or otherwise), report, Advance Request, Financial Statement, exhibit or schedule furnished, by or on behalf of Borrower or any Guarantor to Agent or any Lender in connection with any Loan Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading at the time such statement was made or deemed made.  Additionally, any and all financial or business projections provided by Borrower to Agent and any Lender have been, or shall be when provided, (i) provided in good faith and based on the most current data and information available to Borrower, and (ii) the most current of such projections provided to Borrower's Board of Directors.

5.7    <u>Tax and Benefit Plan Matters</u>.

(a)    Except as described on Schedule 5.7, each of Borrower and each Guarantor has (i) filed all federal, state and local Tax returns that are required to be filed, which Tax returns are accurate and complete in all material respects, (ii) duly paid or fully reserved for all Taxes or installments thereof (including any interest or penalties) as and when due, which have or may become due pursuant to such returns, and (iii) paid or fully reserved for any Tax assessment received by it for the three (3) years preceding the Closing Date, if any (including any taxes being contested in good faith and by appropriate proceedings).

(b)    Each of Borrower and each Guarantor has paid all amounts necessary to fund all pension, profit sharing, deferred compensation and other retirement plans in accordance with their terms and as may be required under ERISA or other applicable Requirements of Law, and none of Borrower or any Guarantor has withdrawn from participation in, or has permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of Borrower or any Guarantor, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other Governmental Authority.

5.8    <u>Intellectual Property Claims</u>.  Either Borrower and/or one or more of the Guarantors owns, or otherwise has the right to use, all the Intellectual Property and no other Person owns or has the right to use any of the Intellectual Property used in the operations of the business of Borrower and the Guarantors.  Each of the Copyrights, Trademarks and Patents is valid and enforceable, (ii) no part of the Intellectual Property has been judged invalid or unenforceable, in whole or in part, and (iii) no claim has been made to Borrower that any part of the Intellectual Property violates the rights of any third party nor, to Borrower's knowledge, is

32

there a reasonable basis for any such claim. Exhibit D is a true, correct and complete list of each of Borrower's and each Guarantor's Patents, registered Trademarks, registered Copyrights, and agreements under which Borrower or any Guarantor licenses Intellectual Property from third parties (other than shrink-wrap software licenses), together with application or registration numbers, as applicable, owned by Borrower or any Guarantor, in each case as of the Closing Date. Borrower is not in material breach of, nor has Borrower failed to perform any material obligations under, any of the foregoing contracts, licenses or agreements and, to Borrower's knowledge, no third party to any such contract, license or agreement is in breach thereof or has failed to perform any obligations thereunder.  To the knowledge of Borrower and each Guarantor, neither the use by Borrower or any Guarantor of the Intellectual Property nor the operation of Borrower's or Guarantors' business infringes the Intellectual Property or other rights of others.

5.9    Sufficiency of Assets.  Except as described on Schedule 5.9, Borrower and Guarantors collectively have all rights with respect to the assets and Intellectual Property necessary in the operation or conduct of Borrower's and Guarantors' business as currently conducted and proposed to be conducted by Borrower and the Guarantors. Without limiting the generality of the foregoing, and, in the case of Licenses, except for restrictions that are unenforceable under Division 9 of the UCC, Borrower and each Guarantor has the right, to the extent required to operate the business of Borrower and the Guarantors, to freely transfer, license or assign Intellectual Property without condition, restriction or payment of any kind (other than license payments in the ordinary course of business) to any third party, and Borrower and the Guarantors collectively own or have the right to use, pursuant to valid licenses, all software development tools, library functions, compilers and all other third-party software and other items that are used in the design, development, promotion, sale, license, manufacture, import, export, use or distribution of the products of Borrower's and Guarantors' business.

5.10    Litigation.  Except as set forth on Schedule 5.10, there are no actions, suits, proceedings or investigations pending (or to the knowledge of Borrower, threatened) against Borrower or any Guarantor or any of their respective properties or businesses, which (a) could reasonably be expected to result in monetary judgment(s) or relief, individually or in the aggregate, in excess of $100,000, (b) seek an injunction or other equitable relief, or (c) affect or pertain to the Loan Documents or any transaction contemplated hereby or thereby.

5.11    Financial Statements.  All consolidated financial statements for Borrower and its Subsidiaries delivered to Agent or Lenders and covering a period ended on or before June 30, 2012 have been prepared in accordance with GAAP (subject, in the case of unaudited financial statements, to the absence of footnotes and normal year-end audit adjustments) and fairly present in all material respects Borrower's consolidated financial condition and consolidated results of operations as of the dates set forth therein.

5.12    Use of Proceeds; Margin Stock.  The proceeds of the DIP Loan shall be used in accordance with Section 7.2(d).  None of Borrower, any Guarantor or any of its or their respective Subsidiaries is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.  As of the Closing Date, none of Borrower, any Guarantor or any of its or their respective Subsidiaries owns any Margin Stock.

33

5.13    <u>Financial Accounts</u>.  Exhibit E, as may be updated by Borrower in a written notice provided to Agent after the Closing Date, is a true, correct and complete list of (a) all Deposit Accounts of Borrower and each Guarantor and (b) all accounts of Borrower and each Guarantor holding Investment Property, and such exhibit correctly identifies the name, address and telephone number of each bank or other institution at which such accounts are maintained, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

5.14    <u>Employee Loans</u>.  Except as described on Schedule 5.14, neither Borrower nor any Guarantor has any outstanding loans to or from any of its employees, officers or directors, nor has Borrower or any Guarantor guaranteed the payment of any loan made by a third party to any employee, officer or director of Borrower or any Guarantor.

5.15    <u>Capitalization and Subsidiaries</u>.  Borrower's capitalization as of the Closing Date is set forth on Schedule 5.15.  Borrower does not own any Capital Stock of any Person, except for Permitted Investments.  Attached as Schedule 1 is a true, correct and complete list of each Subsidiary of Borrower and each Guarantor.

5.16    <u>The Budget</u>.  The Approved Budget reasonably presents, in all material respects, on a pro forma basis, the projected financial operations and disbursements of Borrower and each Guarantor for the period specified therein and such projections in the view of the management of Borrower, are reasonably achievable based upon reasonable assumptions and other information available to Borrower as of the first day of such period.

5.17    <u>Prepetition Obligations; Defenses</u>.

(a)    <u>Bridge Facility</u>.  As of the Petition Date, the aggregate outstanding principal balance of the Bridge Obligations are approximately as set forth in the Financing Order and the Loan Parties are truly and justly indebted to Bridge Agent and the Bridge Lenders with respect to the Bridge Obligations without setoff, defense or counterclaim.

(b)    <u>Notes</u>.  As of the Petition Date, the aggregate outstanding principal balance of the Notes Obligations are approximately as set forth in the Financing Order and the Loan Parties are truly and justly indebted to Notes Agent and the Noteholders with respect to the Notes Obligations without setoff, defense or counterclaim.

(c)    <u>Term Loan</u>.  As of the Petition Date, the aggregate outstanding principal balance of the Term Loan Obligations are approximately as set forth in the Financing Order and the Loan Parties are truly and justly indebted to Term Loan Agent and the Term Lenders with respect to the Term Loan Obligations without setoff, defense or counterclaim.

5.18    <u>Prepetition Documents</u>.  The Loan Parties acknowledge and agree that:

(a)    <u>Bridge Facility</u>.  (i) Subject to the automatic stay, the Bridge Documents are valid and enforceable and (ii) Bridge Agent for the benefit of the Bridge Lenders has a valid, enforceable and fully perfected lien in all of the Bridge Collateral, including Cash Collateral, and all proceeds thereof, having the priority set forth in the Intercreditor Agreement.

34

(b)    Notes. (i) Subject to the automatic stay, the Notes Documents are valid and enforceable and (ii) Notes Agent for the benefit of the Noteholders has a valid, enforceable and fully perfected lien in all of the Notes Collateral, including Cash Collateral, and all proceeds thereof, having the priority set forth in the Intercreditor Agreement.

(c)    Term Loan. (i) Subject to the automatic stay, the Term Loan Documents are valid and enforceable and (ii) Term Loan Agent for the benefit of the Term Lenders has a valid, enforceable and fully perfected lien in all of the Term Loan Collateral, including Cash Collateral, and all proceeds thereof, having the priority set forth in the Intercreditor Agreement.

5.19    Chapter 11 Case Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for the hearing for the approval of the Interim Order has been given and proper notice for the hearing for the approval of the Final Order will be given.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Secured Obligations of the Debtors will constitute allowed administrative expense claims in the Chapter 11 Cases having the priority set forth in the Financing Orders.

(c)    After the entry of the Interim Order, the Secured Obligations of the Debtors will be secured by a valid and perfected, enforceable and unavoidable first priority, priming Lien with priority over the Liens of the Prepetition Secured Parties on all of the Collateral of the Debtors to the extent provided and as more fully set forth in the Financing Orders.

(d)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on or after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended without the prior written consent of the Required Parties.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Secured Obligations of the Debtors, Agent and Lenders shall be entitled to immediate payment of such Secured Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court, as more fully set forth in the Financing Orders.

5.20    Collateral. The provisions hereof create legal and valid security interests in all the Collateral of the Non-Debtor Subsidiaries in favor of Agent, for the benefit of the Secured Parties, and such security interests constitute perfected and continuing security interests in such Collateral, securing the Secured Obligations, enforceable against each Non-Debtor Subsidiary and all third parties. All appropriate financing statements have been filed in the proper filing office in the appropriate jurisdictions under applicable Requirements of Law in order to perfect the security interest granted to Agent hereunder in such Collateral that may be perfected by filing a financing statement.

35

**Section 6.**    **Insurance; Indemnification.**

6.1    Coverage.  Borrower shall cause to be carried and maintained, on its own behalf and on behalf of each Guarantor (or shall cause each Guarantor to carry and maintain the insurance coverage required by this Section 6.1):  (a) commercial general liability insurance, including directors and officers' insurance, on an occurrence basis, against risks customarily insured against in Borrower's industry;  (b) so long as there are any Secured Obligations outstanding, insurance upon the Collateral, insuring against all risks of physical loss or damage howsoever caused, in an amount not less than the full replacement cost of the Collateral (provided that such insurance may be subject to standard exceptions and deductibles); and a sufficient fidelity insurance policy.

6.2    Certificates.  On or before the thirtieth (30th) day following the Closing Date (or such later date as Agent shall agree), Borrower shall have delivered to Agent certificates of insurance that evidence Borrower's compliance with its insurance obligations in Section 6.1 and the obligations contained in this Section 6.2.  Borrower's insurance certificate shall state Agent, as administrative and collateral agent for the Secured Parties, is an additional insured for commercial general liability, an additional insured and a loss payee for all risk property damage insurance, a loss payee for fidelity insurance, and a loss payee for property insurance and additional insured for liability insurance for any future insurance that Borrower may acquire from such insurer.   Attached to the certificates of insurance will be additional insured endorsements for liability and lender's loss payable endorsements for all risk property damage insurance and fidelity.   All certificates of insurance will provide for a minimum of thirty (30) days advance written notice to Agent of cancellation or any other change adverse to Agent's interests.  Any failure of Agent to scrutinize such insurance certificates for compliance is not a waiver of any of Agent's or any Lender's rights, all of which are reserved.

6.3    Attorney-in-Fact.  Each of Borrower and each Guarantor appoints Agent as its attorney-in-fact to make, settle and adjust all claims under and decisions with respect to such Person's policies of insurance, and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments, provided that, Agent shall not act as such Person's attorney-in-fact unless an Event of Default has occurred and is continuing.  The appointment of Agent as any attorney-in-fact for Borrower and each Guarantor is a power coupled with an interest and is irrevocable until the Secured Obligations have been indefeasibly satisfied in full.  Proceeds of insurance shall be applied, at the option of Agent, to repair or replace the Collateral or to reduce any of the Secured Obligations.

6.4    Indemnity.  Borrower agrees to indemnify and hold Agent, each Lender and their respective Related Persons harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort, but excluding any Excluded Taxes), including reasonable attorneys' fees and disbursements and other costs of investigation or defense (including those incurred upon any appeal), that may be instituted or asserted against or incurred by Agent or any Lender or any other Person indemnified hereunder as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents or the administration of such credit, or in connection with or arising out of the transactions contemplated hereunder and thereunder, or any actions or failures to act in connection therewith,

36

or arising out of the Disposition or utilization of the Collateral, excluding in all cases claims resulting solely from the gross negligence or willful misconduct of the Person claiming indemnification hereunder.  Borrower agrees to pay, and to save Agent and each Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales or other similar Taxes (other than Excluded Taxes) that may be payable or determined to be payable with respect to any of the Collateral or this Agreement.

**Section 7.** __Other Covenants__.  Borrower agrees as follows:

7.1 __Financial Reports; Notices__.

(a) __Financial Statements__.  Borrower shall furnish to Agent the financial statements and reports listed hereinafter (the "__Financial Statements__"):

(i) as soon as practicable (and in any event within 30 days) after the end of each month, internally prepared monthly cash flow statements for Borrower on a consolidated basis and a table showing Borrower's current capitalization on a consolidated basis;

(ii) promptly after the sending thereof, copies of any financial statements or reports that Borrower has made generally available to all its equity holders; and

(iii) financial and business projections promptly following their approval by Borrower's Board of Directors, as well as budgets, operating plans and other financial information reasonably requested by Agent.

Borrower shall not make any change in its (i) accounting policies or reporting practices, except as required by GAAP or (ii) fiscal years or fiscal quarters.  The fiscal year of Borrower shall end on December 31.

(b) __Other Deliveries__. Borrower shall furnish to Agent each of the following:

(i) __Bankruptcy Matters__.  Copies of all monthly operating reports, projections or other information respecting Debtors' business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of the Debtors with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee, at the time such document is filed with the Bankruptcy Court, or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any appointed in the Chapter 11 Cases) or the Committee;

(ii) __Variance Report__.  On or before 4:00 PM (Pacific time) on Tuesday of each calendar week, a weekly line-by-line budget variance report, in form and scope reasonably acceptable to Agent, which report shall compare actual cash receipts and disbursements of Borrower and each Guarantor with amounts provided for in the Approved Budget on a line-by-line basis for the preceding weekly period and the preceding four-week rolling period; and

37

       (iii)    <u>Approved Budget</u>. At such times as Borrower shall determine (but in any event not later than 4:00 PM (Pacific time) on Tuesday of the fourth calendar week of the then applicable Approved Budget), an updated rolling 13-week cash flow budget setting forth all projected cash receipts and disbursements (by line item) of Borrower and the Guarantors on a weekly basis for the 13-week period commencing with the following calendar week (such updated budget, if approved by Agent and Notes Agent, shall thereafter constitute the Approved Budget).

       (c)    <u>Notices</u>. Borrower shall promptly (and in any event no later than two (2) Business Days after becoming aware thereof) notify Agent of the occurrence of (i) any Event of Default or any event or circumstance that, with the giving of notice or lapse of time or both, may constitute an Event of Default or (ii) any event that would have a Material Adverse Effect, specifying, in each case, the nature and anticipated effect thereof and any action proposed to be taken in connection therewith.

    7.2    <u>Affirmative Covenants</u>.

       (a)    <u>Compliance with Laws, Etc</u>. Each Loan Party shall comply with all applicable Requirements of Law, except for such failures to comply that would not, in the aggregate, have a Material Adverse Effect.

       (b)    <u>Maintenance of Property</u>. Each Loan Party shall maintain and preserve (i) in good working order and condition all of its tangible property necessary for the conduct of its business and (ii) all rights, permits, licenses, approvals and privileges necessary, used or useful, whether because of its ownership, lease, sublease or other operation or occupation of property or other conduct of its business, except for such failures to maintain and preserve the items set forth in <u>clauses (a)</u> and <u>(b)</u> above that would not, in the aggregate, have a Material Adverse Effect.

       (c)    <u>Inspection Rights</u>. The Loan Parties shall keep proper books of record and account, in which full, true and correct entries in all material respects shall be made in accordance with all applicable Requirements of Law of all financial transactions and the assets and business of each Loan Party. Each Loan Party shall permit any Related Person that Agent or any Lender authorizes, including its attorneys and accountants, to inspect the Collateral and examine and make copies and abstracts of the books of account and records of the Loan Parties at reasonable times and upon reasonable notice during normal business hours.

       (d)    <u>Use of Proceeds</u>. Borrower shall utilize the Cash Collateral and the proceeds of the DIP Loans solely (a) to pay interest, fees and expenses owing to Agent and the Lenders pursuant to this Agreement, (b) to repay in full on the Closing Date all outstanding Bridge Obligations, (c) to pay the fees and expenses of legal counsel and other professionals retained by Notes Agent, (d) in accordance with the Approved Budget and the Financing Orders (including, without limitation, the Approved Budget variances set forth in Section 7.19) and (e) for certain other Prepetition expenses that are approved by the Bankruptcy Court and consented to by Agent and Notes Agent; <u>provided</u>, that all proceeds of the Final Advance shall be maintained in a deposit account of Borrower subject to an Account Control Agreement and applied solely to payment of amounts described in the definition of "Final Advance." Borrower

38

shall not be permitted to use the Cash Collateral or the proceeds of the DIP Loans (i) for payment of interest and principal with respect to any Indebtedness (other than the Secured Obligations and the Bridge Obligations), (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation challenging the validity, perfection, priority, extent or enforceability of the Secured Obligations or the Liens of Agent on the Collateral, (iii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation challenging the validity, perfection, priority, extent or enforceability of the obligations of the Loan Parties under the Prepetition Documents or the Liens of the Prepetition Secured Parties on the Prepetition Collateral, provided that up to $30,000 shall be made available to the Committee for investigation costs in respect of the stipulations set forth in the Financing Orders, (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior consent of Agent and Notes Agent, except as contemplated by the Approved Budget or (v) to pay any expenses other than the itemized amounts set forth in the Approved Budget unless Agent and Notes Agent consent to such non-conforming payment in writing.

> 7.3    Further Assurances.

> > (a)    Borrower shall, and shall cause the Guarantors to, from time to time execute, deliver and file, as directed by Agent, any financing statements, security agreements, collateral assignments, notices, control agreements, or other documents to perfect or give the highest priority (except as otherwise provided herein) to Agent's Lien on the Collateral. Borrower shall, and shall cause the Guarantors to, from time to time procure any instruments or documents as may be reasonably requested by Agent, and take all further action that may be necessary, or that Agent may reasonably request, to perfect and protect the Liens granted hereby and by the Loan Documents.

> > (b)    Borrower shall, and shall cause the Guarantors to, protect and defend their respective title to the Collateral and Agent's Lien thereon against all Persons claiming any interest adverse to Borrower, any Guarantor, Agent or any Lender, other than any such claims in respect of Permitted Liens.

> 7.4    Indebtedness.  Borrower shall not, nor permit any Guarantor to, create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness, or prepay any Indebtedness or take any actions which impose on Borrower or any Guarantor an obligation to prepay any Indebtedness .

> 7.5    Collateral.  Each Loan Party shall at all times keep the Collateral and all other property and assets used in such Loan Party's business or in which such Loan Party now or hereafter holds any interest free and clear from any Liens whatsoever (except for Permitted Liens), and shall give Agent prompt written notice of any legal process affecting the Collateral, such other property and assets, or any Liens thereon.  Borrower shall not, nor permit any Guarantor to, agree with any Person other than Agent (and the Prepetition Secured Parties pursuant to the Prepetition Documents) not to encumber or otherwise grant a Lien on its property.

39

7.6     _Investments_.  Borrower shall not, nor permit any Guarantor to, directly or indirectly acquire or own, or make any Investment in or to any Person, other than Permitted Investments.

7.7     _Distributions_.  Borrower shall not, nor permit any Guarantor to, (a) repurchase or redeem any class of Capital Stock, (b) declare or pay any cash dividend or make a cash distribution on any class of Capital Stock, except that the Guarantors may pay dividends or make distributions to Borrower, (c) on and after the Closing Date, lend money to any employees, officers or directors or guarantee the payment of any such loans granted by a third party, (d) waive, release or forgive any indebtedness owed by any employees, officers or directors, (e) purchase or make any payment on or with respect to any Indebtedness subordinated in lien and/or right to payment to the Secured Obligations (other than repayment of the Bridge Obligations on the Closing Date) or (f) pay any management, consulting or similar fees to any Affiliate or holder of Capital Stock of Borrower or any Guarantor.

7.8     _Transfers_.  Except for Permitted Transfers, Borrower shall not, nor permit any Guarantor to, voluntarily or involuntarily transfer, sell, lease, license, lend or in any other manner convey any equitable, beneficial or legal interest in any material portion of its assets.

7.9     _Mergers or Acquisitions; Preservation of Existence_.

(a)     Borrower shall not merge or consolidate, or permit any Guarantor or any of its or their respective Subsidiaries, to merge or consolidate, with or into any other business organization, or acquire, or permit any Guarantor to acquire, all or substantially all of the Capital Stock or property of another Person.

(b)     Borrower will, and will cause each Guarantor and any of its or their respective Subsidiaries, to do or cause to be done, all things necessary to preserve and keep in full force and effect such Person's existence.

(c)     Borrower shall not, and shall not permit any Guarantor to, carry on any business, operations or activities (whether directly, through a joint venture or otherwise) other than those carried on by Borrower and its Subsidiaries at the date hereof.

7.10     _Taxes_.  Borrower, each Guarantor and each of its and their respective Subsidiaries shall timely file all Tax returns required to be filed and timely pay when due all Taxes, fees or other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against Borrower, any Guarantor or Subsidiary, any Lender or the Collateral, upon the ownership, possession, use, operation or Disposition by Borrower or any Guarantor or Subsidiary thereof or upon rents, receipts or earnings of Borrower or any Guarantor or Subsidiary arising therefrom.  Borrower shall file, and shall cause each Guarantor and its and their respective Subsidiaries to file, on or before the due date therefor all personal property Tax returns in respect of the Collateral.  Notwithstanding the foregoing, Borrower, any Guarantor or any Subsidiary of the foregoing may contest, in good faith and by appropriate proceedings, Taxes for which such Person maintains adequate reserves therefor in accordance with GAAP.

7.11     _Corporate Changes_.  Borrower shall not, nor shall it allow Guarantor or its or their Subsidiaries to, change its corporate name, legal form or jurisdiction of formation without thirty

40

(30) days' prior written notice to Agent. None of Borrower, any Guarantor or any Subsidiary of the foregoing shall (a) suffer a Change in Control; (b) relocate its chief executive office or its principal place of business unless: (i) it has provided fifteen (15) days' prior written notice to Agent and (ii) such relocation shall be within the continental U.S.; (c) relocate any item of Collateral (other than (x) sales of Inventory in the ordinary course of business and (y) relocations of Collateral from a location described on Exhibit C to another location described on Exhibit C), unless (i) it has provided fifteen (15) days' prior written notice to Lender, (ii) such relocation is within the continental U.S. and (iii) if such relocation is to a third party bailee, it has delivered a bailee agreement in form and substance reasonably acceptable to Lender.

7.12    Deposit Accounts:. After the Closing Date, none of Borrower, any Guarantor or any Subsidiary of the foregoing shall maintain any Deposit Accounts, or accounts holding Investment Property, except with respect to which Agent or Notes Agent has entered into an Account Control Agreement or waived such requirement.

7.13    Subsidiaries. Borrower shall not form or acquire any Subsidiary subsequent to the Closing Date.

7.14    Transactions with Affiliates. Borrower shall not, and shall not permit any Guarantor or any of its or their Subsidiaries to, directly or indirectly enter into or permit to exist any transaction with or for the benefit of any Affiliate of Borrower, any Guarantor or any Subsidiaries of any of the foregoing, except for Permitted Transfers and transactions that are in the ordinary course of such Person's business, upon fair and reasonable terms that are no more favorable to such Affiliate than would be obtained in an arm's length transaction.

7.15    Amendments to Other Agreements. Borrower shall not, and shall not permit any Guarantor to, amend, modify or waive any provision of (a) any of the organizational documents of Borrower or any Guarantor in a manner materially adverse to Agent, any Lender or their respective rights hereunder, or (b) any Prepetition Document except in connection with implementation of the Restructuring Support Agreement.

7.16    Repayment of Indebtedness. Except as specifically permitted hereunder, no Loan Party shall, without the express prior written consent of the Lenders or pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Chapter 11 Case that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

7.17    Reclamation Claims. No Loan Party shall enter into any agreement to return any of their inventory to any of their creditors for application against any Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims under Section 546(g) of the Bankruptcy Code or allow any creditor to take any setoff against any of its Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise without the prior written consent of Agent or as otherwise permitted by order of the Bankruptcy Court.

41

7.18    Chapter 11 Claims.    No Debtor shall incur, create, assume, suffer to exist or permit any other super priority administrative claim (including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code) which is pari passu with or senior to the claims of Agent and the Lenders against the Debtors, except with respect to the Carve-Out or as set forth in the Financing Order.

7.19    Variance Covenant.

(a)    Net Cash Flow.    Commencing with the calendar week ended May 25, 2013, Borrower shall not permit the aggregate net cash flow (aggregate cash receipts minus aggregate cash disbursements (excluding disbursements on account of professional fees and expenses of the Loan Parties' primary legal counsel and DIP Agent's and Notes Agent's professionals)) of Borrower and the Guarantors as of the end of any calendar week for the four-week period ending as of the end of such calendar week to negatively deviate more than ten percent (10%) from the projected net cash flow of Borrower and its Subsidiaries set forth in the Approved Budget for such period.

(b)    Line-Item Disbursements.    Borrower shall not permit actual aggregate line-item disbursements of Borrower and the Guarantors for any calendar week to exceed the corresponding budgeted line-item disbursements set forth in the Approved Budget for such period by more than fifteen percent (15%); provided, that Borrower and the Guarantors may carry-forward positive variances and balances within line items in the Approved Budget and reallocate such variances and balances to other periods for such line items.

7.20    Sale Milestones.    Borrower shall cause, or shall cause one or more of the Guarantors (as applicable) to cause, the following actions (collectively, the "Sale Process") to occur no later than the applicable date set forth below:

(a)    At all times on and after the Closing Date, Borrower shall continue to retain Houlihan Lokey as its investment bank on the terms and conditions set forth in that certain engagement letter between Borrower and Houlihan Lokey dated December 21, 2012, or shall retain another investment bank acceptable to Agent and the Required Lenders on such terms and conditions acceptable to Agent and the Required Lenders (the "Investment Bank"), to conduct a process to market and sell the assets of the Loan Parties; provided, that so long as Borrower has filed an application to retain Houlihan Lokey on or before the Closing Date, Houlihan Lokey shall be deemed to be retained for purposes of this Agreement unless such application is denied by the Bankruptcy Court or Borrower or Houlihan Lokey otherwise terminate Houlihan Lokey's engagement. (Agent and the Lenders acknowledge and agree that the fees and costs payable to the Investment Bank in connection with the consummation of a Sale shall be paid to such Investment Bank (including Houlihan Lokey) before the use of such proceeds to repay the Loans or other Secured Obligations under the Loan Documents.);

(b)    The Investment Bank shall (i) be authorized to communicate directly with Agent and each Lender regarding Borrower, each Guarantor, the Collateral and the Sale process; (ii) upon its engagement, have weekly calls with Agent and the Lenders to discuss Borrower's financial performance and operations, the Approved Budget and the progress of the Sale; and

42

(iii) provide Agent and Notes Agent with such information as shall be requested by Agent and Notes Agent in connection with the consultation or consent rights, as applicable, of Agent and Notes Agent with respect to the Sale Process set forth in the Approved Bidding Procedures;

(c)     No later than twenty-one (21) calendar days after the Petition Date, obtain Bankruptcy Court approval of the Bidding Procedures Motion, pursuant to an order (the "Bidding Procedures Order") in form and substance acceptable to Agent and Notes Agent;

(d)     No later than thirty (30) calendar days after the Petition Date (the "Bid Deadline"), solicit binding bids to acquire the designated lots of the assets of the Debtors pursuant to the Bidding Procedures Order;

(e)     No later than three (3) calendar days after the Bid Deadline, commence and complete, subject to the supervision of the Bankruptcy Court and in accordance with the Approved Bidding Procedures, the Auction, upon the completion of which the Debtors shall evaluate each bid at the Auction and, in accordance with the Approved Bidding Procedures, select the Successful Bid for subsequent approval by the Bankruptcy Court pursuant to the Sale Order;

(f)     No later than three (3) business days after the conclusion of the Auction, obtain approval of the Sale of all or substantially all of the Debtors' assets to one or more buyers on the terms of the Successful Bid (the "Approved Sale") pursuant to a sale order in form and substance acceptable to Agent and Notes Agent (the "Sale Order"); and

(g)     No later than five (5) calendar days after entry of the Sale Order, consummate the Approved Sale pursuant to the Sale Order.

**Section 8.     Agent.**

8.1     Appointment of Agent.

(a)     Each Lender hereby appoints FCO MA Coda Holdings LLC (together with any successor Agent pursuant to Section 8.7) as Agent under the Loan Documents and authorizes Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Loan Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto.

(b)     Without limiting the generality of clause (a) above, Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents, and each Person making any payment in connection with any Loan Document to any Lender is hereby authorized to make such payment to Agent, (ii) act as collateral agent for Agent and each Lender for purposes of the perfection of all Liens created by the Loan Documents and all other purposes stated therein, (iii) manage, supervise and otherwise deal with the Collateral, (iv) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (v) except as may be otherwise specified in any Loan

43

Document, exercise all remedies given to Agent and the other Lenders with respect to Borrower and each Guarantor and/or the Collateral whether under the Loan Documents, applicable Requirements of Law or otherwise and (vi) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; provided, however, that Agent hereby appoints, authorizes and directs each Lender to act as collateral sub-agent for Agent and the Lenders for purposes of the perfection of all Liens with respect to the Collateral, including cash and Cash Equivalents, held by such Lender, and may further authorize and direct the Lenders to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to Agent, and each Lender hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed. Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Lender). Any such Person shall benefit from this Section 8 to the extent provided by Agent.

(c)    Under the Loan Documents, Agent (i) is acting solely on behalf of the Lenders, with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms, "agent", "Agent", "administrative agent", and "collateral agent" and similar terms in any Loan Document to refer to Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Lender, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above. Except as expressly set forth in the Loan Documents, Agent shall not have any duty to disclose, and shall not be liable for failure to disclose, any information relating to Borrower, any Guarantor or any of its or their respective Subsidiaries that is communicated to or obtained by Agent or any of its Affiliates in any capacity.

(d)    Notwithstanding the generality of the foregoing subsections (a) through (c), Agent agrees with Lenders and solely for the benefit of Lenders and not for the benefit of any Loan Party, that the Collection Account shall be administered subject to the obligations and agreements of Agent set forth in this subsection (d). Agent has established the Collection Account at Bank of America as more specifically described in the definition of Collection Account above. Agent agrees that the Collection Account shall not be moved to any other financial institution, and the wire instructions thereof shall not be changed, without the prior consent of Required Lenders. Agent agrees that all Advances it makes to Borrower hereunder shall be made solely and strictly in accordance with the requirements of this Agreement, including satisfaction of each condition to the DIP Loans and each Advance. Within two (2) days after each Advance Date, Agent shall deliver to each Lender a statement setting forth the balance, as of the Advance Date, of the Collection Account and an allocation of such balance among the remaining Commitments of the Lenders. Any successor Agent appointed pursuant to Section 8.7 shall specifically assume the obligations of Agent in respect of operation and administration of the Collection Account.

44

8.2     Binding Effect; Use of Discretion.

(a)     Each Lender, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by Agent or Required Lenders (or, if expressly required in any Loan Document, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater proportion) and (iii) the exercise by Agent or Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of Lenders.

(b)     If Agent shall request instructions from Required Lenders (or, if expressly required in any Loan Document, a greater proportion of the Lenders) or all affected Lenders with respect to any act or action (including failure to act) in connection with any Loan Document, then Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from Required Lenders (or, if expressly required in any Loan Document, a greater proportion of the Lenders) or all affected Lenders, as the case may be, and Agent shall not incur liability to any Person by reason of so refraining. Agent shall be fully justified in failing or refusing to take any action under any Loan Document (i) if such action would, in the opinion of Agent, be contrary to any Requirement of Law or any Loan Document, (ii) if such action would, in the opinion of Agent, expose Agent to any potential liability under any Requirement of Law or (iii) if Agent shall not first be indemnified to its satisfaction against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under any Loan Document in accordance with the instructions of Required Lenders (or, if expressly required in any Loan Document, a greater proportion of the Lenders) or all affected Lenders, as applicable.

8.3     Agent's Reliance, Etc. Agent may, without incurring any liability hereunder, (a) treat the payee of any DIP/Roll-Up Note as its holder until such DIP/Roll-Up Note has been assigned in accordance with Section 11.14, (b) consult with any of its Affiliates, directors, officers, employees, agents, representatives, attorneys, accountants and Affiliates (as to any Person, its "Related Persons") and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, Borrower or any Guarantor) and (c) rely and act upon any document and information (including those transmitted by electronic transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties. None of Agent or its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and Borrower, on its own behalf and on behalf of each Guarantor, and each Lender, hereby waives and shall not assert (and Borrower and each Guarantor shall cause its Subsidiaries to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment of a court of competent jurisdiction) in connection with the duties of Agent expressly set forth herein. Without limiting the foregoing, Agent: (i) shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required Lenders (or, if expressly required in any Loan

45

Document, a greater proportion of the Lenders) or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of Agent, when acting on behalf of Agent); (ii) shall not be responsible to any Lender or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document; (iii) makes no warranty or representation, and shall not be responsible, to any Lender or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of Borrower, any Guarantor or any Related Person of any of the foregoing in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to Borrower or any Guarantor, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by Agent in connection with the Loan Documents; and (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of Borrower or any Guarantor or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default, and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from Borrower or any Lender describing such Default or Event of Default that is clearly labeled "notice of default" (in which case Agent shall promptly give notice of such receipt to all Lenders, provided that Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction); and, for each of the items set forth in clauses (i) through (iv) above, each Lender and Loan Party hereby waives and agrees not to assert (and each Loan Party shall cause its Subsidiaries to waive and agree not to assert) any right, claim or cause of action it might have against Agent based thereon.

    8.4    **Agent Individually.**  Agent and its Affiliates may make loans and other extensions of credit to, acquire Capital Stock of, engage in any kind of business with, Borrower, any Guarantor or any Affiliate of any of the foregoing as though it were not acting as Agent and may receive separate fees and other payments therefor. To the extent Agent or any of its Affiliates makes a Commitment or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Required Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include Agent or such Affiliate, as the case may be, in its individual capacity as Lender, or as one of the Required Lenders.

    8.5    **Lender Credit Decision.**  Each Lender acknowledges that it shall, independently and without reliance upon Agent, any Lender or any of their Related Persons or upon any document solely or in part because such document was transmitted by Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of Borrower and each Guarantor and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such

46

documents and information as it shall deem appropriate. Except for documents expressly required by any Loan Document to be transmitted by Agent to the Lenders, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrower, any Guarantor or any Affiliate of any of the foregoing that may come in to the possession of Agent or any of its Related Persons.

8.6    Indemnification. Each Lender agrees to reimburse Agent and each of its Related Persons (to the extent not reimbursed by Borrower or any Guarantor) promptly upon demand for its Pro Rata Share of any out-of-pocket costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and any Taxes or insurance paid in the name of, or on behalf of, Borrower or any Guarantor) incurred by Agent or any of its Related Persons in connection with the preparation, documentation, negotiation, syndication, execution, delivery, administration, modification, amendment, consent, waiver or enforcement of, or the taking of any other action (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding (including preparation for and/or response to any subpoena or request for document production relating thereto) or otherwise) in respect of, or legal advice with respect to, its rights or responsibilities under, any Loan Document. To the extent required by any applicable Requirement of Law, Agent may withhold from any payment to any Lender under a Loan Document (including pursuant to Section 2.10 hereof) an amount equal to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that Agent did not properly or timely withhold Tax from amounts paid to or for the account of any Lender for any reason, or if Agent reasonably determines that it was required to withhold Taxes from a prior payment to or for the account of any Lender but failed to do so, such Lender shall promptly indemnify Agent fully for all amounts paid, directly or indirectly, by Agent as Tax or otherwise, including penalties and interest, together with all expenses incurred by Agent (including any Taxes owed by Agent as a result of the receipt of such amounts) and legal fees if Agent, in its reasonable judgment, determines that it requires the assistance and advice of counsel to advise Agent on its rights or responsibilities under any Loan Document. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Agent may offset against any payment to any Lender under a Loan Document, any applicable withholding Tax that was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which Agent is entitled to indemnification from such Lender under this Section 8.6.

8.7    Successor Agent. Agent may resign at any time by delivering notice of such resignation to the Lenders and Borrower, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective, in accordance with the terms of this Section 8.7. If Agent delivers any such notice, the Required Lenders shall have the right to appoint a successor Agent. If, after 30 days after the date of the retiring Agent's notice of resignation, no successor Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders. Effective immediately upon its resignation, (a) the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, (b) the Lenders shall assume and perform all of the duties of Agent until a successor Agent shall have accepted a valid appointment hereunder, (c) the retiring Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any

47

actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as Agent under the Loan Documents, and (iv) subject to its rights under Section 8.2(b), the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents. Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

8.8     Release of Collateral. Each Lender hereby consents to the release and hereby directs Agent to release the following:

(a)     any Guarantor if all of the Capital Stock of such Guarantor owned by Borrower, any Guarantor or any Subsidiary of any of the foregoing is sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a valid waiver or consent); and

(b)     any Lien held by Agent for the benefit of the Secured Parties in (i) any Collateral that is sold or otherwise disposed of by a Loan Party in a transaction permitted by the Loan Documents (including pursuant to a valid waiver or consent) and (ii) all of the Collateral and all Loan Parties, upon (A) termination of all of the Commitments, (B) indefeasible payment in full in cash of all of the Secured Obligations that Agent has theretofore been notified in writing by the holder of such Secured Obligation are then due and payable, and (C) to the extent requested by Agent, receipt by Agent and Lenders of liability releases from the Loan Parties in form and substance acceptable to Agent.

**Section 9.     Events of Default.**

The occurrence of any one or more of the following events shall be an Event of Default:

9.1     Payments. Borrower or any Guarantor fails to pay any amount due under this Agreement, any DIP/Roll-Up Note or any of the other Loan Documents on the due date; or

9.2     Covenants.

(a)     Any Loan Party breaches or defaults in the performance of any covenant or Secured Obligation under Sections 7.1, 7.2(d), 7.4 through 7.9, 7.11(a) and 7.12 through 7.20; or

(b)     Any Loan Party breaches or defaults in the performance of any covenant or Secured Obligation under this Agreement (other than those listed in clause (a) above), any DIP/Roll-Up Note, or any of the other Loan Documents; provided that with respect to a default under any such covenant under this Agreement (other than those listed in clause (a) above), such default continues for more than fourteen (14) days after the earlier of the date on which (i) Agent has given notice of such default to Borrower and (ii) Borrower has actual knowledge of such default; or

9.3     Other Loan Documents. The occurrence of any other default or event of default under any Loan Document; or

48

9.4    Enforceability. (a) Any provision of any Loan Document shall fail to be valid and binding on, or enforceable against, Borrower or any Guarantor that is a party thereto or (b) any Loan Document purporting to grant a security interest to secure any Secured Obligation shall fail to create a valid and enforceable security interest on any Collateral purported to be covered thereby or such security interest shall fail or cease to be a perfected Lien with the priority required in the relevant Loan Document; or

9.5    Representations. Any representation or warranty made by Borrower or any Guarantor in any Loan Document shall have been false or misleading in any material respect when made or furnished; or

9.6    Bankruptcy Matters.

(a)    The Final Order shall not have been entered within twenty-one (21) days after the entry of the Interim Order;

(b)    Any of the Interim Order (or the Final Order, when applicable) or any other order with respect to any of the Bankruptcy Cases affecting in any material respect this Agreement (including the Bidding Procedures Order, the Sale Order or any other order in respect of the Sale Process) shall cease to be in full force and effect, or the Bankruptcy Court shall enter any order amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order (or the Final Order, when applicable) or any other such order without the prior written consent of the Required Parties;

(c)    (i) Any of the Loan Parties shall fail to comply with the Financing Order or any other order with respect to any of the Bankruptcy Cases affecting in any material respect this Agreement (including the Bidding Procedures Order, the Sale Order or any other order in respect of the Sale Process) or (B) any of the Loan Parties shall fail to comply with any order of the Bankruptcy Court, other than the orders described in the preceding clause (i), in any material respect; or

(d)    (i) The Bankruptcy Court shall enter any order (A) dismissing any of the Bankruptcy Cases or converting any of the Bankruptcy Cases to a Chapter 7 case, (B) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in any of the Bankruptcy Cases, (C) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of the Loan Parties' senior management or (D) any other superpriority claim (other than the Carve-Out (as defined in the Financing Order)) or grant of any other Lien (including any adequate protection Lien) having a priority equal or superior to the claims of Agent and Lenders or the Liens in favor of Agent securing the Secured Obligations shall be granted in any of the Chapter 11 Cases or (ii) the filing of any pleading by any Loan Party seeking, or otherwise consenting to or supporting, any of the matters set forth in the foregoing clause (i); or

(e)    Other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget, in each case to the extent authorized by one or more "first day"

49

or other orders satisfactory to Agent, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition indebtedness or payables (including, without limitation, reclamation claims); or

        (f)    The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor holding or asserting a Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor;

        (g)    (i) The filing by any Debtor of any plan of reorganization or liquidation that is not an Approved Plan (as defined in the Restructuring Support Agreement), (ii) the termination of the Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization; (iii) a breach by any Loan Party of any provision of the Restructuring Support Agreement or (iv) the Restructuring Support Agreement ceases to be in full force and effect other than, with respect to the Debtors, as a result of the filing of the Chapter 11 Cases;

        (h)    Any Debtor shall file a motion in any of the Bankruptcy Cases (i) to use Cash Collateral under Section 363(c) of the Bankruptcy Code without the Lenders' consent, (ii) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement or (iii) to take any other action or actions adverse to Agent or the Lenders or their rights and remedies hereunder or under any of the other Loan Documents or the Financing Orders, or Agent's or the Lenders' interest in any of the Collateral, except that the Loan Parties are entitled to conduct the Sales Process in a manner consistent with the Approved Bidding Procedures;

        (i)    (i) Except as a result of the filing of the Chapter 11 Cases, any of the Prepetition Documents for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction; (ii) any Loan Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Loan Documents or the Prepetition Documents or the Liens securing the Secured Obligations or the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the Liens securing such obligations; or (iii) any Loan Party engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against any Secured Party or any Prepetition Secured Party; provided, however, that it shall not constitute an Event of Default if the Loan Parties provide information with respect to the Prepetition Documents to a party in interest, or are compelled to provide information by an order of the Bankruptcy Court so long as Agent, Notes Agent and Term Loan Agent have been served with the request for such an order or, if no such service has been made prior to the time the Loan Parties are required to provide information, so long as the Loan Parties provide prior written notice to Agent, Notes Agent and Term Loan Agent of any intention or requirement to do so;

        (j)    Entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral;

(k)     The consummation of a sale of any material portion of the Loan Parties' assets outside of the ordinary course of business (other than sales expressly permitted pursuant to Section 7.8 or an Approved Plan (as defined in the Restructuring Support Agreement)); or

(l)     The Committee or any other party interest shall engage in any challenge to the validity, perfection, priority, extent or enforceability of any of the Loan Documents, the Prepetition Documents or the Liens securing any of the Secured Obligations or the Prepetition Obligations.

9.7     Judgments.  Except for the allowance (but not the payment) of prepetition claims in the Chapter 11 Case, one or more judgments, orders or decrees (or other similar process) shall be rendered against any Loan Party in an aggregate amount in excess of $100,000 and (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order or decree or (ii) such judgment, order or decree shall not have been vacated or discharged or bonded or stayed pending appeal for a period of 30 consecutive days and there shall not be in effect (by reason of a pending appeal or otherwise) any stay of enforcement thereof; or

9.8     Attachments.  Any material portion of the assets of Borrower or any Guarantor is attached or seized, or a levy with a priority senior to or pari passu with the Liens securing the Secured Obligations is filed against any such assets, or Borrower or any Guarantor is enjoined or in any way prevented by court order from conducting any part of its business; or

9.9     Other Obligations.  Except as occasioned by the filing of the Chapter 11 Cases and obligations with respect to which the Bankruptcy Code prohibits any Debtor from complying or permits any Debtor not to comply, (a) a default or breach occurs under any other agreement, document or instrument entered into either (x) Prepetition and which is affirmed after the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code or (y) Postpetition, to which any Debtor is a party that is not cured within any applicable grace period therefor, and such default or breach (i) arose due to a failure of any Debtor to make any payment when due (after giving effect to any applicable grace period) (whether due because of scheduled maturity, required prepayment provisions, acceleration, demand or otherwise) on any Indebtedness of any Debtor or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness to become due prior to its stated maturity or prior to its regularly scheduled dates of payment or (b) the occurrence of any default under any agreement or obligation of any Debtor that could reasonably be expected to have a Material Adverse Effect.

9.10    Material Adverse Effect.  Any event or circumstance shall have occurred since the Petition Date that has resulted in a Material Adverse Effect.

## Section 10.    Remedies.

10.1    General.  During the continuance of any Event of Default, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before or notice from, the Bankruptcy Court: (a) upon the written request of the Required Lenders, Agent shall terminate and suspend any then-outstanding Commitments and/or accelerate and demand payment of all or any part of the Secured Obligations and declare them to be immediately due and payable; provided, that the termination and suspension of the

51

Commitments shall not eliminate or modify the obligation of the Lenders to make the Final Advance as required by this Agreement; (b) Agent may notify any account debtors of Borrower or any Guarantor to make payment directly to Agent, compromise the amount of any such account on behalf of Borrower or such Guarantor, as applicable, and endorse Agent's name without recourse on any such payment for deposit directly to the Collection Account, and (c) Agent shall have (on behalf of the Secured Parties) and may exercise all rights and remedies with respect to the Collateral under the Loan Documents or otherwise available to it under the UCC and other applicable Requirements of Law, including the right to release, hold, sell, lease, liquidate, collect, realize upon, or otherwise Dispose of all or any part of the Collateral and the right to occupy, utilize, process and commingle the Collateral; provided that prior to foreclosing on the Collateral or otherwise exercising remedies with respect to the Collateral, Agent shall provide the Loan Parties (with a copy to any counsel for the Committee and to the U.S. Trustee) with five (5) business days prior written notice during which time any such party can elect to file a pleading seeking an emergency hearing in opposition to Agent's exercise of its rights and remedies and provided further that, in any hearing following such notice, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by Agent shall be whether, in fact, an Event of Default has occurred and is continuing. Any such Disposition may be made either at public or private sale at Agent's place of business or elsewhere. Borrower agrees that any such public or private sale may occur upon ten (10) calendar days' prior written notice to Borrower. Agent may require Borrower to assemble the Collateral and make it available to Agent at a place designated by Agent that is reasonably convenient to Agent and Borrower. Agent shall be deemed to have acted reasonably in the custody, preservation and Disposition of any of the Collateral if it complies with the obligations of a secured party under the UCC.

    10.2    Application of Proceeds. The Proceeds of any Disposition or other realization upon all or any part of the Collateral shall be applied by Agent in the following order of priorities:

        First, to the payment of that portion of the Secured Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to Agent) payable to Agent in its capacity as such (including interest thereon);

        Second, to payment of that portion of the Secured Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including reasonable fees, charges and disbursements of counsel to the respective Lenders), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

        Third, to payment of that portion of the Secured Obligations constituting accrued and unpaid interest on the Loans and other Secured Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

        Fourth, to payment of that portion of the Secured Obligations constituting unpaid principal of the Loans and other Secured Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them; and

52

Last, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full, to Borrower or as otherwise required by Law.

10.3    Marshaling; Deductions.

(a)    Agent shall be under no obligation to marshal any of the Collateral for the benefit of Borrower, any Guarantor or any other Person, and Borrower expressly waives, on its behalf and on behalf of the Guarantors, all rights, if any, to require Agent to marshal any Collateral.

(b)    Agent shall be entitled to make any deduction or withholding of any Tax from any payment to a Lender pursuant to Section 10.2 that Agent determines, in its sole discretion, is required to be made by applicable Requirements of Law (including because Agent determines that such deduction or withholding would have been required to have been made with respect to payments to such Lender even if no Event of Default had occurred). Accordingly, Agent shall be entitled to enforce all rights that Agent and Borrower are entitled to exercise pursuant to Section 2.10, including such rights to make any deduction or withholding of any Tax and rights to request updated U.S. Tax Compliance Certificates or any other applicable IRS forms or other certifications.

10.4    Indemnification by the Lenders.  Without limiting the indemnification obligations of each Lender to Agent pursuant to Section 8.6, each Lender shall severally indemnify Agent, within 10 days after demand therefor, for (i) any Taxes attributable to such Lender's failure to comply with the provisions of Section 2.12(c) relating to the maintenance of a Participant Register and (ii) any Excluded Taxes attributable to such Lender (including failure by such Lender to comply with Section 2.10(d)), in each case, that are payable or paid by Agent in connection with any Loan Document, and any expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to the Lender from any other source against any amount due to Agent under this Section 10.4.

10.5    Cumulative Remedies.  The rights, powers and remedies of Agent under this Section 10 shall be in addition to all rights, powers and remedies given by Requirements of Law and are cumulative.  The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of or election of remedies with respect to any other rights, powers and remedies of Agent.

## Section 11.    Miscellaneous.

11.1    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Requirements of Law, but if any provision of this Agreement shall be prohibited by or invalid under such Requirement of Law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

53

11.2    Notice.    Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, service of process or other communication (including the delivery of Financial Statements) that is required, contemplated, or permitted under the Loan Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received upon the earlier of:  (i) the day of transmission by facsimile or hand delivery; (ii) one day following transmission by an overnight express service or overnight mail delivery service; or (iii) the third calendar day after deposit in the U.S. mails, with proper first class postage prepaid, in each case addressed to the party to be notified as follows:

   (a)  If to Agent:

     FCO MA CODA HOLDINGS LLC, as Agent
     Attention:   Josh Pack and Mari Subburathinam
     1345 Avenue of the Americas, 46th Floor
     New York, NY  10105
     Facsimile:  (310) 228-3031
     Telephone:  (310) 228-3015

     with a copy to:

     SIDLEY AUSTIN LLP
     Attn:  Jeremy E. Rosenthal
     555 West Fifth Street, Suite 4000
     Los Angeles, California 90013
     Facsimile:  (213) 896-6893
     Telephone:  (213) 896-6600

   (b)  If to any Lender, to such Lender at the address listed on such Lender's signature page attached hereto.

   (c)  If to Borrower, any Guarantor or any of its or their respective Subsidiaries:

     CODA HOLDINGS, INC.
     Attention:  General Counsel
     2340 S. Fairfax Ave.
     Los Angeles, CA 90016
     Facsimile:  (323) 965-9607
     Telephone:  (323) 557-1400

     With a copy to

     WHITE & CASE LLP
     Attention:  John Cunningham and Roberto J. Kampfner
     633 West 5th Street, Suite 1900
     Los Angeles, California 90071
     Facsimile:  (213) 452-2329
     Telephone:  (213) 620-7700

or to such other address as each party may designate for itself by like notice.

11.3    Entire Agreement. This Agreement, any DIP/Roll-Up Notes, and the other Loan Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof. Notwithstanding the foregoing, however, the Financing Orders shall continue to govern the terms and conditions of the transactions contemplated hereby to the extent inconsistent with, or address matters not addressed in, this Agreement.

11.4    No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

11.5    No Waiver. The powers conferred upon Agent by this Agreement are solely to protect its rights hereunder and under the other Loan Documents and its interest (for the benefit of the Secured Parties) in the Collateral and shall not impose any duty upon Agent to exercise any such powers. No omission or delay by Agent at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by Borrower or any Guarantor at any time designated, shall be a waiver of any such right or remedy to which Agent or any Lender is entitled, nor shall it in any way affect the right of Agent to enforce such provisions thereafter.

11.6    Survival. All agreements, representations and warranties contained in this Agreement, any DIP/Roll-Up Notes and the other Loan Documents or in any document delivered pursuant hereto or thereto shall be for the benefit of Agent and each Lender and shall survive the execution and delivery of this Agreement and the expiration or other termination of this Agreement.

11.7    Successors and Assigns. The provisions of this Agreement and the other Loan Documents shall inure to the benefit of and be binding on Borrower and each Guarantor and their permitted assigns (if any). Neither Borrower nor any Guarantor shall assign its obligations under this Agreement, any DIP/Roll-Up Notes or any of the other Loan Documents without Agent's express prior written consent, and any such attempted assignment shall be void and of no effect.

11.8    Amendments, Waivers.

(a)    No amendment or waiver of any provision of any Loan Document, and no consent with respect to any departure by Borrower or any Guarantor therefrom, shall be effective unless the same shall be in writing and signed by Agent, the Required Lenders (or by Agent with the consent of Required Lenders), Borrower and each Guarantor; provided that no such amendment, waiver or consent shall, unless in writing and signed by all Lenders directly affected thereby (or by Agent with the consent of all Lenders directly affected thereby), in addition to Agent, Required Lenders (or by Agent with the consent of Required Lenders)

55

Borrower and each Guarantor, do any of the following: (i) increase or decrease the amount of, or extend the term of, any Commitment, (ii) reduce the principal of or rate of interest on (other than waiving the imposition of the Default Rate) any Loan or reduce the amount of any fees payable under any Loan Document, (iii) except as set forth in the definition of Maturity Date, postpone the date fixed for or reduce any scheduled installment of principal or any payment of interest or fees due to any Lender under the Loan Documents, (iv) release all or substantially all of the Collateral, except as otherwise may be provided in any Loan Document, (v) release Borrower or any Guarantor from, or consent to an assignment or a delegation of, the obligations of Borrower or any Guarantor under the Loan Documents, except as otherwise may be provided in any Loan Document, (vi) amend, modify, terminate or waive Sections 2.8(a) or this Section 11.8(a), or (vii) amend or modify the definition of "Required Lenders" or any provision providing for the consent or other action by all affected Lenders.

(b)     Notwithstanding any provision in this Section 11.8 to the contrary, (i) no amendment, modification, termination or waiver affecting or modifying the rights or obligations of Agent under any Loan Document shall be effective unless signed by Borrower, each Guarantor, Agent and Required Lenders, (ii) Agent may amend Schedule A to reflect assignments permitted hereunder, and (iii) Agent and any Loan Party may amend or modify any Loan Document to grant a new Lien, extend an existing Lien over additional Property or join additional Persons as Loan Parties, in each case for the benefit of Agent and Lenders.

(c)     Each of the Lenders hereby agrees that, notwithstanding any provision in this Agreement or the Restructuring Support Agreement to the contrary, at any time that Coda JV Holdings shall hold (x) more than 50% of the sum of the aggregate unpaid principal amount of the Loans then outstanding and the Commitments then in effect and (y) more than 50% of the outstanding principal balance of the Enhanced Priority Notes:

(i)     (A) At least two Lenders shall be required to constitute Required Lenders with respect to any action to be taken by Required Lenders hereunder unless Coda JV Holdings shall certify to Agent that such action shall have been approved by members of Coda JV Holdings holding 71.59% or more of the percentage interests therein and (B) at least two Lenders shall be required to constitute Required DIP Lenders with respect to any action to be taken by Required DIP Lenders under the Restructuring Support Agreement unless Coda JV Holdings shall certify to Agent that such action shall have been approved by members of Coda JV Holdings holding 71.59% or more of the percentage interests therein;

(ii)     Coda JV Holdings shall, at the request of Aeris, consent to any action to be taken by Required Lenders hereunder or any action to be taken by Required DIP Lenders under the Restructuring Support Agreement if (A) Aeris consents to such action and (B) members of Coda JV Holdings holding more than 28.41% of the percentage interests therein have certified to Agent that such members have consented to such action;

(iii)     At least two holders of Enhanced Priority Notes shall be required to constitute Required Noteholders under the Restructuring Support Agreement with respect to any action to be taken by Required Noteholders under the Restructuring Support

56

Agreement unless Coda JV Holdings shall certify to Agent that such action shall have been approved by members of Coda JV Holdings holding 71.59% or more of the percentage interests therein; and

(iv)    Coda JV Holdings shall, at the request of Aeris, consent to any action to be taken by Required Noteholders under the Restructuring Support Agreement if (A) Aeris consents to such action and (B) members of Coda JV Holdings holding more than 28.41% of the percentage interests therein have certified to Agent that such members have consented to such action.

11.9    Performance. Time is of the essence of the Loan Documents.

11.10    Waiver of Jury Trial. EACH OF BORROWER, EACH GUARANTOR, AGENT AND EACH LENDER UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS, ANY OF THE INDEBTEDNESS SECURED HEREBY OR OTHER SECURED OBLIGATIONS, ANY DEALINGS AMONG BORROWER, ANY GUARANTOR, AGENT AND/OR ANY LENDER RELATING TO THE SUBJECT MATTER OF ANY LON DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED AMONG BORROWER, THE GUARANTORS, AGENT AND/OR THE LENDERS. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT.    THIS WAIVER IS IRREVOCABLE AND MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY    SUBSEQUENT    AMENDMENTS,    RENEWALS,    SUPPLEMENTS    OR MODIFICATIONS TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

11.11    Governing Law and Jurisdiction.

(a)    Governing Law. ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE).

(b)    Submission to Jurisdiction.    EACH LOAN PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE LOAN PARTIES, AGENT AND THE LENDERS PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT; PROVIDED, THAT AGENT, LENDERS AND EACH LOAN PARTY ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY

57

HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE SECURED OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF AGENT. EACH LOAN PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH LOAN PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH LOAN PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

(c)     Service of Process. Each Loan Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the U.S. with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of such Loan Party specified herein (and shall be effective when such mailing shall be effective, as provided therein). Each Loan Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Requirements of Law.

(d)     Non-exclusive Jurisdiction. Nothing contained in this Section 11.11 shall affect the right of Agent or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against Borrower or any Guarantor in any other jurisdiction.

11.12   Professional Fees. Borrower promises to pay or reimburse on demand all reasonable fees, costs and expenses incurred by (a) Agent in connection with (i) the preparation, documentation, negotiation, syndication, execution and delivery, administration of, or any amendment, restatement, modification, waiver or termination of any Loan Document, (ii) any legal advice relating to Agent's rights or responsibilities under any Loan Document, (iii) the administration of the Loan and the facilities hereunder and any other transaction contemplated hereunder or any Loan Document and (b) Agent and each Lender in connection with the enforcement, assertion, defense or preservation of Agent's and the Lenders' rights and remedies under the Loan Documents, including preparation for and/or response to any subpoena or request for document production relating thereto, in each case of clauses (a) through (d), including reasonable attorneys' fees and expenses, reasonable fees and expenses of consultants, auditors (including internal auditors) and appraisers and UCC and other corporate search and filing fees and wire transfer fees. Each Loan Party further agrees that such fees, costs and expenses shall constitute Secured Obligations.

11.13   Confidentiality. Each of Agent and each Lender acknowledges that certain items of Collateral and information provided to it by the Loan Parties are confidential and proprietary information of the Loan Parties, if and to the extent such information either (x) is marked as

confidential by the Loan Parties at the time of disclosure, or (y) should reasonably be understood to be confidential (the "Confidential Information"). Accordingly, each of Agent and each Lender agrees that any Confidential Information it may obtain in the course of documenting or executing and delivering the Loan Documents or acquiring, administering, or perfecting Agent's security interest in the Collateral for the benefit of the Secured Parties shall not be disclosed to any other Person in any manner whatsoever, in whole or in part, without the prior written consent of Borrower, such consent not to be unreasonably withheld or delayed, except that Agent and each Lender may disclose any such information:  (a) to its Related Persons if, in its sole discretion, it determines that any such Person should have access to such information in connection with such Person's responsibilities in connection with the Loan or and Loan Document and, provided that such recipient of such Confidential Information either (i) agrees to be bound by the confidentiality provisions of this paragraph or (ii) is otherwise subject to confidentiality restrictions; (b) if such information is generally available to the public; (c) if required or appropriate in any report, statement or testimony submitted to any Governmental Authority having or claiming to have jurisdiction over Agent or such Lender, as applicable; (d) if required or appropriate in response to any summons or subpoena or in connection with any litigation, to the extent permitted or deemed advisable by counsel to Agent or such Lender, as applicable; (e) to comply with any Requirement of Law applicable to Agent or such Lender, as applicable; (f) to the extent reasonably necessary in connection with the exercise of any right or remedy under any Loan Document or other Disposition of Collateral; (g) to any participant or assignee of Lender or any prospective participant or assignee; provided, that such participant or assignee or prospective participant or assignee agrees to be bound by this Section 11.13 prior to disclosure; or (h) otherwise with the prior consent of Borrower; provided, that any disclosure made in violation of this Agreement shall not affect the obligations of Borrower, any Guarantor or any of their respective Affiliates under this Agreement or any of the other Loan Documents.

     11.14  Assignment.

         (a)    [Reserved.]

         (b)    Each Lender may sell, transfer or assign, at any time or times, all or a portion of its rights and obligations hereunder and under the other Loan Documents (including all of its rights and obligations with respect to its outstanding Commitment, if any) to any Qualified Assignee; provided, however, that any such sale, transfer or assignment shall (i) require the execution of an assignment agreement in form and substance reasonably satisfactory to, and acknowledged by, Agent (an "Assignment Agreement"), (ii) be in an amount of not less than $50,000, unless such assignment is made to an existing Lender or an Affiliate of an existing Lender or is of the assignor's (together with its Affiliates') entire interest of the Loan or is made with the prior written consent of Agent, (iii) except for assignments to existing Lenders or an Affiliate of an existing Lender, include a payment to Agent of an assignment fee of $3,500 (unless otherwise agreed by Agent) and (iv) be made in compliance with the restrictions set forth in Section 4 of the Restructuring Support Agreement.  In the case of an assignment by a Lender under this Section 11.14, the assignee shall have, to the extent of such assignment, the same rights, benefits and obligations as all other Lenders hereunder.  The assigning Lender shall be relieved of its obligations hereunder with respect to its outstanding Commitment (if any) and Loans, or assigned portion thereof, from and after the date of such assignment. Borrower hereby acknowledges and agrees that any assignment shall give rise to a

59

direct obligation of Borrower to the assignee and that the assignee shall be considered to be a "Lender" hereunder and under the other Loan Documents, subject to recordation thereof by Agent in the Register. Agent may amend Schedule A to this Agreement to reflect assignments made in accordance with this Section 11.14.

(c)    In addition to the other rights provided in this Section 11.14, each Lender may, without notice to or consent from any other Person, sell participations to one or more Persons (other than a natural person, Borrower or any of its Subsidiaries or Affiliates) in or to all or a portion of its rights and obligations under the Loan Documents (including all of its rights and obligations with respect to the Loan); provided, however, that, whether as a result of any term of any Loan Document or of such participation, (i) no such participant shall have a commitment, or be deemed to have made an offer to commit, to make any Loan hereunder, and, no such participant shall be liable for any obligation of such Lender hereunder, (ii) such Lender's rights and obligations, and the rights and obligations of the Loan Parties and Agent and other Lenders towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain a holder of its portion of the Secured Obligations, and in no case shall a participant have the right to enforce any of the terms of any Loan Document, and (iii) the consent of such participant shall not be required for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Secured Obligations), except for those described in clauses (ii), (iii) and (iv) of Section 11.8(a).

11.15  Revival of Secured Obligations.    The Loan Documents and the Secured Obligations and Collateral security shall continue to be effective, or shall be revived or reinstated, as the case may be, if at any time payment and performance of the Secured Obligations or any transfer of Collateral to Agent or any Lender, or any part thereof, is rescinded, avoided or avoidable, reduced in amount, or must otherwise be restored or returned by, or is recovered from, Agent or any Lender, as applicable, or by any obligee of the Secured Obligations (including pursuant to any settlement entered into by any Secured Party in its discretion), whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment, performance, or transfer of Collateral had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, avoided, avoidable, restored, returned, or recovered, the Loan Documents and the Secured Obligations shall be deemed, without any further action or documentation, to have been revived and reinstated except to the extent of the full, final, and indefeasible payment of the Secured Obligations in cash.

11.16  Adjustments.    Except to the extent that this Agreement expressly provides for payments to be allocated to a particular Lender or to the Lenders generally, if any Lender (a "Benefitted Lender") shall, at any time after the Loans, other Secured Obligations and/or other amounts payable hereunder have become due and payable, receive any payment of all or part of the Secured Obligations owing to it, or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by set off, or otherwise), in a greater proportion than any such payment to or Collateral received by any other Lender, if any, in respect of the Secured Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Secured Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such Collateral,

60

as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such Collateral ratably with each of the other Lenders; provided that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

11.17  No Third Party Beneficiaries.  No provisions of the Loan Documents are intended, nor will be interpreted, to provide or create any third-party beneficiary rights or any other rights of any kind in any person other than Agent, each Lender, Borrower and each Guarantor unless specifically provided otherwise herein, and, except as otherwise so provided, all provisions of the Loan Documents will be personal and solely between Agent, the Lenders, Borrower and the Guarantors.

11.18  Counterparts.  This Agreement and any amendments, waivers, consents or supplements hereto may be executed originally or by transmittal of an electronic file (included a PDF) in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

## Section 12.    Guaranty.

12.1    Guaranty.  Each Guarantor hereby agrees that it is jointly and severally liable for, as primary obligor and not merely as surety, and absolutely and unconditionally guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations (collectively the "Guaranteed Obligations").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.

12.2    Guaranty of Payment. The guaranty set forth in this Section 12 (this "Guaranty") is a guaranty of payment and not of collection.  Each Guarantor waives any right to require Agent or any Lender to sue Borrower, any Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

12.3    No Discharge or Diminishment of Guaranty.

(a)    Except as otherwise provided for herein, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Obligated Party; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights

61

which any Guarantor may have at any time against any Obligated Party, Agent, any Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b) The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c) Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of Agent or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of any Obligated Party; (iv) any action or failure to act by Agent or any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

12.4    Defenses Waived.    To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of Borrower or any Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person. Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Guaranty except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash. To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Obligated Party or any security.

12.5    Rights of Subrogation.    No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any Collateral, until the Loan Parties and the Guarantors have fully performed all their obligations to Agent and the Lenders.

62

12.6    Reinstatement; Stay of Acceleration. If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned (including pursuant to any settlement entered into by any Secured Party in its discretion), each Guarantor's obligations under this Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed for any reason, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Lender.

12.7    Information. Each Guarantor assumes all responsibility for being and keeping itself informed of Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Guaranty, and agrees that neither Agent nor any Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

12.8    Liability Cumulative. The liability of each Guarantor under this Section 12 is in addition to and shall be cumulative with all liabilities of each Loan Party to Agent and the Lenders under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

*(Signature pages follow.)*

63

IN WITNESS WHEREOF, Borrower, each Guarantor, Agent and each Lender have duly executed and delivered this DIP Loan Agreement as of the day and year first above written.

BORROWER:

        CODA HOLDINGS, INC.

        By: _____
        Name:
        Title:

GUARANTORS:

        CODA AUTOMOTIVE, INC.

        By: _____
        Name:
        Title:

        CODA AUTOMOTIVE (CA), INC.

        By: _____
        Name:
        Title:

        CODA ENERGY LLC

        By: _____
        Name:
        Title:

        ENERGYCS LLC

        By: _____
        Name:
        Title:

Signature Page

LIO ENERGY SYSTEMS HOLDINGS LLC

By: _____
Name: _____
Title: _____

MILES ELECTRIC VEHICLES LIMITED

By: _____
Name: _____
Title: _____

Signature Page

AGENT:

FCO MA CODA HOLDINGS LLC,
as Agent

By:_____
Name:
Title:        Glenn P. Cummins
              Treasurer

Signature Page

LENDERS:

CODA JV HOLDINGS LLC,
as Lender

By:_____
Name:
Title:        CONSTANTINE M. DAKOLIAS
                      PRESIDENT

1345 AVENUE OF THE AMERICAS
NEW YORK, NY 10105
Attention: CONSTANTINE M. DAKOLIAS
Facsimile: 646 224 8716
Telephone: 212 798 - 6100

Signature Page

AERIS CAPITAL ARCHER, L.P.,
as Lender

By: _____
Name:         Gregory Link          Ralph Woodford
Its:          Director              Director


Address:      _____
              _____
              _____
Facsimile:    _____
Telephone:    _____

Signature Page

EXHIBIT A

## ADVANCE REQUEST

To:    FCO MA CODA HOLDINGS LLC, as Agent                    Date: _____, 20__
       Attention: Josh Pack and Mari Subburathinam
       1345 Avenue of the Americas, 46th Floor
       New York, NY 10105
       Facsimile: (310) 228-3031


       CODA HOLDINGS, INC., a Delaware corporation ("Borrower"), hereby requests an Advance (the "Requested Advance") in the amount of _____ Dollars ($_____) on _____, _____ (the "Advance Date") pursuant to that certain DIP Loan Agreement, dated as of May 8, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Agreement"), by and among Borrower, the Lenders party thereto and FCO MA Coda Holdings LLC, as Agent (in such capacity, "Agent"). Capitalized words and other terms used but not otherwise defined herein are used with the same meanings as defined in the Agreement.

       The Requested Advance shall be sent by wire transfer to the deposit account of Borrower specified in Section 2.1(d) of the Agreement.

       Borrower represents that the conditions precedent to the Requested Advance set forth in the Agreement are satisfied and shall be satisfied upon the making of the Requested Advance, including but not limited to:

       (a)    Borrower has delivered to Agent a certificate executed by Borrower's Chief Executive Officer or Chief Financial Officer certifying that the amount of the Requested Advance and the intended use of the funds to be so advanced are consistent with the Approved Budget and such funds shall be so used within the following 14 day period;

       (b)    the representations and warranties set forth in the Agreement, including Section 5, and the other Loan Documents shall be true and correct in all material respects on and as of the Advance Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date;

       (c)    no Event of Default shall have occurred and be continuing as of the Advance Date; and

       (d)    (i) if (A) the Requested Advance is to be made on or after the date twenty-one (21) days after the Petition Date or (B) the amount of the Requested Advance, together with the outstanding principal amount of the DIP Loans, shall exceed the Interim Advance, the Bankruptcy Court shall have entered the Final Order on or prior to such date, (ii) the Interim Order or the Final Order, as the case may be, shall not have been vacated, reversed, modified or amended without the consent of the Required Parties, (iii) no motion for reconsideration of any

A-1

such order shall have been timely filed and (iv) no appeal of any such order shall have been timely filed or, if such order is the subject of a pending appeal in any respect, none of the making of any Loans, the use of Cash Collateral in accordance with the Agreement, the granting of super priority claim status with respect to the Secured Obligations, the granting of the Liens described in the Agreement and the performance by any Debtor of its obligations under the Agreement shall be the subject of a presently effective stay pending appeal.

Borrower agrees to notify Agent promptly before the funding of the Requested Advance if any of the matters which have been represented above shall not be true and correct on the Advance Date and if Agent has received no such notice before the Advance Date then the statements set forth above shall be deemed to have been made and shall be deemed to be true and correct as of the Advance Date.

Executed as of [          ], 20[   ].

CODA HOLDINGS, INC.

By: _____
Name:
Title:

A-2

EXHIBIT B-1

FORM OF DIP NOTE

$[_____]                                                                                    ___ __, 20__

FOR VALUE RECEIVED, CODA HOLDINGS, INC., a Delaware corporation (the "Borrower"), hereby promises to pay to the order of [_____], a [_____] or the holder of this DIP Note ("Lender") at the Collection Account or such other location as Agent (as defined below) shall specify, in lawful money of the United States of America, the principal amount of [_____] Dollars ($[_____]) or such other principal amount of DIP Loans as Lender has advanced to Borrower, together with interest at a rate per annum set forth in the Loan Agreement.

This DIP Note (this "Promissory Note") is a DIP Note referred to in, and is executed and delivered in connection with, that certain DIP Loan Agreement dated as of May 8, 2013, by and among Borrower, the lenders party thereto and FCO MA Coda Holdings LLC, as Agent (in such capacity, "Agent") (as the same may from time to time be amended, restated, modified or supplemented in accordance with its terms, the "Loan Agreement"), and is entitled to the benefit and security of the Loan Agreement and the other Loan Documents, to which reference is made for a statement of all of the terms and conditions thereof. All payments shall be made in accordance with the Loan Agreement. All terms defined in the Loan Agreement shall have the same definitions when used herein, unless otherwise defined herein. An Event of Default under the Loan Agreement shall constitute a default under this Promissory Note.

Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest under the UCC or any applicable law. Borrower agrees to make all payments under this Promissory Note without setoff, recoupment or deduction and regardless of any counterclaim or defense. This Promissory Note has been negotiated and delivered to Lender and is payable in the State of New York. This Promissory Note shall be governed by and construed and enforced in accordance with, the laws of the State of New York and any applicable laws of the United States of America (including the Bankruptcy Code).

CODA HOLDINGS, INC.

By: _____
Name:
Title:

B-1-1

EXHIBIT B-2

FORM OF ROLL-UP NOTE

$[_____]                                                                      ___ __, 20__

FOR VALUE RECEIVED, CODA HOLDINGS, INC., a Delaware corporation (the "Borrower"), hereby promises to pay to the order of [_____], a [_____] or the holder of this Roll-Up Note ("Lender") at the Collection Account or such other location as Agent (as defined below) shall specify, in lawful money of the United States of America, the principal amount of [_____] Dollars ($[_____]) or such other principal amount of Roll-Up Loans as Lender has advanced to Borrower, together with interest at a rate per annum set forth in the Loan Agreement.

This Roll-Up Note (this "Promissory Note") is a Roll-Up Note referred to in, and is executed and delivered in connection with, that certain DIP Loan Agreement dated as of May 8, 2013, by and among Borrower, the lenders party thereto and FCO MA Coda Holdings LLC, as Agent (in such capacity, "Agent") (as the same may from time to time be amended, restated, modified or supplemented in accordance with its terms, the "Loan Agreement"), and is entitled to the benefit and security of the Loan Agreement and the other Loan Documents, to which reference is made for a statement of all of the terms and conditions thereof. All payments shall be made in accordance with the Loan Agreement. All terms defined in the Loan Agreement shall have the same definitions when used herein, unless otherwise defined herein. An Event of Default under the Loan Agreement shall constitute a default under this Promissory Note.

Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest under the UCC or any applicable law. Borrower agrees to make all payments under this Promissory Note without setoff, recoupment or deduction and regardless of any counterclaim or defense. This Promissory Note has been negotiated and delivered to Lender and is payable in the State of New York. This Promissory Note shall be governed by and construed and enforced in accordance with, the laws of the State of New York and any applicable laws of the United States of America (including the Bankruptcy Code).

CODA HOLDINGS, INC.

By: _____
Name:
Title:

B-2-1

## EXHIBIT C

### NAME, LOCATIONS AND OTHER INFORMATION FOR BORROWER AND GUARANTORS

BORROWER: Coda Holdings Inc. a Delaware Corporation (EIN 80-0551892)

GUARANTORS:

Coda Automotive Inc. a Delaware Corporation (EIN 27-020680)

Coda Automotive (CA) Inc. a Delaware Corporation (EIN 27-1959109)

Energy CS LLC a Delaware LLC (EIN 45-3281359)

Coda Energy LLC  a Delaware LLC (EIN 45-2433053)

Lio Energy Systems (Holdings) LLC  a Delaware LLC (EIN 45-2433158)

Miles Electric Vehicles Limited, a Hong Kong Entity)

Borrowers and Guarantors are all located at 2340 S. Fairfax Avenue Los Angeles California 90016

EXHIBIT D

PATENTS, TRADEMARKS, COPYRIGHTS AND LICENSES

See attached.

Status as of March 12, 2013

## CODA Patent Portfolio

### 1. Owned Patents

| Holder | Country | Patent Title | Description | Issued | Published | Patent No. |
|---|---|---|---|---|---|---|
| EnergyCS | US | METHOD AND SYSTEMS FOR RETROFITTING A FULL HYBRID TO BE A PLUG-IN ELECTRIC HYBRID | This patent covers the conversion process, software and instrumentation for the single battery system plug-in-plus retrofit kit developed at EnergyCS. | 10-Jul-12 | 29-Apr-10 | 827,620 |
| | Japan | | | 22-Dec-11 | 16-Sep-08 | 4890555 |
| EnergyCS | China | MULTIPLEXER AND SWITCH-BASED ELECTROCHEMICAL CELL MONITOR | This is the fundamental measuring and balancing circuit used in our BMS and the bulking block on which the BMS is based. It uses low-cost off-the-shelf components to achieve a safe and reliable measuring circuit. | 17-Nov-10 | 21-May-08 | ZL200680010877.2 |
| | Hong Kong | | | 17-Nov-10 | 9-Apr-09 | HK1129863 |

### 2. Pending Applications

| Applicant | Country/Region | Application Title | Description | Published | Filed | Application Number |
|---|---|---|---|---|---|---|
| Automotive | US | ROTARY ENCODER GEAR SELECTOR FOR VEHICLE | Software Algorithm that controls gear selection, transmission control module (transmission park pole). Inverter/motor performance (torque request) and LEDs on the gear selector. | 8-Dec-11 | 10-May-11 | 13/174418 |
| | China | | | 7-Dec-11 | 12-May-11 | 201110126098.1 |
| | Hong Kong | | | 28-Sep-12 | 7-Jun-12 | 12105539.3 |
| Automotive | US | ELECTRIC VEHICLE REGENERATIVE BRAKING SYSTEM | Software algorithm that controls traditional brake system with electronic stability control. Implementation of overlap/parallel regenerative brake system, which allows up to 15% of energy recovery. The main point of this patent is integration of traditional brake system with regenerative capabilities of the traction motor. | 22-Dec-11 | | 13/335436 |
| | China | | | | 27-Mar-12 | 201210084470.1 |
| Automotive | US | ELECTRO-CHEMICAL CELL BALANCING CIRCUITS AND METHODS (SLEEP BALANCING) | Allows us to balance the cells with the BMS turned off. This can reduce the cost of the balancing circuit and the size of the LMUs. | 7-Jun-12 | 6-Dec-11 | 13/311,994 |
| | PCT | | | 14-Jun-12 | 6-Dec-11 | PCT/US2011/063253 |
| | China | | | | 20-Feb-12 | 201180060404.0 |
| Automotive | US | CELL MONITORING AND BALANCING CIRCUIT WITH SELF-DIAGNOSTIC FEATURES | Adds redundant check of measurement and balancing without doubling up on expensive components. Allows our BMS to achieve a high level of safety without high costs. | 7-Jun-12 | 6-Dec-11 | 13/312,025 |
| | PCT | | | 14-Jun-12 | 6-Dec-11 | PCT/US2011/063507 |
| | China | | | 28-Nov-12 | 20-Feb-12 | 201180063465.5 |
| Automotive | US | SYSTEM AND METHOD FOR MEASURING ISOLATED HIGH VOLTAGE | Combines isolation and high voltage measurement circuits, two important functions of the BMS. Prevents damaging high voltage from reaching low voltage components and reduces cost by combining the two circuits together. | 7-Jun-12 | 6-Dec-11 | 13/312,664 |
| | PCT | | | 14-Jun-12 | 6-Dec-11 | PCT/US2011/063497 |
| | China | | | 29-Aug-12 | 6-Dec-11 | 201180059569.2 |
| Automotive | US | HILL HOLDING CONTROL IN AN ELECTRIC VEHICLE | Software algorithm utilizing calibration parameters to control torque at the motor after identifying unsolicited negative torque from inverter (torque feedback broadcasted by inverter.) | | 27-Jun-12 | 13/260,180 |
| | PCT | | | | 27-Jun-12 | PCT/US2012/1092934 |
| EnergyCS | Europe | METHOD AND SYSTEMS FOR RETROFITTING A FULL HYBRID TO BE A PLUG-IN ELECTRIC HYBRID | Method and controls for converting an OEM hybrid into a plug-in hybrid using a single, larger battery system to replace the small hybrid battery pack. Provides battery controls and instrumentation to allow plug-in recharging of vehicle battery pack. | 2-Jan-08 | 19-Oct-07 | 08740260.6 |
| EnergyCS | Europe | MULTIPLEXER AND SWITCH-BASED ELECTROCHEMICAL CELL MONITOR | Continuation of fundamental measuring and balancing circuit used in our BMS and the building block on which the BMS is based. It uses low-cost off-the-shelf components to achieve a safe and reliable measuring circuit. | 2-Jan-08 | 19-Oct-07 | 06749383.3 |
| Automotive | US | (con of 972) BATTERY TEMPERATURE CONTROL | Monitoring and control of temperature gradients through the use at target set points, detected air flow and internal rate of heating. | 20-Oct-11 | 12-Jun-12 | 12/494422 |
| | US | | | 1-Feb-12 | 12-Apr-11 | 13/084715 |
| | China | | | 19-Oct-11 | 15-Apr-11 | 201110097672.5 |
| | Hong Kong | | | 21-Sep-12 | 18-Apr-12 | 12103657.4 |
| Automotive | US | BATTERY HUMIDITY CONTROL | Systems and methods for controlling humidity within a battery pack, including detection, condensation prevention, compromised electrical isolation, and corrosion prevention/reduction. | 20-Oct-11 | 12-Apr-11 | 13/085025 |
| | China | | | 19-Oct-11 | 15-Apr-11 | 201110097684.1 |
| | Hong Kong | | | 7-Sep-12 | 18-Apr-12 | 12103899.2 |
| Automotive | US | AERODYNAMIC PERFORMANCE IN PASSENGER VEHICLES | Reduced drag utilizing specific ducting, tuning, and damming to improve aerodynamic performance in passenger vehicles. | 19-Jan-12 | 16-Jul-10 | 13/045377 |
| | China | | | 1-Feb-12 | 15-Jul-11 | 201110094298.4 |
| Automotive | US | BATTERY DISCONNECTION IN ELECTRIC VEHICLES | Method of manually disconnecting a high voltage electric vehicle battery for servicing. | 15-Dec-11 | 10-May-11 | 13/104386 |
| | China | | | 18-Apr-12 | 13-May-11 | 201110125601.3 |
| Automotive | US | BATTERY CHARGING USING MULTIPLE CHARGERS | Method of sequencing or paralleling chargers for electric vehicles using "master-slave" and other architectures. | 15-Dec-11 | 10-May-11 | 13/104401 |
| | China | | | 16-Nov-11 | 12-May-11 | 201110126059.1 |
| | Hong Kong | | | 21-Sep-12 | 16-May-12 | 12104778.8 |
| Automotive | US | BATTERY ASSEMBLY | | 27-Sep-12 | 15-Jul-10 | 13/193020 |
| | China | | | 14-Mar-12 | 8-Jul-11 | 201110192509.5 |
| Automotive | US | SELECTABLE DRIVING MODES | Method of implementing city (more economy, more regeneration) driving, highway | 15-Dec-11 | 10-May-11 | 13/104412 |

| Category | Region | Title | Description | | | |
|---|---|---|---|---|---|---|
| Automotive | China Hong Kong US China | BATTERY WITH IMPROVED TERMINALS | Design and implementation of battery terminals that reduce resistance through improved electrode connection, facilitate assembly with higher active material packing factor, extend battery life through better, more reliable sealing and ensure correct installation polarity during assembly. | 7-Dec-11 28-Sep-12<br>15-Jan-12<br>1-Feb-12 | 12-May-11 7-Jun-12<br>16-Jul-10<br>14-Jul-11 | 2011101200969 1210546.0<br>13/186646<br>201110201769.3 |
| Automotive | US PCT China | BATTERY PACK WITH BREATHABLE MEMBRANE | Use of breathable membrane to allow for pressure and humidity equalization between interior and exterior air in an electric vehicle battery pack. | 13-Dec-12<br>13-Dec-12<br>12-Dec-12 | 8-Jun-11<br>8-Jun-11<br>16-Dec-11 | 13/155799<br>PCT/US2012/041504<br>201110425175.3 |
| Automotive | US PCT China | MECHANISM TO REDUCE THERMAL GRADIENTS IN BATTERY SYSTEMS | Use of ducting and air flow restriction to balance air flow within an electric vehicle battery pack so as to reduce thermal gradients. | 20-Dec-12<br>20-Dec-12 | 16-Jun-11<br>15-Jun-12<br>28-Oct-11 | 13/161530<br>PCT/US2012/042577<br>201105369921 |
| Automotive | US PCT China | ENVIRONMENTAL CONTROL USING DYNAMIC TEMPERATURE SET POINT | Enhancement to above BATTERY TEMPERATURE CONTROL. | 28-Feb-13<br>28-Feb-13 | 23-Aug-12<br>22-Aug-12<br>3-Feb-12 | 13/218000<br>PCT/US2012/051780<br>201210024048.6 |
| Automotive | US PCT China | COOLING SYSTEM WITH ANOMALY DETECTION | Use of fluid density inference to detect impeded or blocked fluid flow which may occur when air bubbles or hose kinks exist in an EV cooling system. Bubbles or kinks may occur as part of regular use, or be incorporated within the system through the assembly process. | 19-Dec-12<br>19-Dec-12 | 8-Jun-11<br>8-Jun-11<br>31-Oct-11 | 13/155820<br>PCT/US2012/041530<br>201110349722.4 |
| Automotive | US China | ELECTRIC VEHICLE WITH STRUCTURALLY INTEGRATED COMPONENTS | The strength of the electric vehicle chassis may be augmented through inclusion of strengthening members within the EV components, such as battery packs, which are incorporated into the vehicle structure when they are installed. | 6-Oct-11<br>21-Mar-12 | 5-Apr-11<br>9-Oct-11 | 13/079973<br>201180001796.5 |
| Automotive | US China | BATTERY THERMAL MANAGEMENT SYSTEMS AND METHODS | Enhancements to above BATTERY TEMPERATURE CONTROL & ENVIRONMENTAL CONTROL, USING DYNAMIC TEMPERATURE SET POINT. | 17-Nov-11<br>30-May-12 | 10-Nov-10<br>29-Feb-12 | 12943595<br>201080039752.7 |
| Automotive | US China | POWERTRAIN SUSPENSION SYSTEMS FOR ELECTRIC VEHICLES | Method of suspending electric powertrain in electric vehicle to maximize performance and minimize noise, vibration and handling. | | 25-Oct-11 | 13283045 |
| Automotive | US | HIGH VOLTAGE BUS DISCHARGE SYSTEM | Discharge of high voltage bus using one or more peripheral components and devices to provide a safe operating environment external to the battery pack and inverter. | | 2-Feb-12<br>13-Mar-12 | 201210023483.8<br>13/418803 |

Status as of March 14, 2013

## CODA Trademark Portfolio

### 1. Registered Marks

| Owner | Country | TrademarkName | Registered | Filed | RegNumber | AppNumber |
|---|---|---|---|---|---|---|
| Coda Automotive, Inc. | European Community | CODA (BLOCK) | 2-Jun-10 | 27-Nov-09 | 8718603 | 8718603 |
| Coda Automotive, Inc. | Hong Kong | CODA (BLOCK) | 27-Feb-12 | 17-Aug-10 | 301691677 | 301691677 |
| Coda Automotive, Inc. | Mexico | CODA (BLOCK) | 30-Sep-10 | 18-Aug-10 | 1182169 | 1113039 |
| Coda Automotive, Inc. | US | MISCELLANEOUS DESIGN (CIRCULAR SYMBOL) | 16-Oct-12 | 25-Feb-10 | 4226078 | 77/945294 |
| Coda Automotive, Inc. | Hong Kong | MISCELLANEOUS DESIGN (CIRCULAR SYMBOL) | 9-Feb-11 | 17-Aug-10 | 301691668 | 301691668 |
| Coda Automotive, Inc. | Mexico | MISCELLANEOUS DESIGN (CIRCULAR SYMBOL) | 22-Oct-10 | 18-Aug-10 | 1113040 | 1113040 |
| Coda Automotive, Inc. | China | MISCELLANEOUS DESIGN (CIRCULAR SYMBOL) | 7-Oct-11 | 19-Aug-10 | 8588826 | 8588826 |
| Coda Automotive, Inc. | European Community | MISCELLANEOUS DESIGN (CIRCULAR SYMBOL) | 3-Feb-11 | 20-Aug-10 | 9325151 | 9325151 |
| Coda Automotive, Inc. | US | CODA & DESIGN (Design plus character(s)) | 13-Nov-12 | 19-Feb-10 | 4242357 | 77/939627 |
| Coda Automotive, Inc. | US | CODA AUTOMOTIVE (Design plus character(s)) | 13-Nov-12 | 19-Feb-10 | 4242350 | 77/940464 |
| Coda Automotive, Inc. | Madrid Protocol | GREENSCREEN (BLOCK) | 1-Jun-10 | 1-Jun-10 | 1043240 | 1043240 |
| Coda Automotive, Inc. | European Community | GREENSCREEN (BLOCK) | 1-Jun-10 | 1-Jun-10 | 1043240 | 1043240 |
| Coda Automotive, Inc. | Hong Kong | LIO ENERGY SYSTEMS (STYLIZED) (Word Mark (Stylized)) | 18-Jan-11 | 8-Jun-10 | 301634454 | 301634454 |
| Coda Automotive, Inc. | China | LIO ENERGY SYSTEMS (STYLIZED) (Word Mark (Stylized)) | 28-Aug-11 | 2-Aug-10 | 8533266 | 8533266 |
| Coda Automotive, Inc. | China | LIO ENERGY SYSTEMS (STYLIZED) (Word Mark (Stylized)) | 14-Apr-11 | 10-Dec-09 | 8108056 | 8108056 |
| Coda Automotive, Inc. | Singapore | LIO ENERGY SYSTEMS (STYLIZED) (Word Mark (Stylized)) | 26-Apr-11 | 10-Jun-10 | T1007299H | T1007299H |
| Coda Automotive, Inc. | S.Korea | LIO (BLOCK) | 3-Jun-10 | 3-Jun-10 | 1042715 | 1042715 |
| Coda Automotive, Inc. | China | LIO (BLOCK) | 21-Jun-11 | 10-Mar-10 | 8108063 | 8108063 |
| Coda Automotive, Inc. | China | LIO (BLOCK) | 14-Apr-11 | 10-Mar-10 | 8108062 | 8108062 |
| Coda Automotive, Inc. | China | LIO (BLOCK) | 28-Aug-11 | 2-Aug-10 | 8533269 | 8533269 |
| Coda Automotive, Inc. | Hong Kong | LIO (BLOCK) | 18-Apr-11 | 3-Jun-10 | 301630395 | 301630395 |
| Coda Automotive, Inc. | Mexico | LIO (BLOCK) | 26-Aug-10 | 3-Jun-10 | 1176222 | 1094399 |
| Coda Automotive, Inc. | Mexico | LIO (BLOCK) | 27-Oct-10 | 3-Jun-10 | 1185320 | 1094401 |
| Coda Automotive, Inc. | Mexico | LIO (BLOCK) | 15-Feb-11 | 3-Jun-10 | 1201420 | 1094403 |
| Coda Automotive, Inc. | Singapore | LIO (BLOCK) | 14-Feb-11 | 3-Jun-10 | T1007026Z | T1007026Z |
| EnergyCS | US | ENERGYCS (Word Mark (Stylized)) | 10-Jul-07 | 30-Jun-03 | 3261451 | 76/528387 |
| Miles Electric Vehicles, Inc. | US | MILES EV (BLOCK) | 27-May-09 | 24-Oct-08 | 3633333 | 7339559 |
| Coda Automotive, Inc. | Hong Kong | LIO (STYLIZED) (Word Mark (Stylized)) | 18-Jan-11 | 8-Jun-10 | 301634463 | 301634463 |
| Coda Automotive, Inc. | Israel | LIO (STYLIZED) (Word Mark (Stylized)) | 15-Jun-11 | 8-Jun-10 | 230428 | 230428 |
| Coda Automotive, Inc. | Israel | LIO (STYLIZED) (Word Mark (Stylized)) | 15-Jun-11 | 8-Jun-10 | 230429 | 230429 |
| Coda Automotive, Inc. | China | LIO (STYLIZED) (Word Mark (Stylized)) | 21-Jun-11 | 10-Dec-09 | 8108059 | 8108059 |
| Coda Automotive, Inc. | China | LIO (STYLIZED) (Word Mark (Stylized)) | 28-Aug-11 | 2-Aug-10 | 8533267 | 8533267 |
| Coda Automotive, Inc. | China | LIO (STYLIZED) (Word Mark (Stylized)) | 14-Apr-11 | 10-Dec-09 | 8108058 | 8108058 |
| Coda Automotive, Inc. | European Community | LIO (STYLIZED) (Word Mark (Stylized)) | 25-Nov-10 | 10-Jun-10 | 9166026 | 9166026 |
| Coda Automotive, Inc. | Singapore | LIO (STYLIZED) (Word Mark (Stylized)) | 26-Apr-11 | 10-Jun-10 | T1007297A | T1007297A |
| Coda Automotive, Inc. | China | LIO ENERGY SYSTEMS (BLOCK) | 7-May-11 | 3-Dec-09 | 8108060 | 8108060 |
| Coda Automotive, Inc. | China | LIO ENERGY SYSTEMS (BLOCK) | 28-Mar-12 | 3-Dec-09 | 8108061 | 8108061 |
| Coda Automotive, Inc. | China | LIO ENERGY SYSTEMS (BLOCK) | 28-Aug-11 | 2-Aug-10 | 8533268 | 8533268 |
| Coda Automotive, Inc. | European Community | LIO ENERGY SYSTEMS (BLOCK) | 15-Nov-10 | 3-Jun-10 | 9150913 | 9150913 |
| Coda Automotive, Inc. | Hong Kong | LIO ENERGY SYSTEMS (BLOCK) | 18-Apr-11 | 3-Jun-10 | 301630403 | 301630403 |
| Coda Automotive, Inc. | Mexico | LIO ENERGY SYSTEMS (BLOCK) | 26-Aug-10 | 3-Jun-10 | 1176224 | 1094406 |
| Coda Automotive, Inc. | Mexico | LIO ENERGY SYSTEMS (BLOCK) | 20-Oct-10 | 3-Jun-10 | 1185050 | 1094408 |
| Coda Automotive, Inc. | Mexico | LIO ENERGY SYSTEMS (BLOCK) | 15-Feb-11 | 3-Jun-10 | 1201421 | 1094409 |
| Coda Automotive, Inc. | Singapore | LIO ENERGY SYSTEMS (BLOCK) | 21-Feb-11 | 3-Jun-10 | T1007029D | T1007029D |

**2. Allowed Marks**

| Owner | Country | TrademarkName | Registered | Filed | RegNumber | AppNumber |
|---|---|---|---|---|---|---|
| Coda Automotive, Inc. | US | CODA (BLOCK) | | 3-Jun-09 | | 77/751594 |

**3. Published Marks**

| Owner | Country | TrademarkName | Registered | Filed | RegNumber | AppNumber |
|---|---|---|---|---|---|---|
| Coda Automotive, Inc. | S.Korea | L!O ENERGY SYSTEMS (BLOCK) | | 3-Jun-10 | | 45-2010-2303 |

EXHIBIT E

## DEPOSIT ACCOUNTS AND INVESTMENT ACCOUNTS

See attached.

Coda Automotive, Inc.
Deposits - 19100
3/31/2013

| Date | Name | Description | Amount | Notes |
|---|---|---|---|---|
| 3/11/2010 | Southern California Edison | 820 Broadway Deposit | $ 2,075 | Check #4112 Dated 3/18/2010 Total $2,075.00 / QB - rs 4/6/12 |
| 1/22/2010 | Legend Real Estate Management | 820 Broadway - Rent Security Deposit | 29,699 | Transferred from prior owner – October 17, 2012 |
| 9/1/2010 | Legend Real Estate Management | 820 Broadway - Rent Security Deposit and Floor | 25,537 | Transferred from prior owner – October 17, 2013 |
| 6/6/2011 | Fairfax Avenue Building, LLC | Fairfax Lease Deposit | 122,127 | Payment on June 6, 2011; check # 4379 |
| 7/19/2011 | Los Angeles Dept of Water and Power | Electricity Deposit (2340 Fairfax Ave) | 9,100 | |
| 7/19/2011 | Los Angeles Dept of Water and Power | Water Deposit (2340 Fairfax Ave) | 750 | |
| 1/29/2012 | Security Deposit (135 E Maple Unit B) | Deposit for Monrovia facility (vacated 2/28/2013) | 7,000 | Legal to request refund from landlord for deposit |
| 2/29/2012 | Coda (CA) Sales Tax Deposit | California BOE - CODA (CA) | 50,000 | |
| 2/15/2013 | Board of Equalization (CA) | CODA Energy California seller's permit | 10,875 | |
| | | Total AX Transactions | $ 257,163 | |

Restricted Cash - 10600

| | | | | |
|---|---|---|---|---|
| 6/14/2011 | Fairfax Avenue Building LLC | Wells Fargo Irrevocable Standby Letter of Credit | $ 500,000 | number IS0000924 |
| 6/21/2011 | Broadway at 9th LLC | Wells Fargo Irrevocable Standby Letter of Credit | 100,000 | number IS0001078 |
| 8/2/2012 | Avalon Risk Management | Wells Fargo Irrevocable Standby Letter of Credit | 70,000 | number IS0013771 |
| | | Total AX Transactions | $ 570,000 | |

Other Long-term liabilities - 28000

| | | | | |
|---|---|---|---|---|
| 4/17/2012 | Worksocial LLC | Security Deposit – 820 Broadway Sublease | $ (75,000) | |

Deposits Accounts
4/22/2013

| Entity | Fed Tax ID | Bank Acct | Bank | Balance as of 4/22/2013 | Notes |
|---|---|---|---|---|---|
| Coda Automotive, Inc. | 27-0206800 | 7004360077 | Wells Fargo - | $ 112,901.16 | |
| Coda Automotive, Inc. | 27-0206800 | 8837309908 | Wells Fargo - | 100.01 | |
| Coda Holdings, Inc. | 80-0551892 | 5917981952 | Wells Fargo - | 963.65 | |
| Los Energy Systems Holdings, LL | 45-2433158 | 80-03032938 | EastWest Bank - | | |
| Miles Electric Vehicles Ltd. | 45-2433158 | 80-03028555 | EastWest Bank - | 64.01 | |
| (Hong Kong Entity) | | | | | |
| Miles Electric Vehicles Limited | | 4471-6888443 | Standard Chartered - | 1,178.96 | |
| (Hong Kong Entity) | | | | | |

Investment Accounts - None

EXHIBIT F

RESERVED

EXHIBIT G

RESERVED

EXHIBIT H

RESERVED

EXHIBIT I

INITIAL APPROVED BUDGET

See attached.

## 13 Week Cash Flow Forecast (DIP Budget)
### as of April 28, 2013

| | Wk 1 5/3/2013 | Wk 2 5/10/2013 | Wk 3 5/17/2013 | Wk 4 5/24/2013 | Wk 5 5/31/2013 | Wk 6 6/7/2013 | Wk 7 6/14/2013 | Wk 8 6/21/2013 | Wk 9 6/28/2013 | Wk 10 7/5/2013 | Wk 11 7/12/2013 | Wk 12 7/19/2013 | Wk 13 7/26/2013 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Opening Cash Balance** | $ - | $ (1,319,808) | $ (1,699,660) | $ (1,866,625) | $ (2,256,114) | $ (2,933,614) | $ (3,747,098) | $ (4,183,215) | $ (4,232,722) | $ (4,555,422) | $ (4,603,929) | $ (4,611,129) | $ (4,659,300) | $ - |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Cash Over Advance / (repayment) | $ (665,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (665,000) |
| Cash Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash Receipts** | $ (665,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (665,000) |
| **Cash Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll | $ - | $ (292,155) | $ - | $ (289,315) | $ - | $ (289,315) | $ - | $ (33,807) | $ - | $ (33,807) | $ - | $ (33,807) | $ - | $ (972,206) |
| Key Employee Incentive Plan | - | - | - | - | - | (425,000) | - | - | - | - | (1,000) | - | - | (425,000) |
| General/Travel/Benefits | (52,074) | (12,964) | 16,765 | (11,139) | (93,000) | 115,561 | (425,000) | (8,500) | (11,000) | (8,500) | (1,000) | (7,164) | (1,000) | (219,667) |
| Facilities /Rent / Utilities - Fairfax | (99,881) | (6,780) | (28,200) | (7,035) | (19,350) | (99,108) | (1,000) | (2,700) | (2,700) | (2,700) | (2,700) | (2,700) | (2,700) | (279,466) |
| General, Liability & Marine Insurance | (95,351) | - | - | - | - | - | (2,700) | - | - | - | - | - | - | (95,351) |
| Energy Engineering & Manufacturing | (52,000) | (38,433) | (122,500) | (72,500) | (25,500) | (25,000) | - | - | - | - | - | - | - | (355,933) |
| Logistics & Freight & Other | (5,500) | (9,500) | (9,500) | (9,500) | (9,500) | (9,500) | (25,000) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (87,417) |
| | | | | | | | (7,417) | | | | | | | |
| **Total Operating Disbursements** | $ (304,808) | $ (379,852) | $ (166,965) | $ (389,489) | $ (147,500) | $ (438,444) | $ (436,117) | $ (49,507) | $ (8,200) | $ (49,507) | $ (8,200) | $ (48,171) | $ (8,200) | $ (2,433,000) |
| **Financial Disbursements** | | | | | | | | | | | | | | |
| *Professional Fees* | | | | | | | | | | | | | | |
| Company Advisors - Houlihan Lokey | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (450,000) |
| Company Advisors - White & Case | - | - | - | - | (75,000) | (375,500) | - | - | (150,000) | - | - | - | (150,000) | (550,000) |
| Claim Agent - KCC | - | - | - | - | (50,000) | - | - | - | (25,000) | - | - | - | (25,000) | (75,000) |
| UCC Advisors / Delaware Counsel | - | - | - | - | (25,000) | - | - | - | (112,500) | - | - | - | (112,500) | (300,000) |
| Audit, IRS & State filings & expense | - | - | - | - | (75,000) | - | - | - | - | - | - | - | (20,000) | (25,000) |
| | | | | | (5,000) | | | | | | | | | |
| **Total Financial Disbursements** | $ - | $ - | $ - | $ - | $ (430,000) | $ (375,500) | $ - | $ - | $ (287,500) | $ - | $ - | $ - | $ (307,500) | $ (1,400,000) |
| **Subtotal Operating & Financial Disbursements** | $ (304,808) | $ (379,852) | $ (166,965) | $ (389,489) | $ (577,500) | $ (813,484) | $ (436,117) | $ (49,507) | $ (295,700) | $ (49,507) | $ (8,200) | $ (48,171) | $ (315,700) | $ (3,835,000) |
| **DIP Financing and Fees** | | | | | | | | | | | | | | |
| Legal - Agent - Sidley | $ (100,000) | $ - | $ - | $ - | $ (100,000) | $ - | $ - | $ - | $ (25,000) | $ - | $ - | $ - | $ (25,000) | $ (450,000) |
| Commitment Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | (75,000) |
| Interest Payments on DIP | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Admin Agent Fee | (50,000) | - | - | - | - | - | - | - | - | - | - | - | - | (50,000) |
| **Total DIP Financing and Fees** | $ (350,000) | $ - | $ - | $ - | $ (100,000) | $ - | $ - | $ - | $ (25,000) | $ - | $ - | $ - | $ (25,000) | $ (500,000) |
| **Total Cash Disbursement** | $ (654,808) | $ (379,852) | $ (166,965) | $ (389,489) | $ (677,500) | $ (813,484) | $ (436,117) | $ (49,507) | $ (320,700) | $ (49,507) | $ (8,200) | $ (48,171) | $ (340,700) | $ (4,335,000) |
| **Ending Cash** | $ (1,319,808) | $ (1,699,660) | $ (1,866,625) | $ (2,256,114) | $ (2,933,614) | $ (3,747,098) | $ (4,183,215) | $ (4,232,722) | $ (4,555,422) | $ (4,603,929) | $ (4,611,129) | $ (4,659,300) | $ (5,000,000) | $ (5,000,000) |

**Notes:**

*- Chapter 11 filing on April 29, 2012*
*- Commitment Fee ($50,000) and Interest ($12,500) are PIK*
*- Sales Closing on June 7, 2013 (week 6)*
*- Old Co. costs only begin week 7*
*- No costs for DLA Piper*

**SCHEDULE A**
**COMMITMENTS**

| Name of Lender | Commitment | Commitment Percentage |
|:--------------:|:----------:|:---------------------:|
| Coda JV Holdings LLC | $3,492,063.49 | 69.84% |
| aeris CAPITAL Archer, L.P. | $1,507,936.51 | 30.16% |
| **TOTAL** | **$5,000,000** | **100%** |

**SCHEDULE B**
**EXIT FACILITY COMMITMENTS**

| Name of Lender | Name of Affiliated Entity | Exit Facility Commitment |
|---|---|---|
| Coda JV Holdings LLC | FCO MA Coda Holdings LLC | $3,285,754.41 |
| Coda JV Holdings LLC | Christopher G. Kelly, Jr. | $220,869.82 |
| Coda JV Holdings LLC | William C. Powers and Carolyn C. Powers Trust | $1,099,930.26 |
| Coda JV Holdings LLC | George W. Wellde, Jr. | $218,842.34 |
| Coda JV Holdings LLC | Miles Rubin | $203,236.83 |
| Coda JV Holdings LLC | Miles EV Holdings Ltd. | $32,518.03 |
| Coda JV Holdings LLC | The Wexner Children's Trust II | $377,035.27 |
| Coda JV Holdings LLC | Eric and Erica Schwartz Family LLC | $149,114.63 |
| aeris CAPITAL Archer, L.P. | N/A | $2,412,698.41 |
| **TOTAL** | | **$8,000,000** |

SCHEDULE 1

SUBSIDIARIES

See attached.



Exhibit B

Corporate Structure
as of April 1, 2013

Stockholders

Coda Holdings, Inc.
(Delaware corporation)
EIN 80-0551892

EnergyCS LLC
(Delaware LLC)
EIN 45-4268689

Coda Energy LLC
(Delaware LLC)
EIN 45-2813953

Coda Trading
Holdings LLC
(Delaware LLC)
EIN 45-2214748

Coda Automotive, Inc.
(Delaware corporation)
EIN 27-0208600

Lio Energy Systems
Holdings (US) LLC
(Delaware LLC)
EIN 27-3180378

Lio Energy
Systems
Holdings LLC
(Delaware LLC)
EIN 45-2433168

Miles Electric
Vehicles Limited
(Hong Kong entity)

Lio Energy Systems
(US) LLC
("Lio US")
(Delaware LLC)
EIN 27-3672688

To be
60% Ownership

Coda Automotive
(CA), Inc.
(Delaware corporation)
EIN 27-1969109

Coda Automotive
Technology
Service (Beijing)
Co., Ltd
("WFOE")

Coda Trading
(Shanghai) Co., Ltd.
(Trading WFOE")

Copyright 2009 CODA Automotive ©

◯ CODA

## SCHEDULE 1A

### EXISTING PERMITTED INDEBTEDNESS

1. Indebtedness under that certain Amended and Restated Secured Note Purchase Agreement, dated as of October 18, 2010, among Borrower and the Noteholders

2. Indebtedness under that certain Term Loan Facility letter, dated February 10, 2012, between Borrower and the Term Lenders

3. Indebtedness under that certain Term Loan Letter Agreement, dated June 5, 2012, by and between Coda Automotive, Inc. and Aeris CAPITAL Archer, L.P.

4. Indebtedness under that certain Loan and Security Agreement, dated as of December 7, 2012, among Borrower, the Bridge Lenders and Bridge Agent

**SCHEDULE 1B**

**EXISTING PERMITTED INVESTMENTS**

None

## SCHEDULE 1C

## EXISTING PERMITTED LIENS

**Liens on Inventory and Accounts held by aeris CAPITAL Archer, L.P. in connection with that certain Term Loan Facility dated June 5, 2012**

**SCHEDULE 5.4**

**ACTIONS BEFORE GOVERNMENTAL AUTHORITIES**

None

**SCHEDULE 5.7**

**TAX MATTERS**

None

**SCHEDULE 5.9**

**SUFFICIENCY OF ASSETS**

None

SCHEDULE 5.10

LITIGATION

1. <u>Corporate Billing LLC v. Coda Automotive Inc.  Los Angeles Superior Court</u>
   Case No.  DC 499279
   Filed January 16, 2013
   Answered  February 22, 2013
   Breach of Contract Amount Claimed $248,000
   Counsel for Claimant
        Todd A. Brisco
        Todd A. Brisco & Associates
            1900 South State College Blvd. Suite 505
            Anaheim, CA 92806
            714-634-2814
   Counsel for Coda
            White and Case
   Status:  Pending

2. <u>Altair Product Design Inc. v. Coda Automotive Inc. Oakland County Michigan Circuit Court</u>
   Case No. 13-131737-CK
   Breach of Contract Amount Claimed $86,208
   Counsel for Claimant
        Lisa M. Panourgias
            Panourgias Law Firm PLLC
            30100 Telegraph Road Suite 360
            Bingham Farms, MI 48025
            248-709-2010
   Counsel for CODA
            Daniel Linna
            Honigman Miller Schwarz and Cohn
            2290 First National Building
            660 Woodward Ave
            Detroit, MI 48226
            313-465-7508
   Status:  Pending

3. <u>Eberspacher Catem gmbh v. Coda Automotive Inc.  Oakland County Michigan Circuit Court</u>
   Case No. 2013-13174-CZ
   Breach of Contract Amount Claimed $159,000
   Counsel for Claimant
        Rodger D. Young
        Sara K. McWilliams
            Young & Associates
            Orchard Corporate Center
            27725 Stansbury Blvd. Suite 125

Farmington Hills, MI 48334
248-353-8620
Counsel for CODA
Daniel Linna
Honigman Miller Schwarz and Cohn
2290 First National Building
660 Woodward Ave
Detroit, MI 48226
313-465-7508
Status: Pending

4.  **Exhibit Works Inc. v. Coda Automotive Inc. Los Angeles Superior Court**
Case No. BC503219
Breach of Contract Amount Claimed $250,000
Counsel for Claimant
Jon McNutt
Jeffer Mangels Butler & Mitchell LLP
1900 Avenue of the Stars
Los Angeles CA 90067
310-785-5364
Counsel for CODA
White and Case
Status:  Pending

5.  **Blitz Digital Solutions vs Coda Automotive Inc. Los Angeles County Superior Court**
Case No. SC 120467
Breach of Contract Amount Claimed $244,495
Counsel for Claimant
Ryan van Steenis
Huron Law Group
1875 Century Park Ease, Suite 1000
Los Angeles California 90067
310-284-3400
Counsel for CODA
White and Case
Status:  Pending

6.  **RLE International, Inc. and RTECH Services, LLC v. CODA Automotive, Inc.**
USDC for Eastern District of Michigan
Case No. 2:13-cv-11873-PDB-RSW
Breach of Contract  Amount claimed $850,000
Attorneys for Plaintiff
Michael Jacob
Jeffrey Wilson
Young,  Basile, Hanlon and McFarlane
3001 W. Big Beaver Road Suite 664

Troy MI 48084-3107
248-649-3333
Justin Schwarz
Schwarz and Co.
100 West Long Lake Road Suite 118
Bloomfield Hills, MI 48304
248-645-1444

Attorneys for Coda
Tricia Sherick
Honigman Miller Schwartz and Cohn LLP
Attorneys and Counselors
660 Woodward Avenue
2290 First National Building
Detroit, MI  48226-3506
Telephone Number: (313) 465-7662


7. **CDH Detroit, Inc.  v. Coda Automotive Inc**
USDC for Eastern District of Michigan
Case No. 2:13-cv-11880-BAF-LJM
Breach of Contract  Amount Claimed $338,234
Attorneys for Plaintiff
Michael Jacob
Jeffrey Wilson
Young,  Basile, Hanlon and McFarlane
3001 W. Big Beaver Road Suite 664
Troy MI 48084-3107
248-649-3333

Attorneys for Coda
Tricia Sherick
Honigman Miller Schwartz and Cohn LLP
Attorneys and Counselors
660 Woodward Avenue
2290 First National Building
Detroit, MI  48226-3506
Telephone Number: (313) 465-7662

## SCHEDULE 5.14

## EMPLOYEE LOANS

None

SCHEDULE 5.15

CAPITALIZATION

See attached.