Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   Case No. 13-11153(CSS)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CODA HOLDINGS, INC., et al.,

8

9         Debtors.

10

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                          United States Bankruptcy Court

14                          824 North Market Street

15                          Wilmington, Delaware

16

17                          May 29, 2013

18                          1:09 PM

19

20

21  B E F O R E :

22  HON CHRISTOPHER S. SONTCHI

23  U.S. BANKRUPTCY JUDGE

24

25  ECR OPERATOR:  LESLIE MURIN

1    HEARING re Motion of Coda Holdings, Inc. and its Affiliated

2    Debtors for Interim and Final Orders (I) Authorizing the

3    Debtors to (A) Obtain Postpetition Financing Pursuant to 11

4    U.S.C. §§ 105, 363, 362, 363(C), 363(e), 364(c), 364(d)(1)

5    and 364(e) and (B) Utilize Cash Collateral of Prepetition

6    Secured Parties Pursuant to 11 U.S.C. § 363, (II) Granting

7    Adequate Protection to Prepetition Secured Parties Pursuant

8    to 11 U.S.C. §§ 361, 362, 363 and 364, (III) Scheduling a

9    Final Hearing Pursuant to Bankruptcy Rules 4001(b) and

10   4001(c), and (IV) Granting Related Relief, filed on May 1,

11   2013 [Docket No. 9]

12

13   HEARING re Motion of Coda Holdings, Inc. and its Affiliates

14   Debtors for Entry of (I) an Order (A) Approving the Bidding

15   Procedures in Connection With the Sale of Substantially all

16   of the Debtors' Assets; (B) Setting Date and Time for an

17   Auction and the Hearing on the Proposed Sale, (C) Approving

18   the Manner, Form, and Notice of the Auction and the Sale

19   Hearing, and (D) Granting Related Relief; and (II) an Order

20   (A) Approving Sale of Debtors' Assets Under Asset Purchase

21   Agreement Free and Clear of Liens, Claims and Interests and

22   (B) Granting Related Relief, filed on May 1, 2013 [Docket

23   No. 11]

24

25   HEARING re Motion of Coda Holdings, Inc. and its Affiliated

1  Debtors for Order Rejecting Unexpired Lease and Subleases of

2  Non-Residential Real Property Located at 820 Broadway, Santa

3  Monica, California 90401 Pursuant to Section 365(a) of the

4  Bankruptcy Code, Nunc Pro Tunc to the Petition Date, Inc.,

5  filed on May 2, 2013 [Docket No. 13]

6

7  HEARING re Application of Coda Holdings, Inc. and its

8  Affiliated Debtors for Authority to Retain and Employ

9  Houlihan Lokey Capital, Inc. as Investment Banker Nunc Pro

10  Tunc to the Petition Date, filed on May 7, 2013 [Docket No.

11  59]

12

13  HEARING re Application of Coda Holdings, Inc. and its

14  Affiliated Debtors for Authority to Retain and Employ White

15  & Case LLP Nunc Pro Tunc to the Petition Date, filed on May

16  7, 2013 [Docket No. 61]

17

18  HEARING re Motion of Coda Holdings, Inc. and Its Affiliated

19  Debtors for Order Rejecting Retailer Agreements and Related

20  Agreements Pursuant to Section 365(a) of the Bankruptcy

21  Code, Nunc Pro Tunc to the Date of this Motion, filed on May

22  9, 2013 [Docket No. 67]

23

24

25  Transcribed by:  Dawn South and Sherri L. Breach

1    A P P E A R A N C E S :

2    WHITE & CASE LLP

3         Attorneys for the Debtors

4         633 West Fifth Street, Suite 1900

5         Los Angeles, CA 90071-2007

6

7    BY:  ROBERTO K. KAMPFNER, ESQ.

8         JOHN K. CUNNINGHAM, ESQ.

9         RONALD GORSICH, ESQ. (TELEPHONIC)

10

11   FOX ROTHSCHILD LLP

12        Attorneys for the Debtors

13        Citizens Bank Center

14        919 North Market Street

15        Suite 1300

16        P.O. Box 2323

17        Wilmington, DE 19899-2323

18

19   BY:  JOHN L. BIRD, ESQ.

20        JEFFREY M. SCHLERF, ESQ.

21

22

23

24

25

1    MORRIS, NICHOLS, ARSHT & TUNNELL LLP

2         Attorney for the Committee

3         1201 North Market Street

4         16th Floor

5         P.O. Box 1347

6         Wilmington, DE 19899-1347

7

8    BY:  GREGORY W. WERKHEISER, ESQ.

9

10   BROWN RUDNICK LLP

11        Attorneys for the Committee

12        Seven Times Square

13        New York, NY 10036

14

15   BY:  WILLIAM R. BALDIGA, ESQ.

16        JEFFREY H. SCHWARTZ, ESQ.

17        BENNETT S. SILVERBERG, ESQ.

18        ALIZA REICHER, ESQ. (TELEPHONIC)

19

20   ROSNER LAW GROUP

21        Attorney for the WARN Claimants

22        824 N. Market Street, Suite 810

23        Wilmington, DE 19801

24

25   BY:  JULIA B. KLEIN, ESQ.

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorney for the U.S. Trustee

3         844 King Street

4         Suite 2207

5         Wilmington, DE 19801

6

7    BY:  DAVID L. BUCHBINDER, ESQ.

8

9    SIDLEY AUSTIN LLP

10        Attorneys for the DIP Lender

11        555 West Fifth Street

12        Los Angeles, CA 90013

13

14   BY:  JEREMY ROSENTHAL, ESQ.

15        ARIELLA SIMONDS, ESQ. (TELEPHONIC)

16

17   LOWENSTEIN SANDLER LLP

18        Attorney for Tianjin Lishen Battery Joint Stock Co.

19        65 Livingston Avenue

20        Roseland, NJ 07068

21

22   BY:  JEFFREY A. KRAMER, ESQ.

23

24

25

1   ALLEN MATKINS

2         Attorney for Santa Monica Landlord (Archway)

3         Three Embarcadero Center, 12th Floor

4         San Francisco, CA 94111-4074

5

6   BY:  IVAN M. GOLD, ESQ.

7

8   PHILLIPS, GOLDMAN & SPENCE

9         Attorney for Martin Cadillac

10        1200 North Broom Street

11        Wilmington, DE 19806-4204

12

13  BY:  STEHPEN A. SPENCE, ESQ.

14

15  BECK & BROWNING

16        Attorney for Martin Cadillac

17        3828 W. Carson Street

18        Suite 100

19        Torrance, CA 90503

20

21  BY:  ROBERT W. BECK, ESQ.

22

23

24

25

1   DORSEY & WHITNEY

2        Attorney for Fladeboe Automotive Cars, Inc.

3        300 Delaware Avenue

4        Suite 1010

5        Wilmington, DE 19801

6

7   BY:  ROBERT W. MALLARD, ESQ.

8

9   YOUNG CONAWAY STARGATT & TAYLOR, LLP

10        Attorney for the DIP Lender

11        Rodney Square

12        1000 North King Street

13        Wilmington, DE 19801

14

15   BY:  EDMON L. MORTON, ESQ.

16

17   CONNOLLY GALLAGHER, LLP

18        Attorney for Newman Family Trusts/Archway

19        1000 West Street

20        Suite 1400

21        Wilmington, DE 19801

22

23   BY:  KAREN BIFFERATO, ESQ.

24

25

1  ALSO PRESENT TELEPHONICALLY:

2  DAVID BRUDER

3  JEFFREY L. COSTELL

4  JAMES V. DREW

5  RACHEL A. FEINTZEIG

6  JEFFREY A. KRIEGER

7  MICHAEL D. SCHOECK

8  MICHAEL ST. JAMES

9  JOHN WILSON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2            THE CLERK:  All rise.

 3            THE COURT:  Please be seated.  Good afternoon.

 4    Mr. Cunningham, no.  All right.

 5            MR. KAMPFNER:  Your Honor, Rob Kampfner for the

 6    debtors.

 7            We would like to thank you for your patience

 8    today, kept you waiting a long time.  We think we have an

 9    agreement that can move this case forward.  I think I'll let

10    the committee discuss it generally.

11            We also have some resolutions on the two of the

12    rejection matters that were pending today, which I can

13    recite for the Court after, and then after that I think

14    we'll get to the White & Case retention objection, which is

15    still going forward.

16            THE COURT:  All right.  Mr. Werkheiser, good

17    afternoon.

18            MR. WERKHEISER:  Good morning, Your Honor.  For

19    the record Gregory Werkheiser, Morris, Nichols, Arsht &

20    Tunnell on behalf of the official committee of unsecured

21    creditors.

22            Your Honor, I just wanted to tend to a

23    housekeeping matter.  I'm joined at counsel table today by

24    Mr. William Baldiga, Bennett Silverberg, and Jeffrey

25    Schwartz from the Brown Rudnick firm.  We did file pro hac
```

1    vice motions on behalf of all three of them.  I believe

2    Mr. Baldiga's and Mr. Silverberg's were entered already.

3    Mr. Schwartz' was file I believe this morning.  And to the

4    extend that -- if he needs to address the Court today we

5    would just ask that Your Honor entertain his comments --

6              THE COURT:  Of course.

7              MR. WERKHEISER:  -- pending entry of a pro hac

8    vice order.

9              THE COURT:  Happy to do so.  Thank you.

10             MR. WERKHEISER:  Thank you.

11             MR. BALDIGA:  Good morning, Your Honor.

12             THE COURT:  Good morning.

13             MR. BALDIGA:  William Baldiga, Brown Rudnick,

14   co-counsel for the committee -- or proposed co-counsel.

15             Your Honor, we put this morning's time to good

16   work.  There's been this morning really an intensification

17   of the discussions that have been happening since the

18   appointment of the committee a short time ago and there is

19   various colors of ink and messiness.  I have not notes that

20   would now substitute for the proposed orders that we do need

21   to submit and submit very quickly to the Court, but all

22   parties thought that these are terms that should be read in

23   by way of general terms to the Court.

24             This is an agreement among Fortress -- or for the

25   lenders or for the lender group and maybe Fortress can

1    identify specifically how they wish to be addressed in terms

2    of who the agreement is with.

3           The debtors and the committee is subject to formal

4    committee approval.  We'll call a meeting very quickly to do

5    that subject to -- for the debtors a board vote, but we both

6    have a high degree of confidence that those approvals will

7    be forthcoming given that we're acting within the

8    instructions under which we've all been asked to come here

9    to try to do.

10          We know Mr. Buchbinder has scheduling urgencies

11   today, so we want to just very quickly report on the

12   essential terms of the agreement.  Certainly colleagues will

13   correct me if something material has been left out or

14   misdescribed, and with the Court's permission I'll just read

15   in the essential terms if that's --

16          THE COURT:  That's fine.

17          MR. BALDIGA:  And this is obviously, Your Honor,

18   with respect to both the sale and the DIP issues.  You saw

19   yesterday there were pleadings filed that resolved some of

20   the issues, but this would resolve all of the other

21   outstanding issues.

22          In prelude to this, Your Honor, is that the

23   committee has had an opportunity through our proposed

24   financial advisors, Deloitte CRG, to, you know, go back into

25   the market, check the marketing that has been done, and the

1   same team was the debtors' team for Beacon Power across the

2   hall with Judge Carey a year ago with the same business, so

3   they were able to gear up very, very quickly.

4           And part of this is that we also believe that as

5   the debtors do, that there is very little prospect for a

6   competitive buyer coming out to bid against the stalking

7   horse bid proposed by Fortress and co-lenders.

8           So without further adieu the bid procedures,

9   including the schedule, would be entered as is.

10          Those call for bid -- any bids, and again no one

11  sees any on the horizon, competing bids by the end of this

12  week.

13          There would be a carve out guaranteed out of the

14  DIP for a combination of the expenses of personal expense of

15  the committee, all professionals of the committee, plus an

16  initial dividend to unsecured creditors -- non-priority

17  dividend -- totaling $1,500,000.  The lenders would not

18  participate in their dividend or in their deficiency in that

19  guaranteed amount.

20          The guarantee would not lapse in the present term

21  sheet that the Court may have reviewed.  There was a lapsing

22  of that if the plan were not to be confirmed by a certain

23  date in August.  All lapsing would be eliminated from the

24  final order that you see so that the carve out is indeed a

25  true carve out absolute regardless of what happens next in

1    the case.

2            That being said all parties have agreed to work

3    cooperatively in good faith building on the work that we've

4    done now to achieve confirmation as soon as possible of a

5    liquidating plan.

6            The -- the avoidance actions, Your Honor, would be

7    dealt with in a -- what I would call a sharing arrangement,

8    the details of which you will see, but they are similar to

9    what you've seen in the DIP papers so far.

10            With respect to some details of that are with

11   respect to a certain set of avoidance or potential avoidance

12   actions against LeShawn (ph) and the joint venture which --

13   in which they are an owner, if Fortress is able to make a

14   settlement of their own relationship going forward with them

15   by June 6th, and that settlement includes a waiver of

16   LeShawn's claims in this case, then the potential asset

17   consisting of causes of action against LeShawn and the joint

18   venture are included in the sale.

19            If there is not a settlement by June 6th between

20   the buyer and LeShawn that involves the waiver of claims

21   against the estate then those claims can be prosecuted by

22   the plan trust with a sharing arrangement that we've

23   negotiated.  First to cost and then on a sharing 50/50

24   basis.

25            The other avoidance actions, the relationships to

1   which Fortress -- or the relationships as to which Fortress

2   would continue to enjoy going forward with vendors,

3   customers, and so forth, they would be in effect buying

4   those causes of action and the estate would have no ability

5   to interfere with that.  Those claims would be essentially

6   waived by the estate.

7              With respect to relationships that are not enjoyed

8   going forward by the buyer, and we think that would be

9   primarily the automotive business relationships generally

10  speaking, they would be available to the plan trust, again,

11  with a sharing arrangement that we've worked out.

12             The -- with respect to causes of action consisting

13  of claims against directors and officers and so forth, the

14  agreement is that with respect to persons who were serving

15  as of the commencement of these cases those would be

16  purchased claims, they would go to the DIP lender so is

17  estate would have essentially waived those claims.

18             With respect to persons that are -- were as of the

19  commencement of the case former directors, officers, and so

20  forth there would be a right to pursue them.

21             With respect to even present directors and

22  officers they would be able to be named as defendants in any

23  litigation the trust thought to be appropriate, but with

24  recourse only to the insurance, and there's some details to

25  be worked out there, but that's the essential business deal.

1         There is -- just trying not to miss anything.

2         There would be within the plan trust the ability

3    within the discretion of those trustees or governors or

4    whatever titles we give those people, the right to reserve

5    proceeds back from distributions in order to fund litigation

6    recoveries that those fiduciaries thought responsible to

7    pursue.

8         With respect to the sale of the automotive assets

9    there tangible automotive -- so-called automotive assets

10   both domestically and around the world.  There is an

11   arrangement by which they would be sold.  The first $500,000

12   of net recoveries would be retained by the DIP lenders, the

13   -- or the buyer.  After that there would be a sharing on

14   domestic assets, two-thirds in favor of the buyer, one-third

15   to the estate pro rata on things that are outside of the

16   U.S.  Again, the $500,000 is in the aggregate for those two

17   bundles of assets.

18        The challenge period for the committee as to the

19   lenders and DIP lenders' priorities, perfection, and so

20   forth would be deemed to have lapsed as part of this deal.

21        The lenders -- the DIP lenders would agree not to

22   -- and the buyer, most importantly -- would agree not to do

23   anything from this point forward that would cause new

24   employee claims to arise.

25        And we believe based on the work the debtors and

1    their representatives have done that the deal here would

2    allow all of the priority claims in the case to be paid out

3    of the DIP loan, but it's important to us of course that

4    there not be any additional priority claims created going

5    forward if the buyer, for example, were to decide not to

6    retain certain employees or executives.

7              On the plan trust, Your Honor, as to the things

8    that are within -- for the benefit and cost of the general

9    unsecured creditors other than the lenders it would be a

10   representative that would control those decisions.

11             As to the -- any issues or opportunities that are

12   solely as of the lenders they would have a representative

13   that would make those decisions and there would be a third

14   or plan trustee, what have you, that would be a tiebreaker

15   as necessary for items of shared responsibility or shared

16   opportunity.

17             Those are the -- unless I've missed something,

18   which is entirely possible given my scattered notes, but I

19   believe I've tried to be true to our discussions, the --

20   that's the deal, Your Honor.

21             Again, we need to go back to the committee, the

22   company needs to go back to the board today, and I believe

23   given the accelerated time frame that this case is on and

24   deserves to be on that we would endeavor to have all of

25   these papers submitted on Monday for the Court's approval.

1           THE COURT:  On Monday?

2           MR. BALDIGA:  On Monday.

3           THE COURT:  Thank you.

4           MR. BALDIGA:  And I don't want to be presumptuous

5    so I should ask what I've missed and --

6           THE COURT:  All right.

7           MR. BALDIGA:  -- and others to comment.

8           THE COURT:  Thank you.

9           MR. BALDIGA:  But thank you, Your Honor.

10          THE COURT:  Thank you.  Does anyone else wish to

11   be heard?

12          MS. KLEIN:  Yes, I do.  Good afternoon, Your

13   Honor.  Julia Klein on behalf of the WARN claimants.

14          I just wanted to bring to Your Honor's attention

15   that I was not invited to participate in these discussions,

16   and our clients did file objections to the bid procedures

17   and to -- there is other motions that are pending, sale

18   order, DIP financing order.

19          So our objections, I don't know if they would be

20   resolved by whatever agreement has been put on the record

21   orally right now, but I have not reviewed any documents.  I

22   sort of crashed the party there at the last minute and I was

23   assured that any WARN claims would not be impacted by the

24   proposed consensual agreement, but as I said, I haven't had

25   the chance to review any details and I would like to just

1    reserve some time after everybody else makes their comments

2    to raise my concerns in detail with respect to the DIP

3    order.

4              THE COURT:  Okay.  Mr. Buchbinder.

5              MR. BUCHBINDER:  Good afternoon, Your Honor, David

6    Buchbinder on behalf of the United States Trustee.

7              The parties have worked hard to significantly

8    alter and improve this potential transaction.  It does

9    address a number of the issues that were in the U.S.

10   Trustee's DIP objection.

11             Actually aren't there some terms that have not

12   been put in the record yet?  Like weren't there some issues

13   on the roll up and the keep?

14       (Counsel confer)

15             THE COURT:  I can't --

16             MR. BUCHBINDER:  Okay.  This is -- Mr. Baldiga's

17   issues are in addition to what was filled yesterday and the

18   terms there.

19             So this is -- this is materially different from

20   the transaction that we objected to.  And if the parties can

21   confirm that they believe that what they're describing will

22   address all administrative and priority claims, it looks

23   like they have made substantial progress in making this case

24   move towards a plan that could be confirmable and it

25   addresses all of the issues that we raised in our DIP

1    objection -- I saved two that I'll mention in a moment --

2    and it certainly addresses the issues raised in our bid

3    procedures objections.

4              The two issues in the DIP objection that have not

5    been addressed by what was filled yesterday and what

6    Mr. Baldiga has read on the record were the U.S. Trustee's

7    argument that the 506(c) waiver and the equities and the

8    case waiver should be deferred to the end of the

9    investigatory period, and having heard the terms there and

10   acknowledged that they significantly changed the scope of

11   the transaction.

12             And as I've indicated have seemed to move this

13   estate towards a confirmable plan on those two issues I will

14   defer to the committees' discretion.

15             And I believe that would resolve the U.S.

16   Trustee's objections to the DIP motion and to the bid

17   procedures motion.

18             THE COURT:  Okay.

19             MR. BUCHBINDER:  I simply would want some

20   confirmation on the record.  The parties believe that they

21   will be able to satisfy all administrative and priority

22   claims.

23             THE COURT:  Taking the lighter point first.

24             I think I heard that the investigation period is

25   going to be deemed to have lapsed in any event, so I think

1    we can defer to the committee on that.

2              And as to administrative and priority claims,

3    counsel wish to be heard on that?

4              MR. KAMPFNER:  Yes, Your Honor.  We have submitted

5    a budget -- a DIP budget that is fully funded that we

6    believe covers all administrative and priority claims.

7              THE COURT:  Does it cover 502(b)(9) claims?

8              MR. KAMPFNER:  We don't believe there are any

9    502(b)(9) claims, Your Honor.

10             THE COURT:  When did you stop -- how soon before

11   you filed did you stop actual production?

12             MR. KAMPFNER:  Oh, there -- I mean at least 90

13   days.

14             THE COURT:  Okay.  All right.  Anyone else?

15             MR. KAMPFNER:  Your Honor, I did want to clarify

16   one thing.

17             Mr. Baldiga did say that the sharing on the

18   avoidance actions was 50/50, 50 percent to the DIP lenders,

19   50 percent to the unsecured, and it's really pro rata I

20   believe is what we were discussing.

21             MR. BALDIGA:  That's correct.  I'm sorry.

22             MR. KAMPFNER:  I just wanted to clarify that

23   point.

24             THE COURT:  Okay.

25             MR. ROSENTHAL:  Good afternoon, Your Honor, Jeremy

1    Rosenthal with Sidley Austin on behalf of the Fortress

2    entity that is the DIP agent and the prepetition notes

3    agent.

4              THE COURT:  Uh-huh.

5              MR. ROSENTHAL:  I just wanted to clarify as far as

6    the approval procedures are concerned we intend to amend the

7    restructuring support agreement that was filed with the

8    Court to attach a new term sheet, that'll be filed

9    presumably by Monday, and that will evidence the agreement

10   of all of the DIP lenders and the relevant prepetition

11   lenders to this arrangement.

12             So much like the committee needs to have a final

13   meeting and the debtors' board needs to approval whatever

14   actions the debtors are going to take I have that as well

15   that needs to be approved.

16             And that is all as far as clarification.

17             Thank you, Your Honor.

18             THE COURT:  You're welcome.  Thank you.

19             Mr. Buchbinder?

20             MR. BUCHBINDER:  Your Honor, Dave Buchbinder

21   again.  One more point of clarification.

22             I believe the parties have expressed that they do

23   not intend that reading these terms into the record today

24   implies that the Court is approving them today, and I

25   understand from discussions with them that they are not

1    seeking to approve these terms in a final DIP order or in

2    the final bid procedures order, but that all of these terms,

3    the term sheet will show people what the terms are, but it's

4    my understanding that approval is not being sought at this

5    time, it will be sought in a separate motion or through the

6    terms of a plan.

7              THE COURT:  Well, I'm certainly not approving

8    anything until I see it in writing, so.

9              MR. KAMPFNER:  Right.  The idea, I think, Your

10   Honor, is to submit documentation on Monday and either get

11   it approved on Monday or at the sale hearing on the 6th of

12   June.  Right?

13             MR. BUCHBINDER:  But, Your Honor, the settlement

14   has not been noticed out.  It's clearly the terms of a plan,

15   and if they intend to have it approved in the DIP document

16   then we are opposed to that.

17             THE COURT:  Well, I --

18             MR. BUCHBINDER:  If they're reading it as the

19   terms that are subject to further Court approval we are fine

20   with that today.

21             THE COURT:  Well, look, they'll prepare their

22   documents and submit it under certification of counsel.

23   They'll show it to you ahead of time and if you have any

24   issues you can raise them at that point.

25             I can't sit here today and say that all of those

1    terms should necessarily be resent out when we've had a

2    contested DIP financing hearing notice, we've had a

3    contested bid procedures hearing notice.  The issues that

4    resolve many of these things have been raised in the context

5    of those documents and it may be entirely appropriate to

6    include some or all of these provisions in resolution of

7    hearing of motions that have already been noticed.

8              MR. BUCHBINDER:  Well, Your Honor, the parties

9    have advised me before today that they would not be seeking

10   approval of these terms --

11             THE COURT:  All right.

12             MR. BUCHBINDER:  -- for the DIP or the bid

13   procedures, that they would proceed independently to have

14   them approved.

15             THE COURT:  Let me get -- can I get some

16   specificity from counsel as to exactly how you intend to

17   proceed?  It's the little vague.

18             MR. KAMPFNER:  We would intend to go forward with

19   the debtor in possession financing motion and the sale

20   motion and to submit orders to the Court today based on the

21   forms that have been previously lodged and have those

22   entered today.

23             We would then -- those orders are not different

24   than what has previously been submitted to the Court.

25             We would then submit final documentation on our

1    agreement by Monday for the Court to have in front of it,

2    and we would --

3              THE COURT:  Is that the RSA?

4              MR. KAMPFNER:  The RSA and whatever other

5    documents are required to document the transaction.

6              And then we would go forward with the sale hearing

7    on the 6th and approve the terms of the transaction.

8              THE COURT:  Okay, I'm confused, because I wasn't

9    expecting -- I thought I heard you were going to be

10   submitting orders Monday, I didn't understand that you were

11   going to be submitting orders today.

12             MR. KAMPFNER:  The orders that we would submit

13   today are the DIP finance -- the final DIP order that we

14   submitted in our surreply or our reply yesterday, which

15   eliminate the role -- eliminate the 506(b) fees to the

16   agents, you know, have the changes with respect to the

17   credit bid rights, and eliminate the distribution provision.

18   Those are the four things that we had previously changed.

19   So the order we would submit to the Court has those changes

20   in it.

21             We would then submit the bidding procedures order

22   that has the deadlines that had been previously proposed.

23   The May 31st bid deadline, the auction on June 3rd if anyone

24   submits a bid, which we don't think is likely, and then the

25   June 6th sale hearing.

1              In addition to those documents we would draft

2    documents to, you know -- to document the deal that has just

3    been read into the record and we would submit those

4    documents on Monday with this Court.

5              And then as of -- you know, then I think we'd have

6    to discuss -- because I don't think we have discussed this

7    -- we'd have to discuss whether those documents would be

8    approved on the -- at the sale hearing on June 6th or how

9    exactly they would be approved, but we would file them with

10   the Court on Monday.

11             So the RSA -- the revised RSA, revised -- you

12   know, to the extent there's a settlement agreement that has

13   to be drafted, that kind of thing.

14             THE COURT:  Okay.  Mr. Buchbinder?

15             MR. BUCHBINDER:  Your Honor, I don't have any

16   problem with the DIP order and its form of yesterday and the

17   bid procedures order and its form as of today, but with

18   respect to the other documents that remain to be filed, as

19   the Court has suggested, I think I'll have to wait and see

20   what they say.

21             But the impression was given to me yesterday and

22   this morning that the parties are not seeking approval of

23   those terms through the DIP order or the bid procedures

24   order and that they will proceed independently.  It is the

25   plan in this case.

1          THE COURT:  All right.

2          MR. BUCHBINDER:  I mean I don't have any problem

3    with a term in the DIP or a term in the sale order that the

4    parties are going to use their best efforts to proceed with

5    the term sheet to confirm a plan, but to the extent that

6    they submit papers that says that this is all approved when

7    the settlement hasn't been noticed to the creditors either

8    as a 9019 motion or as a plan that's another issue.

9          But I don't think that's before the Court today, I

10   think that's for next week.

11         THE COURT:  Yep.  Yep.

12         MS. KLEIN:  Your Honor, sorry, Julia Klein of the

13   Rosner Law Group again on behalf of the WARN claimants.

14         I just -- I have a problem with the parties filing

15   something that they supposedly agreed to.  We had filed an

16   objection to the DIP order as well and independent from the

17   committee, and as I said, I haven't seen the final product

18   and I would like to be able to run it by my clients and

19   co-counsel before anything gets entered under certification

20   of counsel, because I don't know if that -- you know, if

21   that novel form of agreement actually resolves our

22   objections.

23         THE COURT:  All right, I hear you.

24         MR. KAMPFNER:  Your Honor, there's no novel -- I

25   mean both orders have been submitted to the Court and have

1    been served upon counsel, so we're not entering any orders

2    that are new today.

3              The -- you know, as for the objections they're

4    there.  If they don't want to withdraw them then we'll have

5    to proceed.

6              THE COURT:  Okay, I understand.

7              Yes, ma'am?

8              MS. KLEIN:  Does the Court -- would like to hear

9    my arguments on the objection then?

10              THE COURT:  Not now, no.

11              MS. KLEIN:  Okay.

12              MR. ROSENTHAL:  And one other item that might

13    clarify things and help the parties.

14              THE COURT:  For the record, please.

15              MR. ROSENTHAL:  Sorry.  Jeremy Rosenthal on behalf

16    of the DIP agent.

17              The funding commitment that is being made or

18    contemplated to be made by the parties is potentially going

19    to come from a cash component of the stalking horse bid and

20    not through an additive amount to the DIP or a change to the

21    DIP budget, so that is not going to require a change in the

22    current order before you for approval of either the DIP or

23    the sale timing sale procedures.

24              THE COURT:  All right.

25              MR. BALDIGA:  Okay, try --

1           THE COURT:  There's nothing more dangerous than

2     trying to read an agreement into the record.

3           MR. BALDIGA:  No, I --

4      (Laughter)

5           MR. Baldiga:  -- I -- and that's why I think I was

6     nominated, Your Honor.  William Baldiga again for the

7     committee.

8           I think actually I can reconcile all of this.

9           We -- the bid procedures are unchanged, so those

10     should be entered today.  I hear no one expect perhaps WARN

11     Act claimant understandably, and it's our fault, perhaps

12     they are represented on the committee but we obviously don't

13     speak for that claimant, and -- but the U.S. Trustee, the

14     debtors, the committee, the DIP lender believe that -- and

15     the stalking horse buyer believes that the bid procedures

16     should be entered.

17           I don't think any of us have looked carefully

18     again while we were in these discussions at the DIP order,

19     but with -- certainly the DIP lender deserves the

20     protections of the DIP orders while it makes this additional

21     funding.  The committees' consent to that is obviously

22     dependent on the laundry list that we read into the court --

23     read into the record.  And again, that would be submitted on

24     Monday.

25           I perhaps confused Mr. Buchbinder myself when I

1    thought I was saying that -- because I'm the one that gave

2    the assurances that you heard -- that we would not be

3    seeking approval of those terms today because none of the

4    parties, not the least the Court, are ready to do that

5    without actually seeing pen to paper, and this presentation

6    is not a substitute for that.

7           It is an agreement, but it's as usual needs to be

8    reduced in writing, including to deserve the attention of

9    the Court.

10          But we do think that when submitted on Monday

11   everything here is within the bounds of the corners of the

12   motions and objections that have been presented previously,

13   and we join the debtors in believing that these are

14   something -- especially in the context of a case this modest

15   -- that deserve to be entered with the compromise of the

16   parties without further motion practice.  There's nothing

17   new about any of these agreements.

18          Thank you.

19          But again, once the Court looks at these papers

20   the Court could differ and set a different procedure.

21          THE COURT:  All right.  Well, what I'm hearing is

22   that you're -- the committee is comfortable with the -- I'm

23   not trying to -- the integrity, which is not the right word

24   -- but that the agreement as you've agreed will be signed up

25   and detailed, but you're not going to know until Monday, but

1   you're comfortable in the interim of having a final DIP

2   order and a bid procedures order being put in place.

3           MR. BALDIGA:  We do.

4           THE COURT:  And you're willing to take that risk,

5   if there is any.

6           Now, if you're going to ask me to sign something

7   in connection with what you file on Monday at the very least

8   I think you're going to need to submit a request of some

9   sort, probably under certification of counsel if that's how

10  you want to try to approach it, or a formal motion, but you

11  can talk about that.

12          But I can't -- you know, you can agree to the

13  terms, but until I sign the order they're not enforceable,

14  at least against the debtor, so --

15          MR. BALDIGA:  Yes, we --

16          THE COURT:  -- you're going to need to come up

17  with a mechanism where I'm going to be -- I'm going to look

18  at what you've agreed to in writing and sign something that

19  makes it binding or whatnot --

20          MR. BALDIGA:  We appreciate that.

21          THE COURT:  -- before it really -- before it

22  really exists.

23          MR. BALDIGA:  And certification of counsel may be

24  the right vehicle.  We do believe that virtually everything

25  that I read into the record and which is the agreement of

1  the parties are enhancements or variations on the DIP order,

2  because that's where the original DIP motion addressed these

3  issues.  And so we do -- it would really be a further order

4  on the DIP motion and not a separate 9019 motion or so

5  forth.

6            So that's procedurally what we think is the right

7  vehicle.  If --

8            THE COURT:  Well, you can have discussions --

9  continuing discussions with Mr. Buchbinder or others and see

10  if you can reach an agreement on how to proceed, and if you

11  can't send it over to me on Monday and I'll make a decision.

12            MR. BALDIGA:  Very good.

13            THE COURT:  The one thing that I know I'm allowed

14  to do is make a decision.

15            MR. KAMPFNER:  Well, with just maybe an additional

16  comment is a lot of this is really related to the APA, and

17  so we'll have to amend the APA, but that's something that's

18  clearly before the Court --

19            THE COURT:  All right.

20            MR. KAMPFNER:  -- and has been before the Court

21  since the first day.

22            THE COURT:  Thank you.  The gentleman back here

23  has been very patient.

24            MR. KRAMER:  Thank you, Your Honor.  Jeffrey

25  Kramer of Lowenstein Sandler on behalf of Tianjin Lishen

1    Battery Stock -- or Joint Stock Co.

2           Your Honor, Lishen is a company based in China,

3    they're one of the largest creditors of the debtor.  They're

4    a member of the creditors' committee.  As well they were the

5    principal supplier of batteries to the debtors.

6           Your Honor, what I wanted to bring up and advise

7    to Court today is that there's a substantial issue regarding

8    the assumption and assignment of the contract of Lishen.

9    There's a question of whether or not the contract was

10   terminated prepetition, what the cure amount would be?

11          The debtors filed a separate assumption and

12   assignment motion.  The objection deadline was tentatively

13   scheduled for tomorrow and the hearing on that was

14   tentatively scheduled for June 6th because it was supposed

15   to be heard along with the sale hearing.

16          Our concern is that what procedures are going to

17   take place with respect to that motion?  We don't want to

18   come in on the 6th on the sale motion with a bunch of

19   witnesses and a four-hour hearing in front of Your Honor on

20   the assumption of this contract.

21          I've spoken to debtors' counsel who's agreed to

22   extend the objection deadline to Monday for Lishen to object

23   to the assumption and assignment other contract, and as well

24   advise us that any hearing or any issues with respect to

25   Lishen will not go forward on June 6th.

1           So we wanted to put that on the record, Your

2    Honor.

3           THE COURT:  Well, to the extent you have a cure

4    controversy that of course is standard operating procedure

5    to approve the assumption and assignment and fight about the

6    cure later.

7           MR. KRAMER:  Yes.

8           THE COURT:  Given the size of your contract I

9    don't know if that would make sense in the context of what

10   the purchaser is thinking is going to proceed or not.

11          As to assignability I guess I'd look to the other

12   -- I'd look to the buyer to see if they're comfortable

13   pushing that back as well, otherwise --

14          MR. KRAMER:  Uh-huh.

15          THE COURT:  -- we may very well have to go forward

16   on the 6th.

17          MR. KRAMER:  Exactly.  I know there was

18   conversations last night and (indiscernible - 1:42:47).

19          MR. ROSENTHAL:  Jeremy Rosenthal again.

20          Absent a deal it's not our intention to assume any

21   contract with Lishen.  If an arrangement can be reached

22   that's consistent with the understanding of the agreement

23   reached with the committee then we'd be happy to proceed

24   with Lishen, but we are not intending to assume any

25   agreements with Lishen.

1          THE COURT:  At all.

2          MR. ROSENTHAL:  Period.

3          THE COURT:  Okay.  You did file -- there was a

4    motion filed though that referenced Lishen, correct?

5          MR. KAMPFNER:  There was, Your Honor.

6          THE COURT:  So you're -- that's being withdrawn?

7          MR. KAMPFNER:  No, no, no.  There's a -- the

8    motion is there and one of two things is going to happen by

9    the 6th.  There's either going to be a consensual agreement

10   with Lishen under which there could be some assumption, it's

11   either going to be assumed or there's going to be some other

12   consensual arrangement or there isn't, in which case it is

13   going to be removed from the list and it is not going to be

14   an assumed contract and it's going to be subject to the

15   estate's right to pursue avoidance actions.

16         THE COURT:  Okay.  I think I -- I thought I just

17   heard that the buyer wasn't interested in the contract.

18   Maybe I misheard.

19         MR. ROSENTHAL:  If Lishen is going to be part of

20   the new co's future operations then we would like to do

21   business with Lishen, and if that involves either assuming a

22   contract or entering into a new one we're essentially

23   indifferent, and so that would have to be a consensual

24   arrangement.

25         If they don't want to have their contract assumed

1    and we don't enter into an alternative arrangement then we

2    would not be --

3              THE COURT:  I understand.

4              MR. ROSENTHAL:  -- attempting to forcibly assume

5    and claims against them would be left for prosecution.

6              THE COURT:  So we will not have a contested

7    assumption hearing.

8              MR. ROSENTHAL:  That is correct.

9              THE COURT:  I think that solves your question.

10             MR. KRAMER:  Okay.  That's different from what we

11   had discussed or our intent was, Your Honor.

12             Thank you.

13             THE COURT:  You're welcome.

14             MR. KAMPFNER:  Your Honor, I just want to make one

15   further clarification.

16             So the debtor in possession order -- the final DIP

17   order entered today isn't intended to prejudice the

18   agreement with the committee.  So, you know, the fact that

19   it's entered is consistent with and part of the agreement,

20   but it isn't intended to supersede it in any way, or you

21   know.

22             THE COURT:  Well, I mean my only point was, you

23   know, to the extent I'm signing a final order it's a final

24   order and, you know, if there's a dispute in the future

25   about what everybody agreed to I just want to make the point

1    that the committee is -- everyone to a certain extent is

2    trusting everyone else's professional judgment, which is

3    totally appropriate --

4            MR. KAMPFNER:  Correct.

5            THE COURT:  -- that the deal will fall out as it

6    is, but you want me to sign final orders today.

7            MR. KAMPFNER:  Yes.

8            THE COURT:  So I just want to make sure I

9    understand that and everybody is on board with that.

10           MR. KAMPFNER:  Yes, Your Honor.

11           THE COURT:  Of course you can amend it

12   consensually.

13           MR. BALDIGA:  I -- Your Honor, William Baldiga for

14   the committee.

15           Could the parties have one minute on this issue?

16   Because it's -- I know we're within the range of some nuance

17   here, but precision on this is important and I think we'd

18   benefit from a minute and we could maybe do that even while

19   Mr. Buchbinder proceeds on his other --

20           THE COURT:  Yeah, let me -- let me just -- so -- I

21   can just kind of get an idea where we're headed.

22           So the DIP is number 9, the bid procedure is

23   number 10.  Before we break where are we on 11 through -- I

24   forget -- 11 through 14?  So that would start with the --

25           MR. KAMPFNER:  Your Honor --

1           THE COURT:  -- Santa Monica lease?

2           MR. KAMPFNER:  We have a consensual agreement to

3    that motion and we can read that into the record if you'd

4    like and it will be documented by stipulation.

5           THE COURT:  All right, let's do that.

6           MR. GOLD:  Good afternoon, Your Honor Ivan Gold of

7    Allen Matkins.  Thank you for my pro hac vice admission,

8    Ms. Bifferato is my local counsel, she's in the courtroom.

9           Mr. Kampfner and I have been in extended

10   discussions to resolve the issues presented by the motion.

11          My clients are the Neman Trusts and Archway

12   Investments, who's the master landlord in item number 11,

13   the properties at 820 Broadway in Santa Monica.

14          The debtor has two subtenants, Worksocial, LLC

15   occupying the first floor of the building, and Icon Mobile,

16   LLC who occupies the second floor.

17          We have reached an agreement by which the

18   effective date of lease rejection will be established at

19   May 31, 2013, this Friday, and the debtor will satisfy its

20   365(d)(3) obligation with respect to the premise which in

21   the aggregate is $68,437.05 by first having the subtenants

22   directed and authorized to make payments, which I'll outline

23   in a moment, directly to the landlord.

24          The debtor would obviously retain its remedies

25   under the subleases, it has security deposits and the like

1    in the event of non-payment from the subtenants, and the

2    debtor would receive dollar for dollar credit against its

3    obligation for the direct payments.

4            The contributions, if you will, Your Honor, which

5    will be detailed in the stipulation, are that Worksocial

6    will pay 20,548.96, Icon Mobile will pay 30,991.14, and then

7    the debtor, assuming these payments are made, will pay

8    16,896.95, and that bundle satisfies the rent obligation.

9            Worksocial would retain its -- it raised it in its

10   objection and for the record both Mr. Kampfner and I have

11   been in conversations over the last 24 hours with Jeff

12   Costell who represents Worksocial, he was originally on the

13   phone, and upon our agreement authorized me to make these

14   representations to the Court that he is in agreement with

15   that Worksocial would retain their general unsecured claim

16   with respect to their security deposit, which was one of the

17   points of their objection.

18           Also as a side issue relating to the DIP the

19   debtor had previously agreed, and this is reflected in the

20   order that has been presented to you, that because the

21   effective date of rejection of our lease will now not be the

22   petition date, it'll be May 31st, that this lease is not

23   part of the DIP collateral, in other words it didn't attach

24   to the DIP collateral and then the lease is rejected, it's

25   not part of the DIP collateral at all and that's addressed

1    in a footnote in the latest version of the DIP order

2    number 9.

3            Our intention is to bundle these terms into a

4    stipulation that would be signed by counsel for Worksocial

5    who filed an objection, my client, and the debtor, and then

6    we would submit that order and an order pursuant to

7    stipulation under certification of counsel.

8            THE COURT:  Okay.

9            MR. GOLD:  Thank you very much.

10           THE COURT:  Thank you.

11           MR. KAMPFNER:  Your Honor, with respect to matter

12   item number 12 I believe that part of the resolution of --

13   the bigger resolution we've been discussing is the

14   withdrawal of the committee of the Houlihan -- their

15   objection to the Houlihan retention.

16           MR. BALDIGA:  Confirmed.

17           THE COURT:  Okay.

18           MR. KAMPFNER:  With respect to item 13 --

19           THE COURT:  Sorry, let me -- give me a second to

20   make a note.

21           MR. KAMPFNER:  Sure.

22           THE COURT:  All right.

23      (Pause)

24           THE COURT:  Okay, thank you.

25           MR. KAMPFNER:  With respect to item 13 -- well

Page 41

1    that one is obviously going forward later.

2              THE COURT:  The committee is withdrawing its

3    objection to that item as well?

4              MR. KAMPFNER:  I don't think there ever one was,

5    Your Honor.

6              THE COURT:  This is White & Case's retention.

7              MR. BALDIGA:  Yes, we're deferring to the U.S.

8    Trustee, Your Honor.

9              THE COURT:  Well, you filed a reservation of

10   rights.

11             MR. BALDIGA:  But our points were subsumed by the

12   U.S. Trustee so that we're going to leave it to the U.S.

13   Trustee's argument and the Court's decision.

14             THE COURT:  Okay.  All right.

15             MR. KAMPFNER:  With respect to 14 the retailer

16   agreement rejection motion we have an agreement to continue

17   the hearing with respect to these two items to the sale

18   hearing on June 6th with the proviso that if the agreements

19   are rejected on that date the rejection date will be

20   retroactive to the day that the motion was filed on May 8th.

21             THE COURT:  Okay.  I'm pretty sure when I gave you

22   a sale hearing date I thought I made it clear that that was

23   the sale hearing date and not --

24             MR. KAMPFNER:  And not anything else?

25             THE COURT:  -- an omnibus date.

 1              MR. KAMPFNER:  Okay.  Well then maybe we --

 2              THE COURT:  Because I'm -- and the reason I say

 3      that is I have two different matters, one at 11:00 and one

 4      at 2:00, so --

 5              MR. KAMPFNER:  I'm sorry, Your Honor, we can -- we

 6      can then just pick another date.

 7              THE COURT:  I think.  And if I didn't say that to

 8      you tell me, but I'm pretty sure I said that to you.  The

 9      next -- the next date is June 26th?

10              Let's -- we can -- tell you what, let's continue

11      it to the 6th, and to extent there's an agreement we'll deal

12      with it then.  If it looks like it's going to be contested

13      --

14              MR. KAMPFNER:  Goes to the 26th.

15              THE COURT:  -- we're going to kick it to the 26th.

16              MR. KAMPFNER:  Yes.

17              THE COURT:  Okay.

18              MR. KAMPFNER:  Okay.  Just for clarification too,

19      when you say the sale motion hearing is on the 6th, and that

20      includes the motion to assume and assign --

21              THE COURT:  Yes.

22              MR. KAMPFNER:  -- executory contracts.

23              THE COURT:  Yes.

24              MR. KAMPFNER:  Thank you.  And, you know, we had a

25      tentative objection deadline because we didn't know when the

1    hearing was going to be, but I would assume that that would

2    now apply, you can set it --

3              THE COURT:  Whenever it was.

4              MR. KAMPFNER:  Yeah.

5              THE COURT:  Okay.  All right.  So we continue that

6    to 6/6.

7         (Pause)

8              THE COURT:  Yes, sir.

9              MR. SPENCE:  Good afternoon, Your Honor, Stephen

10   A. Spence, Phillips Goldman & Spence, I'm here on behalf of

11   Martin Cadillac.

12             And I just wanted to put on the record that we

13   were one of the objectors to number 14, we're in agreement

14   with the debtors' (indiscernible - 1:53:28).

15             THE COURT:  Okay, thank you.

16             MR. BECK:  Excuse me, Your Honor, Robert Beck on

17   CourtCall for creditor Martin Cadillac.

18             THE COURT:  Yes, sir.

19             MR. BECK:  I'd just like to insert that in the

20   event we don't reach an agreement and it goes to a full

21   hearing on June 26th that Martin will be able to file a

22   surreply, and if you can give us a date certain which this

23   surreply would be due then that would be helpful.

24             THE COURT:  I think you can work that out with the

25   other side.  I'm certainly happy to have you further brief

Page 44

1    the matter to the extent necessary.  You guys can work out

2    amongst yourself when that'll happen.

3             MR. BECK:  Okay.

4             THE COURT:  Is that all right?

5             MR. KAMPFNER:  Yes, Your Honor.

6             THE COURT:  Okay.

7             MR. SPENCE:  Thank you, Your Honor.

8             THE COURT:  All right.  So I think you can hand me

9    up the Houlihan order.

10            MR. KAMPFNER:  Yeah, Your Honor, that's what I was

11   going to propose.  May I approach?

12            THE COURT:  Yes.  It'd be nice to sign something.

13        (Pause)

14            THE COURT:  All right.

15            MR. KAMPFNER:  And so -- and then --

16            THE COURT:  Let me just look through my notes and

17   make sure I understand where we're headed.

18            Now, item 11 you're going to submit a consent

19   order at a future time with a stipulation.

20            Item 12 I've just signed.

21            The White & Case retention is still objected to.

22            The rejection motion is continued to June 6th or

23   June 26th if it's going to be contested.

24            Item 15 was withdrawn a while ago.

25            So how should we proceed?

```
 1              I see gentlemen -- I see people working in the
 2    hallway there.
 3              MR. KAMPFNER:  Your Honor, I think we should go
 4    forward with item 13, and I will --
 5              THE COURT:  That's fine with me.
 6              MR. KAMPFNER:  -- defer to John Cunningham on
 7    that.
 8              MR. CUNNINGHAM:  Good afternoon, Your Honor.
 9              THE COURT:  Good afternoon.
10              MR. CUNNINGHAM:  John Cunningham of White & Case,
11    proposed counsel for the debtors in possession on the
12    debtors' application to retain White & Case as attorneys.
13              Your Honor, we do have just the United States
14    Trustee objection.  I heard Mr. Baldiga say his reservation
15    of rights is subsumed.  He did tell me today he was not
16    going to be objecting, so I believe again the only thing
17    we're addressing is the United States Trustee's objection.
18              THE COURT:  I think that's what he meant.
19              MR. CUNNINGHAM:  Your Honor, just for the record,
20    because it's a contested matter for the evidence, we're not
21    going to have live testimony.  We -- I did agree with
22    Mr. Buchbinder very simply to have the exhibits that we
23    attached to the application to be admitted into evidence.
24    That would be Debtors' A, which is my declaration in support
25    of the application.
```

1          THE COURT:  Right.

2          MR. CUNNINGHAM:  Debtors' Exhibit B, which is the

3   engagement letter with the debtors.

4          Debtors' Exhibit C which is the declaration of

5   Christopher Rose.

6          And then lastly Debtors' Exhibit D which is the

7   supplemental letter with the debtors.

8          And that would form the evidence in support of the

9   debtors' application, Your Honor.

10         And I believe Mr. Buchbinder, who filed his

11   objection, he has one exhibit himself, that was the copy of

12   the website from our firm that has the biographical

13   information of Mr. Rose and we agree, Your Honor, that that

14   is a true and correct version and we consent to that as

15   coming in as evidence as well.

16         So I think that would form the record.

17         THE COURT:  Okay.  Just so the record is clear

18   then Exhibits A, B, C, D and E -- no --

19         MR. CUNNINGHAM:  No, E was a case.

20         THE COURT:  Yes, okay, that's what I thought so.

21   Okay.  So exhibits A, B, C and D to your application are

22   admitted without objection.

23      (Debtor's Exhibit Nos. A, B, C and D were admitted)

24         THE COURT:  And Exhibit A to Mr. Buchbinder's

25   response the admitted without objection.

1          (U.S. Trustee's Exhibit No. A was admitted)

2               MR. BUCHBINDER:  Dave Buchbinder for the record.

3      I agree with counsel's representations, that is our

4      agreement.

5               THE COURT:  Okay.  And no cross-examination or

6      anything like that.  Okay.

7               MR. CUNNINGHAM:  No, Your Honor.  So --

8               THE COURT:  So Essential Therapeutics.  Other than

9      the fact that I lost that case tell me a good reason why I

10     shouldn't apply it.

11         (Laughter)

12              MR. CUNNINGHAM:  Ten years later, Your Honor.

13              THE COURT:  Yeah.

14              MR. CUNNINGHAM:  Your Honor, Section 327(a)

15     provides that the trustee or debtor in possession, quote,

16     "with the Court's approval may employ one or more attorneys

17     that do not hold or represent an interest adverse to the

18     estate and that are disinterested persons."

19              The U.S. Trustee is not alleging at all in the

20     objection that White & Case does not hold or represent an

21     interest of adverse to the estate under Section 327(a).

22              Rather the U.S. Trustee's lone objection is that

23     White & Case is not a disinterested person under Section

24     327(a).

25              Your Honor, that term is defined in Bankruptcy

1    Code Section 101-14.  101-14 states "that a disinterested

2    person is a person that (a), is not a creditor or equity,

3    security holder or an insider; (b), is not and was not

4    within the two years before the date of the filing of the

5    petition a director, officer, or employee of the debtor; and

6    (c), does not have an interest materially adverse to the

7    interest of the estate or of any class of equity security

8    holders by reason of any direct or indirect relationship to,

9    in connection with, or interest in the debtor or for any

10   other reason."

11           Your Honor, the debtors and the U.S. Trustee agree

12   that this is an issue of statutory interpretation and that

13   the plain meaning rule applies.

14           And we agree with the U.S. Trustee's statement in

15   paragraph 14 of the objection where the quote is, "Where a

16   statutes meaning is plain the sole function of the Court is

17   to enforce it according to its terms."  Citing United States

18   versus Ron Pair at 480 U.S. 235 at page 241.

19           So taking the plain meaning approach to the

20   definition of disinterested person, Your Honor, the first

21   word in Section 101-14 is the word person, which itself is

22   defined in Section 101-41, and that definition of person

23   lists as including an individual, a partnership, and

24   corporation.

25           And, Your Honor, we submit that there is no

1     question that the person at issue here as defined in Section

2     101-41 is the partnership, White & Case, and not the

3     individual, Chris Rose.

4            Indeed the U.S. Trustee in Section B at page 5

5     entitles that section White & Case is a person.

6            The debtors' application clearly, Your Honor, is

7     an application solely to retain White & Case, it is not an

8     application to retain Chris Rose in any capacity.

9            So starting with that threshold definition of

10    person and applying it to the list set forth in Section

11    101-14 of disinterested person we believe it is clear that

12    White & Case is not a creditor, equity or security holder,

13    or insider, and White & Case is not a director, officer, or

14    employee of the debtor.

15           Rather the sole issue, Your Honor, in our view is

16    whether Chris Rose as a current partner of White & Case and

17    as the former officer of the debtors creates a materially

18    adverse interest to the estate that would disqualify White &

19    Case under 101-14(c).

20           Your Honor, the uncontested facts in evidence and

21    the record on this application demonstrate there is no

22    material adverse interest.

23           The Debtors' Exhibit C, the declaration of Chris

24    Rose, states that from August 2010 to June 2012 Mr. Rose was

25    employed by debtor, Coda Automotive, Inc. and served as the

1   senior vice president and general counsel of Coda Holdings

2   and general counsel of Coda Automotive, Inc., and his

3   employment by the debtors terminated in June 2012.

4           Mr. Rose subsequently joined White & Case in

5   September 2012 and is currently a partner in the firm's M&A

6   group located in Palo Alto, California.

7           Mr. Rose's declaration stated he has not provided

8   any services or billed any time to the debtor since joining

9   White & Case, he has not participated in any manner in the

10  preparation, filing, or prosecution of these Chapter 11

11  cases.

12          Mr. Rose also testifies in his declaration that

13  since October 2012 White & Case implemented and maintains an

14  ethical screen applicable to Mr. Rose and his secretary from

15  the files, work product, and other information concerning

16  the debtors as well as the attorneys and other White & Case

17  personnel providing services to the debtors.

18          Mr. Rose also testified that he has waived any and

19  all claims against debtors that he may have and any and all

20  equity interest in the debtors that he may have.

21          That is the testimony that is unrebutted, Your

22  Honor.

23          Debtors' Exhibit B, our engagement letter, makes

24  clear that we were retained in October 2012 to provide the

25  restructuring advice and the mandate that we were given that

1    led ultimately to these bankruptcy filings.  That was signed

2    by Coda's current general counsel, John Wilson, who was

3    Mr. Rose's successor.

4            Importantly, Debtors' Exhibit D, Your Honor, is

5    the supplemental letter dated October 25th also signed by

6    Mr. Wilson.

7            And the operative paragraph in that supplement,

8    Your Honor, and I can just read it because it's very

9    important, it sets forth -- it's the second paragraph -- it

10   sets forth:

11           "Coda acknowledges and agrees that (1), Chris Rose

12   is the former senior vice president and general counsel of

13   Coda and that Mr. Rose in 2012 became a partner of White &

14   Case in its Palo Alto, California office.

15           (2), White & Case has implemented an ethical

16   screen of Mr. Rose and his secretary on the one hand and all

17   White & Case attorneys and personnel who provide services in

18   the representation of Coda on the other hand, including

19   without limitation all documents and information and advice

20   by White & Case to Coda in connection with the

21   restructuring.

22           (3), White & Case shall not provide advice to Coda

23   with respect to any claims or issues involving Mr. Rose or

24   any other former officers and directors of Coda.

25           And (4), Coda consents to the use of conflicts

1    counsel to represent Coda in connection with any claims or

2    issues involving Mr. Rose or any other former officers of

3    Coda.

4              The above ethical screen prevents not only

5    disclosures of an oral and written nature but also

6    electronic communications and is administered in accordance

7    with policies and procedures of White & Case.

8              The existence of this screen was circulated to all

9    personnel of the firm."

10             Your Honor, these letters and statements again are

11   uncontested.  The evidence in the record supports a finding

12   that White & Case holds no interest -- no material adverse

13   interest to the debtors' estate as provided in Section

14   101-14(c), and no party, including the U.S. Trustee, has

15   raised any objection to White & Case's retention under

16   101-14(c).

17             Rather the only objection to White & Case's

18   retention by the U.S. Trustee is based solely on Section

19   101-14(b), and that entire argument, Your Honor, is based

20   and argued on Judge Walrath's 2003 decision in Essential

21   Therapeutics.

22             In that case Judge Walrath found that Bingham was

23   not a disinterested person under Section 101-14 B because

24   Mr. Vega, a Bingham partner, had served as secretary of the

25   debtors within the two years of the petition date.

1              Judge Walrath adopted a general rule, and other

2      courts have called this a per se rule, which disqualifies

3      the firm because one of its members is not disinterested.

4              The Essential Therapeutics' decision; however,

5      Your Honor, also stated that (1), Bingham's application

6      listed Mr. Vega as one of the two Bingham partners to handle

7      the case; (2), that Mr. Vega had billed time to the matter;

8      and (3), that Bingham offered to set up an ethical screen

9      prospectively as opposed to the very beginning of the

10     bankruptcy engagement.

11             Under these facts one could arrange that the

12     person for purposes of disinterested person included

13     Mr. Vega in Essential Therapeutics.

14             In contrast based on the unrebutted evidence

15     Mr. Rose again never worked on any Coda matter since joining

16     White & Case, never billed any time to a Coda matter, and

17     was subject to an ethical screen since the beginning of the

18     restructuring and bankruptcy mandate in October of 2012.

19             Your Honor, we cited two --

20             THE COURT:  I think -- so really your point would

21     be that the imputation of the conflict that Judge Walrath

22     discussed in Essentials she in effect makes it a matter of

23     law, and I think your argument is it depends on the facts

24     and circumstances of the case.

25             MR. CUNNINGHAM:  Yes, I recognize that the -- her

1    decision has been read and I tend to read it as well as

2    adopting a per se rule.

3            THE COURT:  Right.

4            MR. CUNNINGHAM:  But I am pointing out to the

5    Court that she did have facts that do differ from the facts

6    that we have.  I don't know if that would sway Judge Walrath

7    or not, but I do know that our facts are different and I'm

8    simply urging the Court to take notice of two subsequent

9    Bankruptcy Court decisions that have addressed this issue,

10   in particular the Cygnus Oil decision that discussed and

11   examined Judge Walrath's decision at length and came to a

12   different conclusion.  That's the conclusion we're asking

13   Your Honor to reach.

14           I mean this -- by the way the other case that we

15   cited, Your Honor, was Sea Island.  We attached both of them

16   to our application.

17           Your Honor, Cygnus Oil is factually analogous to

18   the facts in this case.  From July 2006 to December 2006

19   Mr. McBride had served as a director of the debtor, Cygnus,

20   and subsequently joined Bracewell Giuliani as a litigation

21   partner of that firm.  Cygnus filed its Chapter 11 case

22   thereafter or a few months thereafter in April 2007.  And

23   the U.S. Trustee similar to the U.S. Trustee here objected

24   to Bracewell's retention under 327(a) and 101-14 and argued

25   that Mr. McBride's involvement with Cygnus should be imputed

1    to Bracewell thereby rendering Bracewell a non-disinterested

2    person.

3              Your Honor, I would just like to read the Court's

4    response, because what I'm about to read, which is from the

5    case, could be exactly the ruling of the Court in this case

6    given the identity of and analogy of the facts, and I'm

7    quoting from the Court here at page 3.

8              THE COURT:  Which is the Cygnus -- Cygnus court?

9              MR. CUNNINGHAM:  This is the Cygnus court at page

10   3, Your Honor.

11             This court also notes it respectfully disagrees

12   with Judge Walrath's finding in the Essential Therapeutics

13   that:

14             "It would be a Herculean task to determine whether

15   the actions of the attorney who served as an officer of the

16   debtor would impair other firm members' ability to act on

17   behalf of the debtor and the estate in an impartial manner.

18   The threat of such a task supported the Delaware Court's

19   application of a per se rule of imputation.  As set forth

20   below, however, such an inquiry is proper and required under

21   Section 101.14(c).

22             "In this case the Court set the matter for hearing

23   and allowed the United States Trustee, Cygnus and other

24   interested parties to introduce evidence as to Bracewell's

25   disinterestedness or lack thereof.  The hearing was short

1    and there was no evidence showing any absence of

2    disinterestedness.

3            "Once a firm established that it is neither a

4    creditor, equity security holder or insider, nor has been a

5    director, officer or employee within the last two years of

6    the debtor, the Court must evaluate the firm's interest in

7    the debtor under Section 101.14(c).  Section 101.14(c)

8    provides for a finding of non-disinterestedness if a person

9    has an interest materially adverse to the interest of the

10   estate by reason of direct or indirect relationship to the

11   debtor.

12           "In this proceeding an indirect relationship

13   exists between Cygnus and Bracewell through McBride's

14   interest in Cygnus.  It is in this section through an

15   indirect relationship that Congress provided for a finding

16   of non-disinterestedness of an entire firm based on one

17   member's involvement with the debtor.  Bracewell fully

18   disclosed McBride's interest in Cygnus in its affidavit

19   supporting the application to employee.  Bracewell asserted

20   that McBride no longer maintains a role with Cygnus and will

21   have no role whatsoever in the representation of the

22   debtors" --

23           THE COURT:  Well --

24           MR. CUNNINGHAM:  Yeah.

25           THE COURT:  -- the Cygnus holding, in effect,

1   eliminates law firm disqualification under former

2   director/officer language.

3           MR. CUNNINGHAM:  Yes.

4           THE COURT:  And is that consistent with, you know,

5   the legislative history, with -- with -- with the way this

6   has been done?  I mean, you -- this section really goes -- I

7   mean, it goes back to the 30s if you trace it all the way

8   back, and it's all about protecting the creditors from the

9   insiders.  You know, Delaware -- debtors' management and

10  Wall Street lawyers and all the other things people were

11  throwing around in 1934.

12          MR. CUNNINGHAM:  Uh-huh.

13          THE COURT:  So I -- I find it difficult to look at

14  this section and -- and construe it so narrowly that it's

15  only dealing with an individual.

16          So even if the day before this bankruptcy was

17  filed you had a person who was president and CEO of the

18  company and he were to go, quit, and go and work at White &

19  Case the very next day before the -- before the bankruptcy

20  filing, that no way, no matter what he did would in any way

21  implicate the former debtor/officer et cetera within two

22  years rule, and the only thing you would look at was

23  interest adverse to the estate.

24          MR. CUNNINGHAM:  But that's -- as the Cygnus court

25  said, that's the focus in which you can explore all the

1    facts and issues as to whether the court has any concern --

2              THE COURT:  So --

3              MR. CUNNINGHAM:  -- regarding that.

4              THE COURT:  So where -- so what does the -- so

5    then -- what exactly is the scope, then, of this action, the

6    former -- the former counsel, lawyer, et cetera, et cetera?

7    I don't have the precise language in front of me.  Let me

8    get the precise language.

9              MR. CUNNINGHAM:  I think it's, again, the person

10   that you're looking to retain.

11             THE COURT:  Is not and was not within two years

12   before the date of the filing of the petition a director,

13   officer or employee.  So you're -- you would -- you would

14   focus it solely on the individual.

15             MR. CUNNINGHAM:  And be --

16             THE COURT:  And that --

17             MR. CUNNINGHAM:  -- only because --

18             THE COURT:  -- basis to support that other than

19   Judge Walrath's finding?

20             MR. CUNNINGHAM:  Yes, Your Honor.  And -- and,

21   again, from our perspective the person -- since the person

22   is also -- talks about individual partnership.  Here we have

23   --

24             THE COURT:  So do --

25             MR. CUNNINGHAM:  -- one of the partners.

1          THE COURT:  So the corrupting influence of a

2     former officer that's hired to the firm that gets retained,

3     the corrupting influence would be simply -- because is it

4     such that it creates an interest adverse to the debtors'

5     estate?

6          MR. CUNNINGHAM:  Exactly.  And -- and you get to

7     decide that by hearing the evidence and the testimony as

8     opposed to just because we have a partner who was a former

9     officer of the debtor and it's within the two years, he had

10    nothing to do with this case, it could be in Siberia, but

11    that's an automatic per se non-stop, you're conflicted and

12    can't take the assignment.  And the --

13         THE COURT:  Well --

14         MR. CUNNINGHAM:  -- view of these courts is that

15    that's too harsh a reading of the plain meaning rule because

16    it doesn't say that.  There's nothing in the statute to say

17    that that vicarious liability where I understand cases talk

18    about and Judge Walrath talks about how you have various

19    ethical rules of imputation of vicarious liability.  This is

20    statutory interpretation under the Bankruptcy Code and

21    there's cases we cited which talk about how that -- that

22    vicarious liability shouldn't be applied here.  Even the

23    U.S. Trustee says in its objection that the -- you know, the

24    ethical rules that govern lawyers, that's not the purpose of

25    the disinterested standard.  It's -- I agree with Your Honor

1    it's an impartiality statutory standard.

2           But in this case when we don't meet what Congress

3    put in, and Congress could have written in that they wanted

4    to have -- include vicarious type of finding of non-

5    disinterestedness.  But instead, as the Cygnus court states

6    here, which I find very compelling and urge Your Honor to

7    adopt, is 101.14(c) deals with Your Honor's concerns.  You

8    have the ability based on the evidence and the testimony to

9    determine.

10          I mean, this is -- this is that extreme case in

11   which you have somebody who is -- hasn't touched upon

12   anything with respect to what we put forth before Your

13   Honor.  We have conflicts counsel.  He's not in any way

14   being exculpated.  I know there was a suggestion by the U.S.

15   Trustee in the objection about whether the buyer was buying

16   releases.  That was factually incorrect then.  As you heard

17   Mr. Baldiga today say the agreement that they have leaves

18   all claims against former officers and directors to the

19   estate.  It's not being touched.  We have Fox Rothschild as

20   conflicts counsel.  There's no -- from our perspective we

21   did everything right once we, you know, were aware of the

22   situation and what we had to do.

23          And we just are of the opinion that the per se

24   rule, which we do believe is the majority rule.  You see the

25   courts in Cygnus Oil and then Sea Island reflect the fact

1    that outside of these, you know -- you know, decisions that

2    Judge Walrath relied -- and, you know, again it was ten

3    years ago -- you see the -- kind of the case law gravitating

4    that -- saying that there is no per se rule.   No one has

5    spotted a -- a legislative history that said, yes, there's

6    definitely this per se requirement to apply.

7              And it takes -- I get the feeling that it takes

8    away from the Court's --

9              THE COURT:  Well --

10             MR. CUNNINGHAM:  -- ability to review the facts.

11             THE COURT:  Now even under your argument it would

12   be per se rule.  It would just be to the individual.  I

13   mean, you are or you are not a former --

14             MR. CUNNINGHAM:  That's true.

15             THE COURT:  -- officer of the debtor --

16             MR. CUNNINGHAM:  Absolutely.

17             THE COURT:  -- in the previous two years.  So --

18             MR. CUNNINGHAM:  Right.  Absolutely.

19             THE COURT:  -- Mr. Rose --

20             MR. CUNNINGHAM:  If Mr. Rose --

21             THE COURT:  -- is per se covered by this rule --

22             MR. CUNNINGHAM:  Absolutely.

23             THE COURT:  -- or this subsection.

24             MR. CUNNINGHAM:  Yes.  If we -- the debtors were

25   to file an application to retain him, no question.  He's --

1    it applies.

2              THE COURT:  Okay.

3              MR. CUNNINGHAM:  Thank you, Your Honor.

4              THE COURT:  Let me hear from Mr. Buchbinder.

5              MR. BUCHBINDER:  Good afternoon, Your Honor.  Dave

6    Buchbinder on behalf of the United States Trustee.

7              You can't change the past.  White & Case seeks to

8    be retained when they knew from the outset that they could

9    not be retained by the plain meaning of the code.  What they

10   should have done in this case -- Mr. Cunningham ended his

11   comments a moment ago by saying we did everything right.  If

12   they did everything right, they wouldn't have taken the case

13   under these circumstances.

14             They seek to circumvent the statute and the case

15   law in this district by an attempt to revise or disclaim the

16   past.  They want to convince this Court that Judge Walrath's

17   opinion in Essential Therapeutics was wrong.  Not only was

18   Judge Walrath's opinion correct, she got it right and she

19   got it right for some reasons that aren't even in her

20   opinion.

21             But when you read her opinion and, frankly, when

22   you look at the cases cited by White & Case in support of

23   their proposition, Judge Walrath had all of those cases in

24   front of her and she cited each and every one of them and

25   rejected them in the Essential Therapeutics' opinion.  There

1    have only been two cases decided since then that have

2    actually cited the case or, as I could find, dealt with the

3    issue, and they were the Cygnus case, which just takes a

4    different viewpoint and there was no evidence in that case

5    that the officer or director had done anything because

6    that's what a lot of these cases turn on, a ministerial

7    officer who does nothing and doesn't participate in the

8    corporation.

9              But, also, in addition to the case law supporting

10   Judge Walrath, and her opinion contains a compendium of

11   decided cases and she shows how the great weight of

12   authority and, certainly, the cases decided within the Third

13   Circuit all are in support of her proposition.  But in

14   addition to that, a careful reading of the code will also

15   support her.

16             Now Mr. Cunningham does not disagree that Section

17   327(a) requires that the professional be disinterestedness.

18   Mr. Cunningham does not argue -- does not disagree that

19   Section 101.14 contains three parts.  But he wants us to

20   ignore or rewrite the second part.  We'll come back to that.

21             Then he wants us to ignore the definition of

22   person or to stretch the definition of person so that it

23   can't possibly be a law firm.  But when Congress wrote the

24   code and wrote these rules, they knew that law firms

25   represented debtors, particularly in Chapter 11 cases.  And

1    it's a stretch to say that a law firm is a person, but the

2    people within it are not persons or that the people in law

3    firms are persons, but that the law firm is not a person.

4    The code works both ways.

5            But let's take a look at Section 101.14 and let's

6    parse it carefully instead of cavalierly ignoring some of

7    the language.

8            While 114(a) says that you are disinterested if

9    you are -- if the person is not a creditor, equity security

10   holder or an insider.  That's worded in the present tense,

11   is not.  So you can have a case like Pricewaterhouse where

12   the Third Circuit said if you have a claim you're not

13   disinterested, but if you waive your claim you are

14   disinterested because you do not now have -- you are not now

15   a creditor.

16           Similarly, you can waive being an equity security

17   holder.

18           Similarly, you can waive being an insider because

19   you're not now.  If Mr. Rose resigns the day before the

20   filing he's not now.  Well -- and if we go to (c) materially

21   adverse interest, it also is, "does not have an interest."

22   It's worded in the present tense, not now because under

23   state conflicts rules for attorneys there are rules that

24   allow us to waive conflicts by obtaining informed consent

25   and those rules are different depending on whether we're

1   representing clients or former clients.  But we can obtain

2   conflict waivers, and the Rules of Professional Conflict

3   allow that.

4            But a status of having been an officer or a

5   director or an employee of the debtor, those items are not

6   subjects of the Rules of Professional Conduct.  They're not

7   items you can waive within the Rules of Professional

8   Conduct.  They don't create conflicts within the Rules of

9   Professional Conduct; (a) does and (c) does, but (b)

10  doesn't.  Congress has taken a position that if you have

11  been or were a director, officer or employee you are not

12  disinterested.  It has nothing to do with conflicts.  It has

13  nothing to do with state bar rules.  It has to do with

14  having had the status of one of these three entities, being

15  a director, being an officer or having been an employee.

16  You can't change the past.

17           Now in the cases -- in the cases that counsel has

18  cited where the law firm is found to not be -- is found to

19  be disinterested, they usually turn on the fact where the

20  officer was a ministerial officer only.  Each and every one

21  of us who has been an attorney and who's done any kind of

22  corporate law knows the situation where you incorporate a

23  client and someone in the law firm signs on to be secretary,

24  and every year they sign the minute book and nobody worries

25  about it.  And that officer doesn't have much of anything to

1   do with the corporation.  They're not involved in the day to

2   day affairs, et cetera. And so it seems almost inequitable,

3   despite the plain language of the code, that such

4   ministerial officers preclude a law firm from representing a

5   debtor.

6            And in Essential Therapeutics, we had a

7   ministerial type officer.  In the Cygnus opinion that

8   counsel relies upon so heavily, the person wasn't -- was an

9   officer, was a director, but there was no evidence that he

10  did anything.  Again, another ministerial officer.

11           But what do we have here?  We have the senior

12  vice-president in charge of finance, the guy who made the

13  deals.  That's exactly the kind of officer that this statute

14  has in mind regardless of the other debates we want to have

15  about secretaries or ministerial officers.  Mr. Rose is so

16  disinterested that his biography on the White & Case

17  webpage, attached as Exhibit B to the objection, brags about

18  his experience at Coda in the second paragraph:

19           "Prior to joining the firm, Mr. Rose was general

20  counsel and senior vice-president of corporate development

21  for Coda Holdings, a maker of electric vehicles and engine

22  storage systems.  During his tenure at Coda, he managed the

23  company's legal, management and environmental health and

24  safety departments.  Mr. Rose's responsibilities included

25  financing, acquisitions, and negotiating international

1    transactions and joint ventures, such as Coda's agreement to

2    partner with Chinese Great Wall Motor Company to develop

3    electric vehicles."

4         It's right there.  He's the deal-maker.  He's not

5    participating with this corporation once a month or once a

6    year.  He was there every day.  He was doing the deals.

7    There is nothing in Section 101.14(b) that says, I can

8    resign my position as an officer, join a law firm, and then

9    have my former employer disclaim my former status as an

10   officer because that's what was done here.

11        But there wasn't a conflict with a former client

12   that was disclosed that could be the subject of a waiver

13   under the applicable Rules of Professional Conduct.  There

14   wasn't a claim here or an equity interest, and to the extent

15   that there is, Mr. Rose has waived it.  He can do that.  The

16   case law lets him.

17        But one's status as having been an officer is not

18   a conflict within the Rules of Professional Conflict (sic).

19   It's not covered by the Rules of Professional Conflict (sic)

20   and it's not 101.14(a).  He's -- it's not because he's a

21   creditor or an equity security holder.  It's 101.14(b).  You

22   can't take a piece of paper and say that you don't exist.  I

23   can't write a piece of paper that says, I, David Buchbinder,

24   don't exist because I do.  Mr. Rose can't take a piece of

25   paper and Mr. Wilson can't take a piece of paper and say,

1    we're going to forget that Mr. Rose was ever involved with

2    Coda, and we're going to do everything we can to keep him

3    out of the picture, although on the firm's website we're

4    going to brag about all the things that he did for Coda.

5    That's not how it works.

6              If it worked that way, then there would be some

7    additional language in 101.14(b) that would say, unless,

8    unless the officer or director doesn't do anything on a day

9    to day basis with the corporation, or unless the involvement

10   with the corporation is not materially adverse, or whatever

11   language would be adopted.  But that language isn't there.

12             When you interpret 101.14(b) to graph language

13   from (c) onto it or (a) onto it, or to graph in the Rules of

14   Professional Conduct that don't apply to (b), you're

15   rewriting the statute.  Congress has spoken.  Judge Walrath

16   got it right.  She got it right because of the rule of

17   imputation and she got it right because 101.14(b) is about

18   status.

19             Now the debtor has local counsel, Fox Rothschild,

20   who are highly competent.  They can certainly complete this

21   case.  From what we've seen today this case is -- all the

22   hard work, if you might suggest, has been done, but

23   certainly no one would suggest that Fox Rothschild is not

24   highly capable of completing this case for the debtor.  So

25   the debtor will not be prejudiced.

```
 1            These rules exist, as the Court pointed out a
 2   little while ago, for the benefit of creditors.  And it is
 3   the creditors here who have been harmed by White & Case's
 4   conduct.  They are not a law firm that does not regularly
 5   appear in Bankruptcy Court.  They regularly appear in
 6   Bankruptcy Court everywhere.  They know the rules.  They
 7   know the case law.  They're not surprised here.  They simply
 8   acted to contrive to create a situation and then present
 9   everyone, including the Court, with a fait accompli to allow
10   themselves to be retained.
11            101.14(b) is very clear.  It's very precise.  It
12   doesn't have any unless's.  It doesn't have any exceptions.
13   If we're going to look at the facts and circumstances, this
14   guy was the dealmaker.  He wasn't involved with the corp --
15   he was involved with the corporation on a day to day, every
16   day basis while he was there.
17            There's a case involving sales, the Beaverman (ph)
18   case where Judge Hahn said bankruptcy might not -- must not
19   just seem right.  It must be right.  And allowing White &
20   Case to be retained in this situation would not seem right
21   and would not be right.  They should not be retained.
22            And thank you very much, Your Honor.
23            THE COURT:  You're welcome.  Thank you.
24            Mr. Cunningham.
25            MR. CUNNINGHAM:  Your Honor, very briefly.
```

1    Mr. Buchbinder's point, and his point is brief, had always

2    been, this is a per se rule. It's black and white.  You're

3    either the officer within two years and you're out.  Now I

4    just heard him say, you have to be a material dealmaker,

5    play a role.  He's now going into really the examination

6    that the Court in Cygnus said is appropriate to look at.  We

7    didn't have the testimony of Mr. Rose.  He didn't ask for

8    him to be here and testify, to go into -- to allow the Court

9    to examine the facts and circumstances and determine -- he -

10   - he says White & Case has harmed the creditor.  What is --

11   what are the facts in evidence that show that White & Case

12   has done any harm to anyone.

13          That's -- by adopting a per se rule, you take the

14   inquiry away from the Court, away from parties in interest

15   to examine if there are really any facts and circumstances

16   here that -- that should allow disqualification, and instead

17   just adopt a hard and fast rule, per se rule and say that's

18   what the code provides.  But that's not what the code

19   provides.

20          The other case, since Essential Therapeutics, is

21   the Sea Island case.  You know, the Court there states:

22          "The Bankruptcy Code does not provide for

23   disqualification of an entire law firm based on the non-

24   disinterestedness of one of its attorneys."  And it cites a

25   whole laundry list of cases.  "The applicable code sections

1    are silent on the question of imputed disqualification and I

2    will not infer what Congress did not supply," citing the

3    Connecticut National Bank versus Germain, 503 U.S. 249, a

4    Supreme Court case.

5            And then it goes on to say -- this is the law

6    firm, "Gilbert, Harrell that is -- thus is not disqualified

7    from representing the debtors under Section 101.14 by the

8    fact that the individual Gilbert Harrell attorneys are

9    disqualified as creditors under 101.14(a)."

10           Again, the code section does not provide for a per

11   se rule.  We believe you are to take -- the correct reading

12   of the statute is to take the law firm as the person.  It is

13   a partnership.  That is the person for purposes of the

14   analysis.  You walk through (a), (b) and (c), we don't fit

15   under (a).  We don't fit under (b).  We absolutely have an

16   issue under (c) by virtue of having a former officer as a

17   partner of the firm.

18           But that's where the Court and the process and the

19   objections come into play, and where the evidence and

20   testimony is presented for Your Honor to determine whether

21   you believe that there are interests adverse to the estate

22   and in your -- you have concerns that would render the firm

23   not disinterested, and then you make that determination as

24   opposed to its black or white per se rule.  That's -- that's

25   our argument, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          Well, I'm -- I want to -- I want to take a break

3    to think about this and then I'll come out and rule.  But --

4    but before I do that, is there any update -- quick update as

5    to where we are on the other two matters?

6          No.  All right.

7          Yes.

8      (Laughter)

9          MR. ROSENTHAL:  I'm sorry, Your Honor.  Jeremy

10   Rosenthal.  We were just looking at each other to -- to

11   decide who was speaking.

12          We wanted to clarify one item; that the DIP agent

13   is stipulating that the debtors -- I'm sorry.  Excuse me.

14   The committee may reserve its right to object on the same

15   grounds, I guess on the 6th, as it has already asserted in

16   its current objection to the DIP if the understanding that

17   we've all reached does not materialize.

18          And they -- I assume -- they recognize that there

19   is a final DIP order and we recognize that they are

20   reserving their rights to attack the propriety of, for

21   example, liens on avoidance actions granted under that

22   order.  And --

23          THE COURT:  Well, would it be -- would it be like

24   a do-over or would it be a Rule 60 or 59 standard?  Yeah.  I

25   just -- I really want to know the effect of what I'm

1    signing.

2            MR. SCHWARTZ:  Jeffrey Schwartz, Brown, Rudnick,

3    proposed counsel to the official committee.

4            It would be de novo, Your Honor.

5            THE COURT:  All right.  That's agreeable?

6            MR. ROSENTHAL:  That's agreeable, Your Honor.

7            THE COURT:  Okay.  All right.  Very good.

8            I don't want to get into a lengthy discussion

9    because I've got this fresh in my mind.  So let's take a

10   break.

11       (Recess taken at 2:37 p.m.)

12           THE CLERK:  All rise.

13           THE COURT:  Please be seated.

14           Okay.  Dealing with the White & Case retention, I

15   am going to sustain the objection.  And I think Judge

16   Walrath -- I'll -- I'll adopt Judge Walrath's reasoning in

17   Essential Therapeutics.

18           The -- to me the argument that's in the cases --

19   some of the other cases and the argument made today that

20   14(b) applies only to the sole individual just doesn't make

21   a lot of sense.

22           First of all, if that were the case there wouldn't

23   even be these cases.  I mean, it would be dealt with very

24   easily and you wouldn't have to worry about whether an

25   entire law firm is not -- disinterested or not.

1          You know, the facts in Essential Therapeutics were

2     not good for -- for the law firm, for Bingham.   And like

3     many cases, bad facts arguably make bad law.  But while

4     there were bad facts in Essential Therapeutics for the

5     disqualified law firm, I don't think the holding is limited

6     to bad facts.   I think the holding applies when we're

7     talking about a really very straightforward issue of whether

8     a person, an individual who is not disinterested imputes

9     that to the rest of the -- rest of the law firm.

10         And I was -- wanted to do a little reading back

11    there because I was thinking back and I eluded it -- I

12    eluded to it in oral argument, which was taking these sort

13    of disinterested issues back to when they first were --

14    arose which was in 19 -- in the 1930s in the context of the

15    Chandler Act and the SEC Acts, et cetera.  And the provision

16    in Professor Steele's book, Debts Dominion, which is a great

17    book for bankruptcy nerds, and it says -- it sort of -- it

18    goes through this paragraph:

19         "The SEC reforms of 1934 made clear that the

20    firms' bankers and their attorneys were precluded from

21    either serving as the trustee or advising the trustee.  The

22    key provision was a requirement that the trustee be

23    disinterested.  The definition of disinterestedness

24    explicitly excluded anyone who had served as a" -- and this

25    is no longer the case, I believe, but -- "an underwriter of

1    any of the outstanding securities of the debtor less" -- and

2    it says -- "Robert Swain and his peers in the reorganization

3    bar" -- and basically that means the sophisticated Wall

4    Street reorganization bar in the mid-30s -- "slipped through

5    the cracks.  Chapter X also required that the trustee's

6    attorneys satisfy a closely analogous disinterested

7    requirement."

8              What happened as a result of that, rather perhaps

9    a silly rule, but the rule nonetheless, is that entire firms

10   left the bankruptcy reorganization practice for 45 years.

11   It wasn't just the one lawyer or the two lawyers at White &

12   Case or Cravath, Swaine & Moore who were disinterest -- who

13   were knocked out.  It was the firm in its entirety.  And I

14   think it -- in order for this provision to make any sense,

15   that has to be the way it's applied.

16             Now White & Case has done nothing wrong.  They

17   fully disclosed the issue.  I don't see any impediment to

18   their staying in as 327(e) counsel.  But I think the

19   disinterestedness requirement has to be adopted as Judge

20   Walrath did in Essential Therapeutics as a per se rule for

21   the entire firm.

22             So I am going to sustain the objection.

23             MR. CUNNINGHAM:  Your Honor, thank you.  I had

24   discussed this possibility with the client and the client

25   would like to apply for us to be retained under 327(e) in a

Page 76

1    limited fashion.  I know there's a decision here in

2    Woodworkers' Warehouse, a decision in Delaware.  So we can

3    file that application very quickly and I guess that could be

4    heard at -- whenever is convenient with Your Honor.

5              THE COURT:  All right.  I have no objection to

6    that -- proceeding in that manner.

7              MR. CUNNINGHAM:  Yes.  Proceeding in that manner.

8              THE COURT:  Okay.  I will enter -- I will enter an

9    order denying the applications without prejudice for the

10   reasons set forth on the record.  Okay.

11             MR. CUNNINGHAM:  Thank you, Your Honor.

12             THE COURT:  All right.

13             All right.  Where are we in the DIP and bid

14   procedures?

15             MR. KAMPFNER:  Your Honor, I believe we have -- we

16   have -- we still have outstanding the WARN objections,

17   unless they're getting withdrawn.  And so I think we would

18   have to go forward on --

19             THE COURT:  Well, just so I'm clear.  Otherwise

20   everybody's on board with going, other than the WARN Act

21   claimants, going forward with the revised orders approving

22   the bid procedures and the DIP?

23             MR. KAMPFNER:  Yes, Your Honor.

24             THE COURT:  All right.

25             I'll hear from the WARN Act claimants -- or,

1    actually, I'll hear from Mr. Buchbinder.

2              MR. BUCHBINDER:  Your Honor, I have to be excused

3    at this point.  I have a plane to catch.

4              THE COURT:  Very good.  All the best.

5              MS. KLEIN:  Thank you, Your Honor.  Again, for the

6    record Julia Klein of the Rosner Law Group on behalf of the

7    WARN Act claimants.

8              The WARN Act claimants are a class of

9    approximately 150 former employees of the debtors who were

10   terminated without cause and without sufficient notice.  And

11   notwithstanding the debtors' representations in, I believe,

12   the sale motion that they are in full compliance with the

13   Workers' Adjustment and Retraining Notification Act, my

14   clients did not receive the notice required under the WARN

15   Act and, therefore, have a substantial claim against the

16   debtors' estates under both the federal WARN Act and the

17   California Labor Code.

18             My clients, as a class, are owed approximately

19   $2.4 million with a portion of that being an administrative

20   claim and the rest general unsecured.

21             We are in court today because we are asking Your

22   Honor to deny the proposed DIP order because it does not

23   reflect the debtors' prudent and well-exercised business

24   judgment.  A lot of papers have been float -- sorry.  A lot

25   of papers have been floating around over the last couple of

1    days here and I admit I -- I don't pretend I have read every

2    single one of them, but I do believe I have a basic

3    understanding of what's going on.

4            The debtor is trying to pledge its interest in

5    avoidance actions.  And I should probably put a caveat in

6    here.  I don't know how things have changed because I wasn't

7    part of the discussions here, so maybe some of these issues

8    were resolved in discussions earlier today.

9            But the debtor is pledging its interest in

10   avoidance actions as part of the DIP financing, and the

11   stalking horse bidder, which is also the DIP lender, is

12   purchasing avoidance actions, so they can't be pursued for

13   the benefit of the -- for the benefit -- prosecuted for the

14   benefit of the entire estate.

15           The debtors are party to a prepetition

16   restructuring support agreement, and because they are a

17   party to that agreement they may not pursue avoidance

18   actions against other parties to that restructuring support

19   agreement.  The RSA incorporates somehow the sale order

20   under which some avoidance actions are -- well, they seem to

21   have been preserved, but other -- other avoidance actions

22   are buried.

23           Now all this value of the avoidance actions is

24   given up without any disclosure as to how much those

25   avoidance actions are actually worth.  If we don't know how

1    much they're worth, we can't make an informed decision, an

2    informed decision about whether we should be releasing them,

3    you know, if -- maybe there is no money to be had.  But that

4    -- that hasn't been disclosed to us.  The debtors have not

5    filed their schedules or anything.

6           Now if I can't make that informed judgment, maybe

7    the debtors have some information I don't have, but if they

8    don't have any evaluations about what the avoidance actions

9    are worth, then I would submit that they can't exercise

10   their informed business judgment either by simply giving

11   them up, burying them or -- or selling them without doing

12   their calculations.

13          So this begs the question whether the estates are

14   better represented by a truly independent estate fiduciary

15   such as a Chapter 7 trustee, for example.  The debtors, they

16   are not neutral because they are bound by the prepetition

17   restructuring support agreement and the restructuring

18   support agreement, they have -- has handcuffed them because

19   the debtors' prepetition disposed of the avoidance actions

20   before they filed for bankruptcy protection and became the

21   fiduciary debtors in possession.

22          Now we, the WARN claimants, we don't know what

23   we're getting in this case.  As I said, we have general

24   unsecured claims, but, also, administrative claims, priority

25   claims, and we don't know what we're giving up.  And because

1    we can't make an informed decision about this, we just

2    simply have to vote no in this case and we would ask that

3    the DIP order as it is be denied because the debtors'

4    forfeiture of the prosecution of the avoidance action, it

5    comes at the expense of my clients, the WARN clients, and

6    the general unsecureds.

7            Our position that the avoidance actions must

8    remain unencumbered, not subject to any lender's super

9    priority claim because the prosecution by an independent

10   estate fiduciary is the only way that we can have a

11   potentially meaningful recovery for us and for the estate as

12   a whole.

13           Another deal that's been floating around is that

14   -- is the idea that there will be a Chapter 11 plan that's

15   confirmed.  And at this point I don't see how this idea is

16   more than illusory because the code provides that

17   administrative claimants must be paid in full, unless they

18   consent otherwise, in order for a Chapter 11 plan to be

19   confirmed.  My clients alone have approximately $2 million

20   in administrative claims and I don't -- I haven't seen who

21   will provide the funding to pay those administrative claims.

22   And I'm sure there's other administrative claims other than

23   the WARN claimants.  I -- again, I really haven't seen the

24   numbers there.  So it's completely unclear who will fund the

25   plan and whether this is actually a realistic expectation.

1              It's my understanding that a deal has been reached

2       with the unsecured creditors' committee.  The last number

3       I've seen was about $650,000, which would result in an

4       approximate recovery of maybe a cent or two.

5              Now this recovery, I believe, is in no way

6       guaranteed because the denominator that the claim pool may

7       change significantly from what it is right now.  It may go

8       up significantly based on lease rejection damages,

9       deficiency claims, the priority claimants that are going to

10      put their claims in.  So $650,000 may sound like a decent

11      deal right now, but down the road it may just be very

12      illusory.

13             On a final note I would -- it seems like the

14      secured lender in this case is getting an enormous value by

15      putting the debtors' assets through the bankruptcy sale.

16      And something is missing from the equation because a

17      bankruptcy sale order is much more valuable than what --

18      what the secured lenders or any lender would get in a like

19      regular Article IX transaction.  So this increased value

20      here is what I believe should be shared with some other

21      creditor constituencies and so they would just say, okay,

22      the general unsecureds get $650,000 and we'll -- we'll see

23      who is going to fund some administrative claimants.  I don't

24      know if that's necessary at fair -- pushing down of that

25      immense value that the secured lenders are getting.

```
 1              The WARN claimants believe they should push that
 2     value down somehow, you know, earmark some money, pay some
 3     more money, put them in a un -- a general unsecured pool,
 4     however they want to structure it.  But the secured lender,
 5     they should be paying more so that admin or unsecured
 6     creditors can share somewhat in that value that the secured
 7     lenders reap by virtue of getting the debtors' assets free
 8     and clear.
 9              And, therefore, we would object to the DIP
10     financing as it is and request that the order be denied.
11              THE COURT:  Okay.  Thank you.
12              MS. KLEIN:  Thank you.
13              THE COURT:  Response.
14              MR. KAMPFNER:  Your Honor, Rob Kampfner, White &
15     Case, the proposed special counsel to the debtor.
16              A couple of comments, initial comments.
17              First, there is no class of WARN claimants.  There
18     is a complaint filed by one claimant and there has not been
19     any certification of any kind.  So it is not a class.
20              Second, the debtor wants to make absolutely clear
21     for the record that it is -- that to the extent there is any
22     claim liability it is disputed and the debtor does not
23     believe that such liability exists.
24              With that out of the way, I think it's important
25     for this Court to note that what we have reached with the
```

1    creditors' committee is a deal that shares significant value

2    for unsecured creditors, which is exactly what counsel for

3    the WARN Act claimants was saying should occur in this case.

4    It is the product of a lot of negotiation over two weeks,

5    and it, in our view, shares a considerable amount of value

6    all across the capital structure.

7              And that's significant, Your Honor, because at

8    this point -- when this case was filed the debtor had, as

9    we've mentioned before, $30,000 of cash in the bank, no

10   option for financing other than the DIP facility, and had

11   all of its assets essentially encumbered.

12             Since that time, we have obtained an initial DIP.

13   We have preserved the going concern value of the company.

14   We have a commitment to fund administrative expenses in this

15   case as set forth in the budget, which is, we believe, a

16   realistic budget, and we have an agreement with the

17   committee to share value with unsecured creditors, which,

18   quite frankly, just doesn't exist outside of the Chapter 11

19   process.

20             I think in this context it is fair and equitable

21   and right for the debtor to grant liens and avoidance

22   actions to the lenders.  And, again, I'll note that because

23   the DIP lender has abandoned the roll-up concept, all of the

24   -- all of the post-petition collateral will secure new money

25   coming into the estate to fund the estate and to get to the

1    sale and to implement the agreement reached with the

2    committee.  I think this is by far the best outcome that

3    unsecured creditors can get, quite frankly.

4         The alternative to not having DIP -- this DIP

5    approved is for the debtor to not have the money to run its

6    estate, for there to be some sort of -- you know, for the

7    deal with the committee to fall apart, and for the --

8    essentially, the case either be converted or dismissed which

9    doesn't provide any value for unsecured creditors or the

10   WARN claimants.

11        As we've noted in our papers, you know, the --

12   there isn't -- the only real way forward at this point that

13   preserves value across the capital structure is to allow the

14   DIP to continue, to grant the DIP lenders their -- their

15   liens, again, for -- only for new money to fund the case,

16   and to implement the deal with the committee.

17            THE COURT:  Thank you.

18            Anyone else?

19            All right.  Counsel.

20            MS. KLEIN:  May I briefly respond?

21            THE COURT:  Yes.

22            MS. KLEIN:  Counsel said that significant value is

23   being pushed down to the unsecured, which is partially what

24   I'm advocating for, but as I said, a large part of my

25   clients' claims is also priority.  And I don't know what the

1    number is right now that's been set aside for priority

2    claimants, but I don't -- I don't know if that's going to be

3    sufficient.

4            I do want to point out that these negotiations

5    that are being referenced that have been going on for weeks

6    and weeks and weeks, they have been with the committee, but

7    they have not been specifically with WARN counsel.  And I

8    believe that we, as a class -- and we will, of course,

9    undergo all the necessary certification requirements.

10   We're going to individually file proofs of claim, things

11   like that.  We have not been heard from our side.

12           We have -- we have one of the largest -- one of

13   the larger claims in these estates.  That's why I believe we

14   need to be dealt with, also, and we can't just be pushed

15   aside and then, you know, eventually we get to file all

16   these proofs of claim and no money is going to be in the

17   estate and no plan is going to be confirmed.

18           I -- I mean, the liens and the avoidance actions,

19   I don't believe that the debtors exercised their sound

20   business judgment in coming to that conclusion.  That is

21   something that was pre-dictated to them prepetition, what --

22   that they would have to give up the right to pursue those

23   after they became fiduciaries of the estate.  There was no

24   calculation made as to, you know, what the return would be

25   on those avoidance actions.  So I -- I don't know how --

1   whether this is equitable and, you know, that's the only way

2   we can view that where that all comes from.

3            And, also, likewise, the proposition that if we

4   were to convert the cases to a Chapter 7 that there would be

5   no value to unsecureds and no value to administrative

6   claimants, I don't know where those numbers are coming from,

7   if the debtors have some type of -- made some type of

8   analysis of the outstanding avoidance claims, what the

9   recovery would be, things like that.  I haven't seen any of

10  those numbers, and without seeing those numbers I don't see

11  how they can exercise their -- their business judgment.

12           I mean, if Mr. Madden is in -- in the courtroom,

13  if I may direct some questions to him, maybe he can help me

14  out and see how he exercised his judgment.

15           THE COURT:  Well, I don't think that's necessary.

16           Thank you.

17           Well, I -- I expressed it at the -- at the first

18  day hearing and -- that I had serious concerns with how the

19  DIP was set up and how the bid procedures were set up.  And

20  I think appropriately, in response to that and just in

21  response to the facts, that there have been significant

22  changes to the -- both the bid procedures and the DIP

23  financing, mostly the DIP financing, to bring those motions

24  and proceedings sort of back into a more normal -- back into

25  line with more normal practices and -- and more reasonable

1   practices.

2           I would start with the proposition that I can't

3   create value here.  I can't sort of say I'm going to waive a

4   magic wand and all of a sudden there's $2 million available

5   for unsecured creditors.  The money that will be available

6   is the money that's going to be available and it will be

7   shared the way it's shared under the waterfall of the

8   Bankruptcy Code as modified by whatever other agreements

9   have been reached by the parties.

10          Avoidance actions are often sort of the pot at the

11  end of the rainbow for unsecured creditors to try to

12  recapture some value.  And as such, there's usually a very

13  -- a fight over whether they can be collateralized.

14          In this case, I -- I am okay with the debtors'

15  business judgment because primarily, if not solely, because

16  of the deals and negotiations that have gone along with the

17  official committee which have created ways for the avoidance

18  actions to be shared, at least in part, amongst the

19  unsecured creditor body.

20          Also, the concept that a Chapter 11 plan here is

21  illusory, that there's not enough for admin claims, that we

22  should appoint a trustee, something along those lines,

23  again, these were -- these were arguments that had a lot

24  more force a couple of days ago.  And I'm not blaming

25  counsel because things have been moving very fluid and I

1    know you haven't been a party to the negotiations.

2            But even as altered in the reply as set forth in

3    the surreply or the reply that was followed -- filed that

4    went through the different changes, I'm aware that there's

5    been significant movement towards stabilizing the case to

6    the point where there's a reasonable prospect that we'll

7    have a confirmable Chapter 11 liquidating plan here, and I

8    think that's all I need.  I don't need to have it set in

9    stone.  All I can do is react to the situation as it is.

10   It's not ideal.  It's never ideal.  It's worse than some,

11   better than some others, I suppose, but --

12       (Laughter)

13            THE COURT:  -- I wouldn't -- I wouldn't put it at

14   the top of the class.  But it is what it is.  It -- it is

15   what it is, and nobody wanted this company to go bankrupt to

16   say the least.

17            But -- so I'm going to overrule the objections

18   based primarily, if not exclusively, on the changes that

19   were voluntarily made as is -- as put forth in the reply and

20   as they've further been clarified and made on the record

21   that's been put before the Court today that will be written

22   down and filed early next week.

23            So if you have orders, I'll sign them.

24            MR. KAMPFNER:  Yes, Your Honor.

25            Just to be -- I want to go through the -- all

1    right.  This -- so may I approach?

2              THE COURT:  Yes.

3              What's this a blackline from, the interim?

4              MR. KAMPFNER:  It's from the second interim --

5              THE COURT:  Oh.

6              MR. KAMPFNER:  -- DIP order.  May I approach

7    again?

8              THE COURT:  Yes.  Thank you.

9              Okay.  All right.  What do you need on the DIP

10   here?

11        (Pause)

12             MR. KAMPFNER:  So, Your Honor, there are some

13   dates in the procedures order that we filled in.

14             THE COURT:  Okay.  Hang on.

15             MR. KAMPFNER:  The first date is on page 4,

16   paragraph 4, and this is the date by which bidders have to

17   present their package to establish that they're qualified

18   bidders.

19             THE COURT:  Uh-huh.

20             MR. KAMPFNER:  And we put in May 31st for that

21   date.

22             THE COURT:  Okay.

23             MR. KAMPFNER:  Paragraph 5 is the bid procedures

24   deadline, which will be May 31st as well.

25             THE COURT:  Okay.

1          MR. KAMPFNER:  Paragraph 6 is the date of the

2     auction, which will be June 3rd at 10 a.m.

3          Paragraph 7 is the sale hearing, which will be

4     June 6th at 10 a.m.

5          The objection deadline for the sale hearing will

6     be June 3rd at 4 p.m., except that the committee will be

7     able to file -- if the deal we've come up with falls apart

8     for some reason, which we obviously don't expect, then the

9     committee would have until noon the next day to file an

10    objection to the sale.

11         THE COURT:  Okay.

12         MR. KAMPFNER:  The debtors will file their

13    schedules by the end of the day tomorrow.

14         And the only other changes in the actual

15    procedures themselves is Exhibit 1, page 2.  It originally

16    had the participation materials due five days before the bid

17    deadline which obviously has passed.

18         THE COURT:  Uh-huh.

19         MR. KAMPFNER:  So we've changed that to on or

20    before the bid deadline itself, which is the May 31st date.

21         THE COURT:  Okay.  I've signed the order.

22         MR. KAMPFNER:  Thank you, Your Honor.

23         THE COURT:  Anything -- nothing to go through on

24    the DIP, correct?

25         MR. KAMPFNER:  No, Your Honor.

1        (Pause)

2             THE COURT:  I've signed the DIP order.

3             MR. KAMPFNER:  Okay.  Thank you very much.

4             THE COURT:  Anything else before we depart?

5             MR. KAMPFNER:  No, Your Honor.

6             THE COURT:  No?

7             MR. KAMPFNER:  Thank you very much.

8             THE COURT:  All right.  Very good.  Thank you.

9    We're adjourned.

10        (A chorus of thank-you)

11        (Whereupon these proceedings were concluded at 3:40 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 92

1

2

3

4                         E X H I B I T S

5    PARTY     NO    DESCRIPTION              ID.        EVID.

6    Debtor    A     John K. Cunningham

7                    Declaration              --          46

8              B     Engagement Letter        --          46

9              C     Christopher Rose

10                   Declaration              --          46

11             D     Supplemental Letter      --          46

12

13   PARTY     NO    DESCRIPTION              ID.        EVID.

14   U.S.

15   Trustee   A     Website Information       --          47

16

17

18

19

20

21

22

23

24

25

Page 93

1                    I N D E X

2

3                     RULINGS

4    DESCRIPTION                          PAGE    LINE

5    Application of Coda Holdings, Inc. and its

6    Affiliated Debtors for Authority to Retain

7    and Employ Houlihan Lokey Capital, Inc. as

8    Investment Banker Nunc Pro Tunc to the

9    Petition Date, filed on May 7, 2013

10   [Docket No. 59]                        44      12

11

12   Application of Coda Holdings, Inc. and

13   its Affiliated Debtors for Authority to

14   Retain and Employ White & Case LLP Nunc Pro

15   Tunc to the Petition Date, filed on May 7,

16   2013 [Docket No. 61]                   73      14

17

18   Motion of Coda Holdings, Inc. and its

19   Affiliates Debtors for Entry of (I) an

20   Order (A) Approving the Bidding Procedures

21   in Connection With the Sale of Substantially

22   all of the Debtors' Assets; (B) Setting Date

23   and Time for an Auction and the Hearing on the

24   Proposed Sale, (C) Approving the Manner, Form,

25   and Notice of the Auction and the Sale Hearing,

Page 94

1    and (D) Granting Related Relief; and (II) an

2    Order (A) Approving Sale of Debtors' Assets

3    Under Asset Purchase Agreement Free and Clear

4    of Liens, Claims and Interests and (B)

5    Granting Related Relief, filed on May 1, 2013

6    [Docket No. 11]                          88      17

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    AAERT Certified Electronic Transcriber CET**D-408

9    Also transcribed by:

10

11

12

13    Sherri L. Breach

14    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

15

16    Veritext

17    200 Old Country Road

18    Suite 580

19    Mineola, NY 11501

20    Date:  May 30, 2013

21

22

23

24

25